IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

UNITED STATES OF AMERICA,           |
                                    |
            Plaintiff,              |
                                    |
VS.                                 | No. 12-20157
                                    |
RONNIE JACKSON,                     |
                                    |
            Defendant.              |

---

TRANSCRIPT OF TRIAL PROCEEDINGS

BEFORE THE

HONORABLE S. THOMAS ANDERSON

MARCH 11, 2014

MARK S. DODSON
OFFICIAL COURT REPORTER
167 N. MAIN STREET – SUITE 923
MEMPHIS, TENNESSEE 38103

UNREDACTED TRANSCRIPT

216

```
 1

 2                      - A-P-P-E-A-R-A-N-C-E-S -

 3
     For the Plaintiff:
 4
                              DAVID PRITCHARD
 5                            CHARLES WESLEY SUMMERS, III
                              U.S. ATTORNEY'S OFFICE
 6                            800 - 167 NORTH MAIN ST.
                              MEMPHIS, TN 38103
 7

 8   Elbow Counsel:

 9
                              JEFF C. WOODS
10                            200 JEFFERSON AVE.
                              SUITE 1313
11                            MEMPHIS, TN 38103

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNREDACTED TRANSCRIPT

```
1                    W I T N E S S   I N D E X

2         WITNESS                              PAGE LINE
      ----------------------------------------------------------
3
   CHRIS ROBERTS                               231    1
4     DIRECT EXAMINATION BY MR. SUMMERS:       231   10
      CROSS-EXAMINATION BY THE DEFENDANT:      262   15
5     REDIRECT EXAMINATION BY MR. SUMMERS:     271   18
   BRIAN DAY                                   276    1
6     DIRECT EXAMINATION BY MR. SUMMERS:       276   11
      CROSS-EXAMINATION BY THE DEFENDANT:      300   25
7     REDIRECT EXAMINATION BY MR. SUMMERS:     307   14
   ERIC TOLBERT                                309    1
8     DIRECT EXAMINATION BY MR. SUMMERS:       309   18
      CROSS-EXAMINATION BY THE DEFENDANT:      351   23
9     REDIRECT EXAMINATION BY MR. SUMMERS:     366   14
      RECROSS-EXAMINATION                      381    5
10 CORY RHEA                                   387    1
      DIRECT EXAMINATION BY MR. SUMMERS:       387    9
11    CROSS-EXAMINATION BY THE DEFENDANT:      393    9
      REDIRECT EXAMINATION BY MR. SUMMERS:     394   16
12 SARA COX                                    396    1
      DIRECT EXAMINATION BY MR. PRITCHARD:     396    9
13    CROSS-EXAMINATION BY THE DEFENDANT:      428   11
      REDIRECT EXAMINATION BY MR. PRITCHARD:   445    6
14    RECROSS-EXAMINATION BY THE DEFENDANT:    448   18

15

16

17

18

19

20

21

22

23

24

25
```

UNREDACTED TRANSCRIPT

```
 1                    E X H I B I T   I N D E X

 2           MARKED                          PAGE LINE
       ------------------------------------------------------
 3     Exhibit 1                             235    7
       Exhibit 2                             237   20
 4     Exhibit 3                             239   12
       Collective Exhibit 4                  248    9
 5     Collective Exhibit 5                  250   20
       Collective Exhibit 6                  252    8
 6     Collective Exhibit 7                  257    6
       Collective Exhibit 8                  259   12
 7     Collective Exhibit 9                  282   14
       Exhibit 10                            288   20
 8     Collective Exhibit 11                 290    8
       Exhibit 12                            294   18
 9     Collective Exhibit 13                 296   12
       Exhibit 14                            297   10
10     Collective Exhibit 15                 315   20
       Exhibit 16                            318   23
11     Collective Exhibit 17                 322   13
       Collective Exhibit 18                 326   10
12     Collective Exhibit 19                 331    3
       Exhibit 20                            336   21
13     Collective Exhibit 21                 338   16
       Collective Exhibit 22                 341   20
14     Exhibit 23                            345   17
       Collective Exhibit 24                 348    3
15     Exhibit 25                            370    4
       Exhibit 26                            379   21
16     Exhibit 27                            391    3
       Exhibit 28                            416   17
17

18

19

20

21

22

23

24

25
```

```
 1                         MARCH 11, 2014

 2

 3              THE COURT:  Good morning.  Are we ready to

 4    proceed?

 5              MR. PRITCHARD:  The government's ready, Your

 6    Honor.

 7              THE COURT:  Are you ready to proceed,

 8    Mr. Jackson?

 9              THE DEFENDANT:  If possible, Your Honor, I

10    would like a few more minutes.

11              THE COURT:  Well, no, sir, we need to proceed.

12    We've got a jury waiting.

13              THE DEFENDANT:  Okay.

14              THE COURT:  Gentlemen, let me advise you that

15    one of the jurors --

16              He hasn't shown up, has he?

17              THE CLERK:  No, sir.

18              THE COURT:  Juror Number 3 apparently called

19    this morning and advised the jury administrator that he

20    was having some medical problems, and so I'm going to --

21    unless there is some objection, we're going to proceed

22    without Juror Number 3.  That's why we have the

23    alternates in the event something like this occurs.  That

24    would be Mr. Long.

25              MR. PRITCHARD:  Yes, Your Honor.
```

UNREDACTED TRANSCRIPT

1          **THE COURT:**  Any objection, Mr. Pritchard?

2          **MR. PRITCHARD:**  No, sir.

3          **THE COURT:**  Any objection, Mr. Jackson?

4          **THE DEFENDANT:**  No, sir.

5          **THE COURT:**  Then we will remove Mr. Long from

6     our jury list and replace him with our first alternate.

7          All right.  Now one other thing, just as a

8     housekeeping matter, obviously I see, Mr. Pritchard, you

9     have got a large number of what appear to be exhibits, I

10    would assume?

11         **MR. PRITCHARD:**  Yes, Your Honor.

12         **THE COURT:**  I think what I'm going to do to

13    try to keep everybody on the same keel is -- are you

14    going to be doing all of the direct and

15    cross-examination, or are you and Mr. Summers going to

16    divide it up?  How is that going to be done?

17         **MR. PRITCHARD:**  We are dividing it up.

18    Mr. Summers will be doing most of the proof this morning.

19    I'll do opening and he'll do the officers who will be our

20    first witnesses.

21         **THE COURT:**  What I'm going to ask both sides

22    to do is remain behind counsel table, and if you want to

23    present something to a witness or display it once it's

24    entered into evidence, then whoever is not doing the

25    questioning can do that, okay.  Does that make sense?

UNREDACTED TRANSCRIPT

1          **MR. PRITCHARD:**  Yes, Your Honor.

2          **THE COURT:**  And, Mr. Woods, I'll ask you to do

3   the same for Mr. Jackson.  So that whoever is doing the

4   questioning remain behind counsel table.  If there are

5   exhibits that need to be passed to a witness, then one of

6   the second chair -- or whoever is doing it can handle

7   that process.

8          And, Mr. Woods, I'll ask you to do that on

9   behalf of Mr. Jackson.

10          **MR. WOODS:**  Yes, Your Honor.

11          **THE COURT:**  Anything else before we bring in

12   the jury?

13          **MR. SUMMERS:**  Your Honor, briefly, the use of

14   the Elmo, will that be okay if the questioner approaches

15   and uses that?

16          **THE COURT:**  Again, I'm going to ask the other

17   person to do that.  What I want to do is just keep

18   whoever is asking the questions behind the counsel table,

19   one, because the microphones pick up everything clearly,

20   and I know it will result in some coordination issues

21   between the parties between you, but you will just have

22   to, if you are doing the questioning, just say,

23   Mr. Pritchard, I need exhibit number whatever, and then

24   he can pass it to the witness or he can display it or

25   ever how you want it done.

UNREDACTED TRANSCRIPT

222

1              **MR. SUMMERS:**  Okay.

2              **THE COURT:**  Okay?  Do you understand,

3    Mr. Jackson?

4              **THE DEFENDANT:**  Yes, sir.

5              **THE COURT:**  Okay.  Let's bring in the jury.

6              **COURT SECURITY OFFICER:**  Yes, Your Honor.

7              (The following occurred in the presence of the

8              jury:)

9              **THE COURT:**  Please be seated.

10             Good morning, ladies and gentlemen.

11             **THE JURY:**  Good morning.

12             **THE COURT:**  Welcome back.  I appreciate you

13   being here on time.  As you will notice and probably have

14   already observed, one of your members is not with us this

15   morning.  I've been advised that there has been a medical

16   issue that has arisen that he's required to take care of,

17   and so I'm going to excuse his presence.  As I indicated

18   to you yesterday, this happens from time to time during

19   trials.  That's why we have the alternates.  So it helped

20   prove my point that we need alternates.  So Mr. Long will

21   be excused, and we will proceed accordingly to utilize

22   the alternates when the time comes, okay.

23             All right.  Mr. Pritchard, would you like to,

24   you or Mr. Summers like to make an opening statement?

25             **MR. PRITCHARD:**  Yes, please.

UNREDACTED TRANSCRIPT

1          **THE COURT:**  All right.  Go ahead.

2          **MR. PRITCHARD:**  Good morning.  The trial this

3     week is going to be about a series of armed robberies

4     that the defendant in this case, Mr. Jackson, committed

5     back in April and May of 2012.  We will present proof to

6     you that, first of all, on April 10th of 2012, the

7     defendant Mr. Jackson along with another individual by

8     the name of Christofer Broden committed an armed robbery

9     of a Dollar General Store here in Memphis.  They wore

10    dark clothing and they wore something over their faces

11    and entered with firearms and robbed the store April 10th

12    of 2012.

13         You will hear proof that on April the 15th,

14    Mr. Jackson along with Mr. Broden committed an armed

15    robbery of another Dollar General Store here in Memphis.

16    Again, on that evening -- and these were robberies that

17    all took place in the evening usually around closing

18    time.  Mr. Jackson and Mr. Broden entered, dark clothing,

19    something covering their face, both armed with handguns

20    and proceeded to rob the store the Dollar General on

21    April the 15th.

22         On April the 24th of 2012, you will hear proof

23    that the defendant Mr. Jackson, again along with

24    Mr. Broden, committed another robbery of a Dollar General

25    Store here in Memphis.  This again was committed in the

224

1    evening time.  They entered in with dark clothing,

2    something covering their face, both armed with handguns

3    and proceeded to rob the store.

4            Again, on April the 24th they committed a

5    second armed robbery.  This was a Walgreens located here

6    in Memphis.  Again, around closing time, they entered the

7    store, armed with handguns, dark clothing, something

8    covering their place and proceeded to rob the store, the

9    Walgreens store here in Memphis.

10           On April 29th, they committed another armed

11   robbery.  Mr. Jackson and Mr. Broden went to a Family

12   Dollar Store this time and entered around closing time,

13   both armed with handguns, both in dark clothing, both

14   with something covering their face, and committed the

15   robbery of the Family Dollar Store here in Memphis.

16           All these, as I've mentioned to you, were

17   committed by Mr. Jackson and Mr. Broden who entered the

18   store each time armed with handguns.

19           By May 21st of 2012, Mr. Jackson had recruited

20   some other people to join this robbery crew.  And you

21   will hear proof that on May the 21st of 2012 an

22   individual by the name of Javon Frazier had been

23   recruited by Mr. Jackson to be a part of this robbery

24   crew.  He had also recruited someone by the name of Sara

25   Cox to be involved with them.

UNREDACTED TRANSCRIPT

225

1              And on May the 21st, 2012, you will hear proof

2    that Mr. Jackson went over to the residence of

3    Mr. Broden.  He was driving a white minivan.  At that

4    location he picked up Mr. Broden and Ms. Cox, and from

5    there they went to a convenience store in South Memphis,

6    Southeast Memphis, and picked up Mr. Frazier.

7    Mr. Jackson then drove all four in the white minivan to

8    Collierville and they set up across the street from a

9    Walgreens located at Poplar and Byhalia Road in

10   Collierville.  And Mr. Jackson began to conduct

11   surveillance on that location.  They decided that that

12   was going to be the place that they would rob, and what

13   Mr. Jackson decided first was that he and Ms. Cox needed

14   to go inside the store to case it out as customers,

15   posing as customers.  So you will actually see the video

16   of Mr. Jackson and Ms. Cox entering into the store and

17   making a purchase.

18              So Mr. Jackson drives from across the street

19   over to the parking lot where the Walgreens is, and he

20   hands the handgun that he's been using in the previous

21   robberies that I talked about that he and Mr. Broden had

22   been committing in April of 2012, he hands that firearm

23   to Javon Frazier, and Frazier and Broden then get out of

24   the van and hide outside the Walgreens waiting for the

25   all clear from Mr. Jackson.

UNREDACTED TRANSCRIPT

1          Mr. Jackson and Ms. Cox then go inside the

2    store, purchase a couple of items, case it out, and

3    leave.  Mr. Jackson then gives the all clear sign to

4    Broden and Frazier who then go in, dark clothing,

5    something over their face, armed with handguns.

6          Now a few things went wrong on this last

7    robbery.  As I mentioned before, the previous robberies

8    all occurred around closing time at each of these other

9    stores.  Well, there was a little bit of a miscalculation

10   this time around.  This turned out to be a 24-hour

11   Walgreens.  It didn't close around 9 or 10 o'clock like

12   the other ones did.  And so when Frazier and Broden went

13   in, there were a lot of customers inside.  This was

14   Frazier's first robbery.  He didn't really know what he

15   was doing like Broden and Jackson did.  Jackson and

16   Broden had a system where really they were just going for

17   the paper currency out of the safe or the cash drawers.

18   Well, Frazier takes the manager back to the office where

19   the safe is, and in addition to getting out the paper

20   currency, he's telling her to get out the rolls of coins

21   which began to be very heavy, and the bag he has actually

22   breaks, and you will see this on video, because the

23   weight of the coins is too much.  So this is another

24   problem because it begins to slow them down and they

25   can't get the quick exit that they need.

UNREDACTED TRANSCRIPT

1    Well, there is so many patrons inside, it is
2    hard for them to kind of keep watch of everybody and
3    somebody ends up calling the police.  So the third
4    mistake that was made here by the group that night was
5    that this particular Walgreens is just up the street from
6    the Collierville Police Department.  And so once the
7    police are called, they quickly start arriving on the
8    scene.  And the first officer on the scene, Officer
9    Roberts, encounters Mr. Jackson and Ms. Cox in the
10   minivan hidden back behind the Walgreens in an empty
11   parking lot.  As he pulls up on the scene, he sees an
12   individual in a white lab coat and a white mask like you
13   see like painters wear or sometimes people with allergies
14   cutting the grass in the front yard running towards the
15   van.  These are the getaway costumes that Frazier and
16   Broden have put on to try and blend in in some way as
17   they are leaving the store.  He sees an individual
18   running towards the van, gets out, pulls his weapon and
19   tells him to stop.  Well, the person doesn't stop.  He
20   takes off running, and Broden and Frazier flee the scene
21   on foot.
22        They don't get real far.  As I mentioned, the
23   police arrived very quickly on the scene, and even though
24   there is a bit of a foot pursuit, Broden and Frazier are
25   pretty quickly taken into custody a short distance away,

1    and their firearms are recovered along with the white

2    coats and masks and stuff that I talked about.

3              Inside the van that Mr. Jackson and Ms. Cox

4    were in, officers find paraphernalia that links Jackson

5    and Broden to these previous robberies, and you will hear

6    about that in some details as we go forward today and

7    tomorrow and maybe into Thursday with our proof.  But

8    that would include a sack of masks matching those white

9    ones that Broden and Jackson -- Broden and Frazier,

10   sorry, wore inside the Walgreens as they went in.  It

11   would include the dark clothing that Jackson wore on the

12   previous robberies of the Family Dollar and Dollar

13   Generals and Walgreens that I talked about.  And there

14   will be some other things we will get into that link him

15   to these prior robberies.

16             So you will hear from all the police that were

17   out there that day.  You will hear from Christofer

18   Broden, and he'll talk to you about how he and

19   Mr. Jackson, the defendant in this case, committed all

20   these robberies.  And you will hear from Sara Cox, who

21   was there that night, how she was recruited to be

22   involved in this last robbery by Mr. Jackson, what his

23   role was on that evening.

24             That's basically in sum and substance going to

25   be the proof that you will hear from the government over

UNREDACTED TRANSCRIPT

1    the next few days.  Mr. Summers and I look forward to

2    presenting that proof to you.  We thank you in advance

3    for your time and attention.  At the end of all the

4    proof, we will come back and stand before you again and

5    ask you to return a verdict of guilty as charged to each

6    and every one of those 12 counts in the indictment

7    against Ronnie Jackson.  Thank you.

8            **THE COURT:**  All right.  Thank you,

9    Mr. Pritchard.

10           Mr. Jackson, would you like to make an opening

11   statement?

12           **THE DEFENDANT:**  Yes, sir.

13           **THE COURT:**  Mr. Jackson, I'm going to ask you

14   to go back and just stand at the table, if you would

15   because you don't have a mic on and just stand at the

16   table.  I think the jury will be able to hear you

17   clearly.

18           **THE DEFENDANT:**  Good morning, ladies and

19   gentlemen of the jury.

20           **THE COURT:**  Can all of you hear, Mr. Jackson?

21   Everyone hear him clearly?

22           Just speak up a little for me, if you would.

23           **THE DEFENDANT:**  Good morning, ladies and

24   gentlemen.  My role here of course is to defend myself,

25   however, not voluntarily, but I will attempt to show my

1    innocence based on the evidence they present, the

2    government presents, to also as well show that indirectly

3    other things that will be proven will show my innocence

4    because trying to come up against the government with a

5    well contrived theory of how a crime occurred, a person

6    will really be at a loss, just being honest.  So with

7    that being said, that's as frank as I can be basically,

8    just trying my best to show my innocence based off the

9    evidence they have because other than that, I look

10   guilty.  So that being said, that's all I have to say.

11             **THE COURT:**  Okay.  Thank you, Mr. Jackson.

12             All right.  Mr. Pritchard or Mr. Summers, call

13   your first witness.

14             **MR. SUMMERS:**  Thank you, Your Honor.  United

15   States calls Officer Roberts.

16             **THE COURT:**  All right.

17             **THE CLERK:**  Please come forward, raise your

18   right hand and be sworn.

19

20

21

22

23

24

25

1              **CHRIS ROBERTS,**

2    having been first duly sworn, took the witness stand and

3    testified as follows:

4              **THE COURT:** Officer, If you would take the

5    witness chair, make yourself comfortable, and we will

6    adjust the microphone if we need to so we can all hear

7    what you have to say.

8              All right.  Mr. Summers.

9                       DIRECT EXAMINATION

10   **BY MR. SUMMERS:**

11   *Q.*    Good morning.  Please state your name and, if you

12   could, for the benefit of the court reporter, please

13   spell your first and last name.

14   *A.*     My name is Chris, C-H-R-I-S, last name Roberts,

15   R-O-B-E-R-T-S.

16   *Q.*    And, Mr. Roberts, where are you currently employed?

17   *A.*    With the Town of Collierville with the Collierville

18   Police Department.

19   *Q.*    Okay.  And how long have you been with the

20   Collierville Police Department?

21   *A.*    Approximately 16 years.

22   *Q.*    16 years?

23   *A.*    (Nods head affirmatively).

24   *Q.*    Outside your duties with the Collierville Police

25   Department, did you have the occasion to respond to a

1    call at 824 West Poplar Avenue on the night of May 21,

2    2012?

3    A.    Yes, sir, I did.

4    Q.    And before we get into that, can you tell the jury

5    what you were doing that evening about the time of that

6    call?

7    A.    If it pleases the jury, I was across the street at

8    Kroger.  That's at 240 and Byhalia, which is just a

9    little bit north of Walgreens just pulling out of the

10   parking lot.

11   Q.    And what exactly happened with the call out?

12   A.    Our Collierville Police Department dispatch gave a

13   call or dispatch stating that there was an armed robbery

14   in progress at the Walgreens at 824 West Poplar.

15   Q.    And at that time, what did you do?

16   A.    At that time, I was -- like I said, I was just

17   north of that location, so I pulled around to the north

18   side of Walgreens to set up a perimeter around that

19   location.

20   Q.    How long did it take you to move from where you

21   were at Kroger and relocate over at 824 West Poplar

22   Avenue at the Walgreens?

23   A.    Less than a minute.

24   Q.    Less than a minute.  And when you made approach

25   into the I guess did you say the rear of Walgreens?

DIRECT - CHRIS ROBERTS                                    233

1    A.    The north side, yes, sir.

2    Q.    North side, okay.  What did you see?

3    A.    When I pulled into the back of the lot, I observed

4    a white Chrysler minivan parked catty-corner just north

5    of that location covering two or three parking spots, and

6    it just looked unusual at that point.

7              **MR. SUMMERS:**  Your Honor, if it pleases the

8    Court, may I approach the witness or have Mr. Pritchard

9    approach the witness?

10             **THE COURT:**  Let Mr. Pritchard do it for you if

11   you would.

12             **THE WITNESS:**  Good morning.

13             **MR. PRITCHARD:**  Good morning.

14   **BY MR. SUMMERS:**

15   Q.    If you could, I passed you forward a map or an

16   overhead view.  Can you please tell me what that is an

17   overhead view of?

18   A.    This is the area of 824 West Poplar, Poplar Avenue,

19   Byhalia, general business district there.

20   Q.    Is that an accurate depiction of that location?

21   A.    Yes, it is.

22             **MR. SUMMERS:**  I'm going to ask you a couple of

23   questions.

24             Your Honor, at this time may I have that moved

25   into evidence as Exhibit 1?

UNREDACTED TRANSCRIPT

*DIRECT - CHRIS ROBERTS*                                                    234

1          **THE COURT:**  Has Mr. Jackson seen it?

2          **MR. PRITCHARD:**  No, Your Honor.

3          **THE COURT:**  If you would, pass it to him, let

4    him look at it first.

5          **THE DEFENDANT:**  Where's the Walgreens?

6          (The defendant and elbow counsel conferred).

7          **THE COURT:**  All right.  Mr. Jackson, any

8    objection to the admissibility of this piece of evidence?

9          **THE DEFENDANT:**  Yes, sir, but Mr. Pritchard

10   said that the officer would point out exactly where is

11   the alleged Walgreens on this photo because he doesn't

12   know, so I would like to see if it would coincide with

13   the officer's testimony, Your Honor, because he can't

14   identify the Walgreens.

15         **THE COURT:**  Officer, is the Walgreens that you

16   testified to, is it depicted on that document?

17         **THE WITNESS:**  Yes, sir, it is.

18         **THE COURT:**  Are you certain that it is?

19         **THE WITNESS:**  Yes.

20         **THE DEFENDANT:**  Could he circle it, Your

21   Honor?

22         **THE COURT:**  Is that your only objection,

23   Mr. Jackson?

24         **THE DEFENDANT:**  Yes, sir, I would like to know

25   where the exact location is --

UNREDACTED TRANSCRIPT

*DIRECT - CHRIS ROBERTS*                                                    235

1          **THE COURT:**  He'll show it.  I assume you are

2     going to display it?

3          **MR. SUMMERS:**  Yes, Your Honor.

4          **THE COURT:**  I'm going to allow it to come in

5     as the first exhibit.

6          **THE CLERK:**  Exhibit 1.

7          (Said item was marked as Exhibit 1).

8          **MR. SUMMERS:**  Your Honor, that would be my

9     next request if I could publish that now.

10         **THE COURT:**  Mr. Pritchard can display it.

11         **MR. SUMMERS:**  Mr. Pritchard, if we could get

12    into the area of the Walgreens I believe right north of

13    it right behind it a little further up.

14         **THE COURT:**  Mr. Pritchard, you know you can

15    zoom in and out and so forth?

16         **MR. PRITCHARD:**  Yes, Your Honor.

17         **MR. SUMMERS:**  I think a little bit further

18    down may show the -- perfect.

19    **BY MR. SUMMERS:**

20    *Q.*    And, Officer Roberts, what do you see in this

21    overhead view here?

22    *A.*    I see Byhalia which is the far right street.

23         **MR. SUMMERS:**  Your Honor, if I may, I believe

24    this -- the TV screen in front of you --

25         **THE COURT:**  You can touch the screen and it

DIRECT – CHRIS ROBERTS                                         236

1    will, it will show where you're --

2              THE WITNESS:  Okay.

3              THE COURT:  -- directing the attention.

4              THE WITNESS:  Okay.  This right here is

5    Byhalia.  This is where I -- that's Byhalia.

6    (indicating).

7              And if I can -- can you pull it down?  I

8    apologize.

9              MR. PRITCHARD:  Like this?

10             THE WITNESS:  Please.  This right here is

11   Walgreens.  This is a strip mall just north of Walgreens,

12   and the direction I came in is I exited the 240 lot from

13   approximately right here, went around the back of this

14   strip mall here and pulled into this general area right

15   here where I observed the white Chrysler minivan parked

16   catty-corner pointing out with its engine running

17   approximately right here (indicating).

18             THE COURT:  Where -- okay, yeah.

19             THE WITNESS:  There we go.

20   BY MR. SUMMERS:

21   Q.   And, Officer, if you could clear the screen and

22   then leave, I believe you've explained that, and leave

23   the mark where you showed where the white minivan was.

24   A.   The white minivan was right there (indicating).

25             MR. SUMMERS:  Okay.  And if we could have that

*DIRECT - CHRIS ROBERTS*                                        237

1    printed, Your Honor, I would ask that be marked as

2    Exhibit 2.

3              **THE COURT:**  All right.  Any objection,

4    Mr. Jackson?

5              **THE DEFENDANT:**  Yes, sir, Your Honor, if I'm

6    not mistaken, didn't he say the minivan was more toward

7    that building up top, Your Honor?

8              **THE COURT:**  Let's ask the witness.  Is that an

9    accurate representation of where the van was parked

10   according to your testimony?

11             **THE WITNESS:**  Yes, sir, it was pointed

12   catty-cornered crossing two or three lanes pointing

13   toward the north.

14             **THE COURT:**  So where the arrow is now is a

15   correct representation?

16             **THE WITNESS:**  Yes, sir, there is a little dot

17   beside it.  That's almost exactly where the van was.

18             **THE COURT:**  All right.  The next printout will

19   be marked as Exhibit Number 2.

20             (Said item was marked as Exhibit 2)

21   **BY MR. SUMMERS:**

22   *Q.*   Officer Roberts, I'm going to pass forward three

23   photos.

24             **MR. PRITCHARD:**  May I show these to --

25             **THE COURT:**  Sure.

                    UNREDACTED TRANSCRIPT

*DIRECT – CHRIS ROBERTS*                                         238

1        **MR. SUMMERS:**  Yes.

2        **THE WITNESS:**  Thank you.

3    **BY MR. SUMMERS:**

4    *Q.*    Officer Roberts, what are these three photos a

5    picture of?

6    *A.*    That's the suspect vehicle that was at the spot

7    where the arrow is at this time.

8        **MR. SUMMERS:**  Okay.  And, Your Honor, at this

9    time if I could have —

10   **BY MR. SUMMERS:**

11   *Q.*    Are all three of those accurate representations of

12   the vehicle that you saw that evening?

13   *A.*    Yes, sir, it is.

14   *Q.*    At this time I would ask to have them marked as

15   Collective Exhibit 3.

16       **THE COURT:**  Any objection, Mr. Jackson?

17       **THE DEFENDANT:**  Just a second.

18       (The defendant and elbow counsel conferred.)

19       **THE DEFENDANT:**  With all due respect, I would

20   like to object to this evidence, Your Honor.

21       **THE COURT:**  On what basis?

22       **THE DEFENDANT:**  Based on confusion and

23   prejudice and because, Your Honor, it's basically showing

24   profile evidence, not evidence of actual commission of a

25   crime, Your Honor.  By them showing footage of — because

*DIRECT - CHRIS ROBERTS*                                                 239

1    I could give my own interpretation of that, Your Honor,

2    it could be just as innocent just as well their

3    interpretation of guilty, Your Honor.  So under rule I

4    think it's 803, exclusion of relevant evidence based on

5    confusion or prejudice or waste of time, Your Honor,

6    that's confusing the issue, Your Honor.  It doesn't prove

7    a crime.  It's considered in a sense profile evidence,

8    Your Honor.  It's not evidence of anything.

9              **THE COURT:**  That will be overruled.  All

10   right.  Go ahead.

11             **THE CLERK:**  Collective Exhibit 3.

12             (Said items were marked as Exhibit 3)

13   **BY MR. SUMMERS:**

14   *Q.*    Officer Roberts, if you could tell the jury and

15   members of the court exactly what is depicted in this

16   photo?

17   *A.*    This is the white Chrysler minivan that I observed

18   the suspect or Mr. Jackson and Ms. Sara Cox in when I

19   first pulled up to the scene of the crime.

20   *Q.*    And we are going to turn back to that scene that

21   night.  You said you made way in the back side around the

22   strip mall, north of the location of Walgreens?

23   *A.*    Correct.

24   *Q.*    As you made your way into that parking area, what

25   was the condition of the parking lot, were there multiple

*DIRECT - CHRIS ROBERTS*                                          240

1    cars in the area, what did it look like?

2    A.    Around the Walgreens area there were a few cars

3    because it was still late at night, but that strip mall

4    there is nothing there.  It's been closed down for a

5    couple hours because it was late, and there was no

6    vehicles on the back side except for that vehicle that I

7    recalled.

8    Q.    And you said the word "catty-cornered" when trying

9    to describe the way that the van was parked, and if you

10   could exactly explain what you mean by "catty-cornered"?

11   A.    This is actually how I saw the van that night.

12   It's not in a parking spot.  It's covering two parking

13   spots pointing outward.

14   Q.    When you say outward, was the front of the vehicle

15   facing out?

16   A.    Yes, it was facing northeast, like it would exit

17   that area.

18   Q.    Okay.  And if they had gone on a straight line,

19   would it have exited the way you were coming in?

20   A.    Yes, it would have.

21   Q.    And what did you do when you saw this vehicle?

22   A.    Is it possible I could get the other map back up?

23   Q.    Absolutely.

24   A.    Right here is where I said the suspect vehicle was

25   (indicating).

*DIRECT - CHRIS ROBERTS*                                              241

1              **THE DEFENDANT:**  Objection, Your Honor.

2              **THE COURT:**  On what basis?

3              **THE DEFENDANT:**  On the use of the term

4    "suspect," Your Honor, from the witness, Your Honor.

5              **THE COURT:**  All right.  If you would, Officer,

6    just refer to it as the minivan.  I think that's the way

7    you have identified it; is that correct?

8              **THE WITNESS:**  Yes, sir.

9              **THE COURT:**  All right.  So, ladies and

10   gentlemen, disregard the use of the term "suspect", and

11   we will just refer to it as minivan.  Go ahead.

12   **BY MR. SUMMERS:**

13   *Q.*    And so the blue area is where the minivan was

14   located?

15   *A.*    Correct.

16   *Q.*    And what did you do when you saw the minivan and

17   where it was parked?

18   *A.*    This little area right here is the only way the

19   minivan could exit which is -- that's the only place it

20   could exit.  I pulled my patrol car and blocked that

21   small intersection right there so that the minivan could

22   not exit that area.

23   *Q.*    What did you see at that location.  Was this

24   anything you saw there that matched the call that you

25   received?

*DIRECT - CHRIS ROBERTS*                                    242

1    *A.*    Not at that time, no.

2    *Q.*    When is the first time you did see something?

3    *A.*    I exited my patrol vehicle and ordered the

4    individuals inside the van to show me their hands, and at

5    that point, I observed a third individual approaching the

6    minivan, and at that time, the dispatch call that went

7    out stated that two suspects were exiting Walgreens

8    wearing a white coat or white lab type coat and a white

9    mask.  As I exited my vehicle and ordered everyone in the

10   van to show me their hands, I saw a third suspect

11   matching that description attempting to get into that

12   van.

13   *Q.*    When you say attempting to get into the van, how

14   close was he to the van?

15   *A.*    Just a few feet.

16   *Q.*    How long did it take you to -- were you blocked

17   from the view of this person?  Did you have to move from

18   your vehicle?  What did you have to do?

19   *A.*    I had to exit my vehicle and order the people in

20   the van to show me their hands.  It was just one to two

21   seconds.  And at that point then I saw the third person

22   attempting to get into the van.

23   *Q.*    And when you were speaking with the, I guess,

24   parties in the minivan, where were they located?

25   *A.*    In the front two seats, the driver seat and the

UNREDACTED TRANSCRIPT

*DIRECT - CHRIS ROBERTS*                                             243

1    front passenger seat.

2    *Q.*    Could you see them?

3    *A.*    Just -- I could see an outline of two individuals

4    in the van.

5    *Q.*    What did you do after you saw the individual

6    clothed in a lab coat and a mask, what did he do, what

7    did you do, what happened?

8    *A.*    At that point I had my service weapon out, and I

9    was ordering everyone to stop, show me their hands, and I

10   was yelling at everyone to stop.

11   *Q.*    Did the individual that had approached the van, did

12   he stop or what did he do?

13   *A.*    No, he immediately made a 180 and ran away from the

14   situation.

15   *Q.*    If you could on the map, if you could instruct the

16   jury as to what exactly, what did he do, where did he go

17   on the map?

18   *A.*    He was coming -- when I saw him, he was

19   approximately where you see this little dot showing up,

20   he turned around and went through this bush area out of

21   my line of sight.

22   *Q.*    And after he left your line of sight, what did you

23   then focus on?

24   *A.*    At that point, I had another officer make my scene,

25   and I told him where I observed -- where I saw the

UNREDACTED TRANSCRIPT

DIRECT - CHRIS ROBERTS                                          244

1    suspect running to, and he ran toward that suspect.  And

2    at that point when Officer Day who made my scene started

3    running toward that suspect, I began ordering the

4    individuals inside the minivan to exit the vehicle.

5    Q.    Did they in fact exit the vehicle?

6    A.    Yes, I took them out one at a time, yes.

7    Q.    Did you then take them into custody?

8    A.    Yes, sir, at that point I had a third officer make

9    my scene, which was Officer Ashley Edwards, she made my

10   scene.  And I took Mr. Ronnie Jackson into custody and

11   went around and then took Ms. Sara Cox into custody with

12   the help of Ms. Edwards or Officer Edwards.

13   Q.    You said that you took Mr. Ronnie Jackson in

14   custody.  Where was Mr. Mr. Ronnie Jackson seated in the

15   vehicle?

16   A.    He was in the driver's seat of the running van.

17   Q.    Where was the other passenger seated?

18   A.    Ms. Cox was in the passenger front seat of the van.

19   Q.    Who did you address first?

20   A.    Mr. Jackson.

21   Q.    Mr. Jackson.  Is Mr. Jackson the individual that

22   you saw that evening in the driver's seat of that minivan

23   in the courtroom today?

24   A.    Yes, sir, he is.

25   Q.    Could you please identify Mr. Jackson and a piece

*DIRECT - CHRIS ROBERTS*                                            245

1    of clothing that he's wearing?

2    *A.*    If it please the Court, he's the individual sitting

3    right over here with the white stocking cap on, white

4    T-shirt and a sports coat.

5    *Q.*    At that point you took Mr. Jackson into custody?

6    *A.*    Yes, I did.

7    *Q.*    And what did you do with Mr. Jackson?

8    *A.*    He was placed in my squad car.

9    *Q.*    Okay.  And did we also -- did you also take Ms.

10   Sara Cox into custody?

11   *A.*    Yes, Ms. Cox was placed in Officer Edwards' squad

12   car.  We separated the two individuals.

13           **MR. SUMMERS:**  Your Honor, if we could, could

14   the record reflect that Officer Roberts has identified

15   Mr. Ronnie Jackson in the courtroom?

16           **THE COURT:**  All right.  The record will

17   reflect that the witness has identified the defendant,

18   Mr. Jackson.  All right.  Go ahead.

19           **MR. SUMMERS:**  Thank you, Your Honor.

20   **BY MR. SUMMERS:**

21   *Q.*    Once you had Ms. Cox and Mr. Jackson secured, what

22   was your next move?

23   *A.*    At that time the radio was going chatter

24   constantly, and I heard that the scene is secured, the

25   two other individuals were in custody.  And at that

UNREDACTED TRANSCRIPT

*DIRECT - CHRIS ROBERTS*                                          246

1   point, we did a perimeter check to make sure everything

2   was secure around that area.

3   Q.   From the time that you initially made the scene,

4   blocked in the minivan to the time that you received a

5   call indicating that all parties were in custody, about

6   what was the time frame, was it quick?

7   A.   I believe dispatch said it was about three minutes.

8   Q.   So events happened quickly?

9   A.   Yes, sir, it did.

10  Q.   What was your next procedure on the scene that

11  night?

12  A.   At that point, after everyone was secured, I went

13  and secured the minivan and began to see what was inside

14  that and checked the perimeter around the minivan.

15  Q.   I'm going to pass more photos up to you.

16          **MR. PRITCHARD:**  I'm going to show Mr. Jackson.

17          **THE COURT:**  Sure.

18  **BY MR. SUMMERS:**

19  Q.   And could you tell me, what are these three photos

20  of?

21  A.   These are the parking location where I located the

22  white minivan that night.

23  Q.   Okay.  And are those pictures from that night?

24  A.   No, this is -- these would be from February of this

25  year.

UNREDACTED TRANSCRIPT

DIRECT - CHRIS ROBERTS                                          247

1    Q.    And do those pictures accurately reflect the

2    location of where you were that night where that minivan

3    was located?

4    A.    Yes, it does.

5    Q.    Importantly, what were the businesses on either

6    side of the parking area that's depicted in this map?

7    A.    One is a dentist's office and the other one where

8    the minivan was parked diagonally in a parking spot,

9    that's an optometry -- it's another small business.

10   Q.    And were those businesses open or closed at the

11   time you approached this scene?

12   A.    Closed.

13   Q.    After you secured the scene and you secured

14   Mr. Jackson and Ms. Cox, what did you do?

15   A.    We began our perimeter search of the area for

16   evidence and checking the van and the perimeter for

17   evidence.

18   Q.    Did you find any evidence?

19   A.    Yes, sir, I did.

20         **MR. SUMMERS:**  Your Honor, before -- I'm

21   getting ahead of myself.  If I could ask that we move

22   those pictures into evidence as Collective Exhibit I

23   believe 4?

24         **THE COURT:**  All right.  Any objection,

25   Mr. Jackson?

UNREDACTED TRANSCRIPT

*DIRECT - CHRIS ROBERTS*                                              248

1                    (The defendant conferred with elbow counsel).

2                    **THE DEFENDANT:**  No objection, Your Honor.

3                    **THE COURT:**  All right.  Stand up when you

4    address the Court.

5                    **THE DEFENDANT:**  No objection, Your Honor.

6                    **THE COURT:**  Without objection, it will be

7    marked as the next exhibit, Mr. Haley.

8                    **THE CLERK:**  Collective Exhibit 4, Your Honor.

9                    (Said items were marked as Collective Exhibit

10                   4).

11   **BY MR. SUMMERS:**

12   *Q.*    If you could clear the screen and then tell the

13   jury what's depicted in this.

14   *A.*    This is the parking area where I observed the white

15   minivan and I observed the third suspect approaching the

16   white minivan.

17   *Q.*    The business to our left?

18   *A.*    That's where the minivan was backed into.

19   *Q.*    And could you move to the next --

20           What is this is a photo of?

21   *A.*    It's a business just the opposite side of that.

22   *Q.*    Okay.

23   *A.*    Just further north.

24   *Q.*    And, again, what's in this photo?

25   *A.*    That's just another picture of the building that

*DIRECT - CHRIS ROBERTS*                                           249

1    the minivan was parked in front of.

2    *Q.*    In those parking spaces depicted in that photo, are

3    those the spaces that the van was parked across?

4    *A.*    Yes, sir, it was.

5    *Q.*    Okay.  Now I believe you had left -- we had left

6    off where you said you were moving through the scene and

7    looking for further evidence?

8    *A.*    Yes, sir.

9    *Q.*    Did you discover any other evidence?

10   *A.*    Yes, sir, I did.

11   *Q.*    What did you find?

12   *A.*    Can we put the map back up again?  I apologize.  At

13   this location right here, I discovered a white mask and a

14   white lab coat laying on the ground at that approximate

15   area.

16   *Q.*    I'm going to pass something forward to you.

17             **AGENT:**  May I approach, Your Honor?

18             **THE COURT:**  Okay.

19   **BY MR. SUMMERS:**

20   *Q.*    If you could, could you -- are you familiar with

21   these packages?

22   *A.*    Yes, sir, I am.

23   *Q.*    Can I ask you to open that if you could and

24   identify the contents.

25             If you could observe those items that you removed

*DIRECT - CHRIS ROBERTS*                                                250

1    from the packaging.

2    A.    Yes, sir.

3    Q.    Have you gotten a chance to look at those?

4    A.    Yes, sir.

5    Q.    What are those?

6    A.    One is a white painter's type mask, or a breath

7    mask, and the other one is a white lab coat or painter's

8    type coat.

9    Q.    Is that mask and that lab coat the same that you

10   collected on the scene that evening?

11   A.    Yes, sir, they were.  They are.

12           **MR. SUMMERS:**  Your Honor, I would ask that the

13   lab coat and mask be moved into evidence as Collective

14   Exhibit 5?  Next numbered collective exhibit.

15           **THE COURT:**  Any objection, Mr. Jackson?

16           (The defendant and elbow counsel conferred).

17           **THE DEFENDANT:**  No objection at this time.

18           **THE COURT:**  Without objection the items will

19   be marked as the next exhibit.

20           (Said items were marked as Collective Exhibit

21           5)

22           **THE CLERK:**  Collective exhibit 5.

23   **BY MR. SUMMERS:**

24   Q.    In further examining the scene at or around the

25   van, the area of the scene that you were responsible for,

UNREDACTED TRANSCRIPT

*DIRECT - CHRIS ROBERTS*                                              251

1    what else did you find?

2    A.    This location right here.

3    Q.    Okay.  Let's see if I've got a picture that might

4    be able to help you with that.

5    A.    Okay.

6    Q.    If you could tell me what's depicted in these two

7    photographs?

8    A.    This is the grassy area just north of Walgreens.

9    Q.    Is that the area that you pointed out on this map?

10   A.    Yes, it is.

11   Q.    And in those photos and at that scene that night,

12   what did you find?

13   A.    Found a Walgreens basket that contained a large

14   quantity of loose cash, bundled cash and coins.

15   Q.    Okay.  And are those photos that I've passed

16   forward to you, are they an accurate depiction of the

17   items you saw that night?

18   A.    Yes, sir, it is.

19             **MR. SUMMERS:**  Your Honor, I would ask that

20   that be moved into evidence as the next collective

21   exhibit number.

22             **THE COURT:**  Has Mr. Jackson seen the photos?

23             **MR. PRITCHARD:**  Yes, Your Honor, I just showed

24   him.

25             **THE COURT:**  Any objection, Mr. Jackson?

UNREDACTED TRANSCRIPT

*DIRECT - CHRIS ROBERTS*                                              252

1          **THE DEFENDANT:**  No objection at this time,

2    Your Honor.  To the photos, correct?

3          **THE COURT:**  Right.

4          **THE DEFENDANT:**  No, sir.

5          **THE COURT:**  It will be marked as the next

6    exhibit.

7          **THE CLERK:**  Collective Exhibit 6.

8          (Said items were marked as Collective Exhibit

9          6)

10         **MR. SUMMERS:**  Your Honor, may we publish

11   Exhibit 6 to the jury?

12         **THE COURT:**  You can.

13   **BY MR. SUMMERS:**

14   *Q.*   Mr. Roberts, if you could, please explain to the

15   jury what's depicted in this photo?

16   *A.*   This is the grassy area just north of Walgreens

17   that we located the Walgreens basket that contained a

18   large quantity of cash and coins.

19   *Q.*   Now, in this photo?

20   *A.*   That's just a closer view of the same basket of

21   cash and loose coins.

22   *Q.*   If you could, what is -- loosely point out or what

23   was in that basket that evening?

24   *A.*   It is a sweatshirt.  This is a sweatshirt.  This

25   right here is a nylon black bag.  This is loose bundled

*DIRECT - CHRIS ROBERTS*                                              253

1    cash and loose cash.  And this is coins.

2    *Q.*    Now, the cash that was collected from that basket,

3    was that ultimately returned to the Walgreens?

4    *A.*    Yes, sir, it was.

5    *Q.*    If you could, further explain the bag and what you

6    knew about that.

7    *A.*    The bag was -- later on was extremely similar to a

8    bag that I found inside the white minivan and the cash.

9              **THE DEFENDANT:**  Objection, Your Honor.  I

10   would like to approach the bench with the prosecution if

11   it would be possible, Your Honor.

12             **THE COURT:**  For what reason?

13             **THE DEFENDANT:**  That there has been actually

14   no evidence, Your Honor, introduced about the van, about

15   the van at this time.

16             **THE COURT:**  All right.  Mr. Summers, he's

17   saying --

18             Let's don't talk over each other.  He's saying

19   all that's been introduced at this point is just the

20   photograph of what was found, that you are making

21   reference now to something else that was in the van that

22   has not been introduced.  So what's your response?

23             **MR. SUMMERS:**  Your Honor, I did not allude to

24   anything that was discovered in the van at this point.

25             **THE COURT:**  I understood.  I thought that's

DIRECT - CHRIS ROBERTS                                                      254

1    where you were -- repeat the question.  Maybe I

2    misunderstood.

3              **MR. SUMMERS:**  I was asking about the bag that

4    was found inside this basket.

5              **THE COURT:**  Okay.  Go ahead.  Ask your

6    question again.

7    **BY MR. SUMMERS:**

8    *Q.*    And, again, I'm more or less trying to direct you,

9    walk you through what's collected in this basket, not

10   alluding to anything in the van.  If you could, just walk

11   us through -- I notice that the money in this photo is in

12   a plastic bag, if you could explain that.

13   *A.*    That's the money that was -- that had been dropped

14   in the safe at Walgreens that night.  That's just the

15   money they had sealed up and packaged to put in their

16   safe that night.

17   *Q.*    And is that a Walgreens bag or is that an evidence

18   bag?

19   *A.*    This black bag right here was just an evidence,

20   just a bag that we found in that basket that night.

21   *Q.*    And the clear plastic bag?

22   *A.*    That's how Walgreens sealed up their money that

23   night.

24   *Q.*    This is as you found it?

25   *A.*    Nothing has been altered in that.

DIRECT - CHRIS ROBERTS                                                255

1    Q.    And the gray clothing, what is that?

2    A.    As we later found out, that belonged to an

3    individual inside, inside Walgreens that night.

4    Q.    Okay.  I'm going to direct your attention back to,

5    at this point back to the van.  Is this the last evidence

6    location that you personally made that night?

7    A.    After that I went back to the van.

8    Q.    And what did you do when you went back to the van?

9    A.    Oh, just doing an inventory, searching the van,

10   looking for evidence, plain view searches, that type of

11   thing.

12   Q.    You mentioned a plain view search.  When you were

13   taking Ms. Cox and/or Mr. Jackson into custody, did you

14   see anything in the van?

15   A.    In plain view I could see a lab coat that was

16   similar to the one that we found in the grassy area just

17   west of my location.  Also saw more masks that were

18   similar to the ones I saw in the grassy area just west of

19   that location.

20   Q.    Okay.  I'm going to hand you something.  And what

21   is that, what's that package?

22   A.    These are the items that we could see in plain

23   view.  They were in the back seat of the van.

24   Q.    Is that -- is that the package that you collected

25   that night?

*DIRECT – CHRIS ROBERTS*                                          256

1    A.    Detective Kirksey is the one that actually

2    collected it.

3    Q.    Did you discover that?

4    A.    Yes, sir I did.

5    Q.    If you could open that package.

6    A.    Masks and lab coat.

7    Q.    And that coat and masks, are those the masks and

8    lab coats that you found inside the white van on 5-21-12?

9    A.    Yes, sir, it is.

10   Q.    In further searching --

11            **MR. SUMMERS:**  And, Your Honor, at this time I

12   would ask to move that into -- and I was looking for the

13   number -- Collective Exhibit --

14            **THE CLERK:**  7.

15            **MR. SUMMERS:**  -- 7.

16            **THE COURT:**  Any objection, Mr. Jackson?

17            **THE DEFENDANT:**  Yes, sir.  I would like to

18   object on this evidence being entered into evidence, Your

19   Honor, based on prejudice, Your Honor, because it only

20   shows that up until the present time you were bringing it

21   up, I was only inside the minivan.  It doesn't show me

22   linked to any such crime as being alleged, only a suspect

23   at the time.

24            **THE COURT:**  Was your testimony that this

25   evidence or these items were found inside the van and you

*DIRECT - CHRIS ROBERTS*

1    observed them in the van?

2            **THE WITNESS:**  Yes, sir.

3            **THE COURT:**  All right.  I'll overrule the

4    objection.  It will be marked as the next exhibit.

5            **THE CLERK:**  Collective Exhibit 7.

6            (Said items were marked as Collective Exhibit

7            7).

8    **BY MR. SUMMERS:**

9    *Q.*    In further searching the van, was there anything

10   else that you saw in plain view?

11   *A.*    Yes, sir, I observed a purse sitting on the

12   passenger front seat where Ms. Cox was sitting.

13   *Q.*    Okay.  And did you see anything at or around that

14   purse area?

15   *A.*    I saw a Walgreens bag.

16   *Q.*    Okay.  Did you have an opportunity to examine the

17   contents of that bag?

18   *A.*    Yes, sir, I did.

19   *Q.*    What was in that bag?

20   *A.*    One was a container, a beverage, I believe it was

21   muscle milk, and also some feminine hygiene products, and

22   also a receipt from Walgreens.

23   *Q.*    And I want to hand you another package.  If you

24   could examine this.

25           If you could, tell me what the contents of that

*DIRECT - CHRIS ROBERTS*                                      258

1    package are.

2    *A.*    It's a Muscle Milk container with the beverage

3    still inside of it, feminine hygiene product and

4    Walgreens receipt.

5    *Q.*    Okay.  And are those the same Muscle Milk, tampon

6    package and receipt that you secured on the scene the

7    night of 5-21-12?

8    *A.*    Yes, sir, it is.

9    *Q.*    I'm going to direct your attention --

10             **MR. SUMMERS:**  First, Your Honor, if I may have

11   that -- ask to have that moved into evidence as

12   Collective Exhibit I believe 8.

13             **THE COURT:**  Any objection, Mr. Jackson?

14             **THE DEFENDANT:**  Yes, Your Honor, I would like

15   to object, Your Honor, because I would like to know what

16   is the relevance of the Muscle Milk and feminine hygiene

17   products to the crime, Your Honor?

18             **THE COURT:**  Your testimony was that you

19   observed these or found these inside the van; is that

20   correct?

21             **THE WITNESS:**  Yes, sir.

22             **THE COURT:**  Okay.

23             **THE DEFENDANT:**  My question, Your Honor, is

24   that relevant to a crime being committed?

25             **THE COURT:**  That will be for the jury to

*DIRECT - CHRIS ROBERTS*                                          259

1    decide.

2              **THE DEFENDANT:**  I would like to object, Your

3    Honor, just for the record.

4              **THE COURT:**  I'll note your objection.  It will

5    be marked as the next exhibit.

6              **MR. SUMMERS:**  I want to ask some questions

7    about that evidence.

8              **THE COURT:**  Let Mr. Haley mark it, and we can

9    pass it back to the witness.

10             **MR. SUMMERS:**  Once it's marked.

11             **THE CLERK:**  Collective Exhibit Number 8.

12             (Said items were marked as Collective Exhibit

13             8).

14   **BY MR. SUMMERS:**

15   *Q.*    Now where exactly within the minivan did you find

16   this bag, the Walgreens bag and its contents?

17   *A.*    Right, this is Sara Cox's purse which was on the

18   front seat of the minivan passenger seat.

19   *Q.*    Inside the Walgreens bag, you said there was a

20   Walgreens receipt?

21   *A.*    Yes, sir.

22   *Q.*    Will you take a look at that receipt for me?

23   *A.*    Yes, sir.

24   *Q.*    If you could, tell me what time and date are on

25   that receipt?

DIRECT - CHRIS ROBERTS                                    260

1   A.    Yes, sir, the date stamped on here is 5-21-2012 at

2   10:09 p.m.

3   Q.    10:09 p.m.  What time did you make the scene that

4   evening?

5   A.    Approximately it would be 10:26, approximately that

6   time.

7   Q.    At or around 10:26?

8   A.    Correct.

9   Q.    So, again, what was the time on that receipt?

10  A.    10:09 of that same night.

11  Q.    So within 15 minutes of that date stamp, you

12  arrived on the scene?

13  A.    Correct.

14  Q.    Okay.  Now after you secured that bag, did you

15  continue to search the van or did you at that point wait

16  for another officer?

17  A.    We waited -- after we did a preliminary search, I

18  waited for Detective Kiersey to make the scene.

19  Q.    Who is Detective Kiersey?

20  A.    He was the lead scene detective that night.

21  Q.    He did in fact make the scene?

22  A.    Yes, sir, he did.

23  Q.    Now this area that we have spoken of that we've

24  clearly marked on this map, I believe the location of 824

25  West Poplar, is that located here in the Western District

UNREDACTED TRANSCRIPT

*DIRECT - CHRIS ROBERTS*                                                      261

1    of Tennessee?

2    A.    Yes, sir, it is.

3    Q.    In fact, it's in Collierville, Tennessee?

4    A.    Yes, sir, it is.

5          **MR. SUMMERS:**  Your Honor, if I may have just

6    one moment.

7          **THE COURT:**  Okay.

8          **THE WITNESS:**  Your Honor, may I put this back

9    in the bag?

10          **THE COURT:**  Let's wait and see if we need to

11   refer to it anymore.

12          **MR. SUMMERS:**  If we may publish part of the

13   Collective Exhibit 8, the receipt, to the jury.

14          **THE COURT:**  All right.

15   **BY MR. SUMMERS:**

16   Q.    Detective Roberts, if you could instruct us as to

17   what you just testified to, the time and of course the

18   contents of the back, I believe.

19   A.    Yes, sir, that's the exact receipt that I found

20   inside the Walgreens bag that was located in the white

21   minivan.

22   Q.    And under the Number 9018533714, is that the -- is

23   that in fact the date stamp that you just read?

24   A.    Yes, sir, May 21st, 2012, 10:09 p.m.

25          **MR. SUMMERS:**  Your Honor, I have no further

*CROSS - CHRIS ROBERTS*                                    262

1    questions.

2           **THE COURT:**  All right.  Mr. Jackson, would you

3    like to ask questions?

4           **THE DEFENDANT:**  Yes, sir, Your Honor.

5           **THE COURT:**  All right.  Go ahead.

6           **THE DEFENDANT:**  Your Honor, I would like

7    Mr. Woods to put up on the display the pictures we just

8    seen regarding the vehicle.

9           **THE COURT:**  All right.  Mr. Woods, if you

10   would come up to the podium, and then you can display

11   whatever items have been admitted that you would like to

12   display to the jury.

13          **THE DEFENDANT:**  Can you zoom it a little bit?

14                     CROSS-EXAMINATION

15   **BY THE DEFENDANT:**

16   *Q.*    Officer Roberts?

17   *A.*    Yes, sir.

18   *Q.*    Good morning.  I just have a few questions

19   regarding the photograph that you see here.  Could you

20   describe where is this Asian Grill compared to the map

21   you showed us on the general --

22          **THE DEFENDANT:**  Mr. Woods, if you would put

23   that, yeah, the big map.

24   **BY THE DEFENDANT:**

25   *Q.*    If you will show the exact location of this Asian

                  UNREDACTED TRANSCRIPT

CROSS – CHRIS ROBERTS                                          263

1    Grill on the map he's about to put on now.

2    A.    Okay.  Can you zoom it back out?  That's good.

3    Thank you.  That's the Asian Grill.

4    Q.    That's the Asian Grill?

5    A.    Yes, sir.

6          **THE DEFENDANT:**  I would like for the jury to

7    pay attention to where this arrow is.

8    **BY THE DEFENDANT:**

9    Q.    And where was the location of the van you say when

10   you arrived on the scene?

11         **THE DEFENDANT:**  All right.  Could you put the

12   picture of the van back up?

13         **THE COURT:**  Mr. Jackson, it probably would be

14   helpful if you can to refer to the exhibit numbers.

15         **THE DEFENDANT:**  Sorry about that, Your Honor.

16         **THE COURT:**  If you can, and we will help you

17   if you need us to, but that helps keep it straight as far

18   as the record is concerned.

19         **THE DEFENDANT:**  Mr. Woods, would you tell us

20   please what exhibits those were, Exhibit 3?

21         **MR. WOODS:**  3.

22         **THE DEFENDANT:**  Number 3.

23   **BY THE DEFENDANT:**

24   Q.    Officers Roberts, you say you arrived on the scene,

25   the van was facing about to exit from where it was

UNREDACTED TRANSCRIPT

1    parked, correct?

2    A.    I said it was pointing northward.

3    Q.    Which is about to exit, as you said, correct?

4    A.    It was -- the van was not moved from -- where that

5    van is right now is where it was when I arrived on the

6    scene.

7    Q.    That's what I'm getting to, sir.  So if this Asian

8    Grill is sideways where this van is, how is the van

9    pointing out as it was attempting to get away from the

10   scene?

11   A.    Asian Grill is north of there, and the van is

12   pointing north.  This picture was taken from the south.

13   Q.    I guess what I'm asking is where is the van here --

14   evidently it's in the parking -- you say it's facing

15   toward the outing as in an escape route, correct?

16   A.    Correct.

17   Q.    If in the picture here, this is the Asian Grill

18   that's in the back of it, how is sit on the side if the

19   van is pointing the opposite direction?

20   A.    That building is on -- is east -- I'm sorry -- west

21   of that location.  I'm not understanding what you are

22   trying to ask.

23   Q.    What I'm trying to ask.  Based on this picture, the

24   Asian Grill is pointed -- basically if the van was

25   pointed, for example, this is the outward where you

*CROSS - CHRIS ROBERTS*                                                    265

1    pulled up to catch the vehicle, correct?

2    *A.*    Correct.

3    *Q.*    Okay.  If Asian Grill is behind it, how is it on

4    the side of it in this picture right here?

5    *A.*    Because the picture was taken from the south going

6    northward.  Both the van and Asian Grill were north of

7    the location where the picture was taken.

8              **THE DEFENDANT:**  Mr. Woods, could you please

9    put Exhibit 3 up because I'm having a hard time trying to

10   understand.

11             **THE COURT:**  I believe that is Exhibit 3,

12   Mr. Jackson.

13             **THE DEFENDANT:**  What's the exhibit?

14             **MR. WOODS:**  1.

15             **THE DEFENDANT:**  Exhibit 1, sorry.

16             **THE COURT:**  Okay.

17             **THE DEFENDANT:**  Okay.

18             **THE WITNESS:**  No, you are good.

19   **BY THE DEFENDANT:**

20   *Q.*    Could you point to the area where the van, the

21   vehicle was located attempting to exit?

22   *A.*    The van was here.  Asian Grill is here.

23   *Q.*    Correct, okay.

24   *A.*    Picture was taken from here.

25   *Q.*    So how would Asian Grill look as being on the side

*CROSS - CHRIS ROBERTS*                                                    266

1    of the van instead of from behind the van if it's in that

2    location in that direction as you just stated?

3    A.    I believe the picture was taken catty-cornered.  I

4    did not take the picture.  I do not know.

5    Q.    So you really don't know what direction the picture

6    was taken?  I mean the picture speaks for itself, though,

7    honestly, doesn't it?

8    A.    I believe so.

9    Q.    So the van couldn't have been facing as an escape,

10   as a return route according to the pictures, correct?

11   Right or wrong, I mean.

12   A.    That would be incorrect.

13   Q.    Okay.  I have one more question.  During the night

14   of the crime, if you can remember --

15           **THE DEFENDANT:**  Please excuse this, Your

16   Honor, but it is kind of explicit, but especially due to

17   my religion, I'm kind of embarrassed, but I must ask this

18   for purpose of jury.

19   **BY THE DEFENDANT:**

20   Q.    When you asked me to exit the vehicle with my hands

21   up, where were my pants, sir?

22   A.    They were around your ankles.

23   Q.    Okay.  So it wasn't any type of -- I was sitting

24   there, did you actually think I could be sitting there

25   waiting for someone to jump in the vehicle for me to

UNREDACTED TRANSCRIPT

*CROSS – CHRIS ROBERTS*                                    267

1   drive off as in a getaway with my pants around my ankles?

2   A.    I didn't know your state of mind that night.

3   Q.    That's just a question, sir.  As being a police

4   officer, if I was the getaway driver and I had my pants

5   down around my ankles with a female in the vehicle, would

6   that make you assume that I'm waiting for criminals to

7   jump in my van so I can drive off with them?

8   A.    Or you are staging it so that I may not think you

9   are doing that.

10            **THE DEFENDANT:**  Okay.  One second, Your Honor.

11  **BY THE DEFENDANT:**

12  Q.    Next question.  When you radioed, you said --

13  excuse me.  When you pulled up on the scene, you said you

14  seen two occupants of a vehicle?

15  A.    Correct.

16  Q.    And at the time, if I am not -- correct me if I'm

17  wrong -- you said you seen another third suspect running

18  up to the vehicle; is that correct?

19  A.    After I exited my vehicle, yes, I saw a third

20  person running toward --

21  Q.    So he was running at the time you exited your

22  vehicle?

23  A.    Yes, he was running up to the van as I was exiting.

24  Q.    Let me ask this for common sense purposes.  You had

25  your lights on, correct?

*CROSS - CHRIS ROBERTS*                                                    268

1    A.    I did not have my blue lights on, no.  I had my

2    headlights on.

3    Q.    Right, so if a alleged criminal was running towards

4    a vehicle that they obviously seen in the open where the

5    pictures were was a police officer, do you think he still

6    trying to run to that van or --

7    A.    I don't believe he could have seen my police car.

8    The van was blocking the view of my police car as the

9    individual was running up, because he was running up from

10   the far side of the van.

11   Q.    Approaching from the other side?

12   A.    Yes.

13   Q.    So how were you able to see him from you being on

14   the other side of the vehicle?

15   A.    When he approached the van, I got out and I could

16   see him approaching from the back side of the van.  I

17   don't believe he could have seen my police car until he

18   actually got up closer to the van.

19   Q.    So in the course of him approaching, you don't

20   think in between that site between you, got between you

21   and the van he couldn't have seen your car?

22   A.    I don't believe he did until it was too late.

23          **THE DEFENDANT:**  One second, Your Honor.

24          **THE COURT:**  Okay.

25          **THE DEFENDANT:**  One other question, Your

                     UNREDACTED TRANSCRIPT

1    Honor, for the witness, Officer Roberts.

2    **BY THE DEFENDANT:**

3    *Q.*    If say, for example, I was in the van with this

4    other occupant, happened to be a female, and you got out,

5    approached weapons drawn, correct?

6    *A.*    Correct.

7    *Q.*    If I had made a move as if to reach down and bend

8    down or came up with a weapon, could you have seen that?

9    *A.*    No, sir.

10   *Q.*    So you wouldn't really know -- even though your

11   headlights were on facing the vehicle, you wouldn't have

12   seen?

13   *A.*    No, sir, like I said before, I could see two

14   individuals in the van, but it was very dark that night.

15   And I couldn't see exactly who all was in the van.  I saw

16   two people in the front seat.  That's all I could see.

17   *Q.*    So you only seen two -- you couldn't see any hands,

18   so you say you told us to put our hands up at the

19   vehicle; how did you know our hands was up or not?

20   *A.*    The windows were rolling down.

21   *Q.*    The windows looked up on the vehicle until they

22   rolled them down out there.  So the windows were down on

23   the vehicle you say?

24   *A.*    I don't remember.  I just asked for y'all to show

25   your hands.

*CROSS - CHRIS ROBERTS*                                                    270

1    Q.    You just stated that the windows were down, so that

2    means you could see in the van, right?

3    A.    No, I said I don't recall.

4    Q.    So how did you see in the van, see two occupants?

5    A.    I could see through the front windshield.  I could

6    see two people inside the van.

7    Q.    So could you have not seen whether or not our hands

8    were raised that you asked us to raise our hands?  Why

9    would you even ask us to raise our hands if you couldn't

10   see us?

11   A.    I said I could see two individuals inside the van.

12   Q.    Question is could you have seen our hands?  You

13   asked us to raise our hands in the vehicle.  Could you

14   have seen our hands since you asked that question?

15   A.    I could see them if you had opened the door, yes.

16   Q.    So you couldn't have seen them if we didn't open

17   the door; is that correct?

18   A.    Possibly not.

19   Q.    I need a direct --

20          **THE DEFENDANT:**  Could you direct the officer

21   to answer yes or no, Your Honor?

22          **THE COURT:**  Officer Roberts, did you see the

23   individuals in the van raise their hands?

24          **THE WITNESS:**  That night, I could just see two

25   individuals, no, sir, I did not see them.

UNREDACTED TRANSCRIPT

1          **THE COURT:**  You never did know whether they

2    did or didn't comply with your instructions?

3          **THE WITNESS:**  No, sir.

4          **THE COURT:**  All right.  Anything else,

5    Mr. Jackson?

6          **THE DEFENDANT:**  Yes, sir.  I'm trying to make

7    a point, yes, sir.

8          **THE COURT:**  All right.  Go ahead.

9          **THE DEFENDANT:**  Your Honor, at this time, I'll

10   just defer questions –– I'll hold off questions to

11   another time.

12         **THE COURT:**  So you are through?

13         **THE DEFENDANT:**  Yes, sir.

14         **THE COURT:**  Any redirect?

15         **MR. SUMMERS:**  Just briefly, Your Honor.

16         **THE COURT:**  All right.

17                    REDIRECT EXAMINATION

18   **BY MR. SUMMERS:**

19   *Q.*   First you stated that you asked Mr. Jackson and

20   Ms. Cox to raise, to put their hands in the air?

21   *A.*   Yes, as I was approaching the vehicle, yes.

22   *Q.*   Is that a standard command of officers?

23   *A.*   Yes, sir.

24   *Q.*   Why is that a standard command?

25   *A.*   So I can make sure there is no weapons or anything

1    else in the person's hands.

2    Q.    So you would order that even if you could

3    ultimately see their hands or not?

4    A.    That's correct.

5    Q.    And I'm going to direct your attention back to

6    Exhibit 1, if we could.

7              **MR. SUMMERS:**  If we could zoom in a little bit

8    on the spot where the van was parked.

9    **BY MR. SUMMERS:**

10   Q.    Now again, if you could, would you show us exactly

11   where the van was?

12   A.    That general area right there (indicating).

13   Q.    Okay.  And where did you come and park, block the

14   van off, I guess?

15   A.    Right there (indicating).

16   Q.    And if I could, I'm going to interrupt and show you

17   another, publish a picture of the van, I believe, that

18   Mr -- is that Exhibit 3 that Mr. Jackson was...

19         Okay.  I believe as you testified the van that

20   evening was parked catty-cornered across two parking

21   spaces; is that correct?

22   A.    Yes, sir.

23   Q.    So in this photo of the -- I believe -- is that the

24   passenger side of the van?

25   A.    Yes, sir.

*REDIRECT - CHRIS ROBERTS*

1    Q.    And of the passenger door?

2    A.    Yes.

3    Q.    And where would this photo have been taken that

4    evening?

5    A.    Just southeast of that location.

6    Q.    So the backdrop of this photo would then be

7    logically what?

8    A.    Whatever is northwest of that location.

9    Q.    And what is northwest of that location?

10   A.    A strip mall that contains Asian Grill, looks like

11   Weight Watchers, there is a Target a little further down.

12   Q.    So is this picture an accurate depiction of where

13   the van was that evening?

14   A.    Yes, sir, it is.

15   Q.    And is it absolutely logical that the Asian Grill

16   would be in the backdrop of this photo?

17   A.    Yes, sir, it was north of that location.

18              **MR. SUMMERS:**  No further questions.

19              **THE COURT:**  Thank you, Officer Roberts.  You

20   can step down.

21              **THE WITNESS:**  Thank you, Your Honor.

22              (Witness excused).

23              **THE COURT:**  Ladies and gentlemen of the jury,

24   let's take a brief recess.  I need to address something.

25   If you would step out, and we will be back with you in

1    just a moment.  Don't research the case and do don't do

2    any research or investigation.

3                    (The following occurred outside the presence

4                    of the jury:)

5              **THE COURT:**  Okay.  Be seated.  I know there

6    have been a couple times when there have been

7    opportunities for Mr. Jackson to view the evidence.  Has

8    that taken place yet?

9              **MR. PRITCHARD:**  Judge, this morning I gave

10   Mr. Woods a copy of all the crime scene photographs that

11   we are going through, so he has those now.  And I gave

12   him some of the incident reports from the previous

13   robberies before the one we are discussing now.  Quite

14   some time ago Mr. Arvin provided discovery when Mr. Woods

15   was actually representing Mr. Jackson regarding the

16   Collierville robbery, so the discovery on that was

17   completed a long time ago.  But as of now, he has all the

18   crime scene photographs that we will be discussing plus

19   some we won't be introducing.

20             **THE COURT:**  Just to the extent we can, just to

21   move things forward a little faster, if possible, make

22   him aware or make them aware of what exhibits you expect

23   to be using as we go forward, and it might speed the

24   process up just a little bit.

25             **MR. PRITCHARD:**  Okay.

1          **THE COURT:**  Okay.  Let's just take a very
2  short -- let's take about a five or ten-minute recess and
3  then we'll come back.
4          **THE CLERK:**  All rise.  This Court is now in
5  recess.
6          (Recess).
7          **THE COURT:**  All right.  Mr. Pritchard,
8  Mr. Summers, call your next witness.
9          **MR. SUMMERS:**  Thank you, Your Honor.  The
10  United States will call Officer Bryan Day.
11          **THE COURT:**  All right.  Let's bring in the
12  jury.
13          (The following occurred in the presence of the
14          jury:)
15          **THE COURT:**  Please be seated.
16          All right.  Mr. Summers, call your next
17  witness.
18          **MR. SUMMERS:**  Thank you, Your Honor.  The
19  United States calls Officer Brian Day, Your Honor.
20          **THE COURT:**  All right.  Officer Day, if you
21  would, step up this way just a little.
22          **THE CLERK:**  Please raise your right hand and
23  be sworn.
24
25

1                          **BRIAN DAY,**

2     having been first duly sworn, took the witness stand and

3     testified as follows:

4              **THE COURT:**  If you will have a seat in the

5     witness chair, make yourself comfortable and adjust the

6     microphone however you need to so that we can clearly

7     hear what you have to say.

8              All right.  Mr. Summers, you can proceed.

9              **MR. SUMMERS:**  Thank you, Your Honor.

10                     DIRECT EXAMINATION

11    BY MR. SUMMERS:

12    Q.    Please state your full name for the Court, first

13    and last, and if you could spell it for the benefit of

14    the court reporter.

15    A.    Brian Day, B-R-I-A-N, D-A-Y.

16    Q.    And, Officer, I see you're in uniform.  Are you

17    employed with the Collierville Police Department?

18    A.    I am.

19    Q.    Were you so employed on the date of May 21 of 2012?

20    A.    Yes.

21    Q.    Okay.  And on that evening, did you have the

22    opportunity to respond to a location at 824 West Poplar

23    Avenue?

24    A.    I did.

25    Q.    Why did you respond to that location on that

*DIRECT - BRIAN DAY*                                                    277

1    evening?

2    A.    I responded to a call of an armed robbery in

3    progress at that address.

4    Q.    Where were you when you received the call?

5    A.    Directly across the street at a gas station.

6    Q.    And about how long did it take you to make the

7    location?

8    A.    Less than a minute.

9    Q.    And from what area did you enter the scene?

10   A.    I drove up the west side of Walgreens kind of by

11   the-drive through area and ended up at the rear of

12   Walgreens as far as I could go with my car.

13   Q.    And I'm going to pass forward a map --

14        **MR. SUMMERS:**  Your Honor, if I could publish

15   Exhibit 1 to the jury?

16        **THE COURT:**  Go ahead.

17   **BY MR. SUMMERS:**

18   Q.    Officer Day, do you recognize this map?

19   A.    I do.

20   Q.    Okay.  And using this map, can you instruct the

21   jury where you came into the scene at Walgreens that

22   evening?

23   A.    Yes, sir.

24   Q.    You can see the Walgreens building kind of in the

25   center of the screen there.

DIRECT - BRIAN DAY                                                      278

1              **THE COURT:**  Excuse me, Officer.  You can touch

2      the screen, and it will show up on the display.

3              **THE WITNESS:**  This will be Walgreens here.  I

4      came from across the street and came behind Walgreens

5      this way and stopped my car here.  I knew Officer Roberts

6      was the original responding officer, and he had given his

7      location back here somewhere (indicating).  So I

8      progressed on foot up to him.

9      **BY MR. SUMMERS:**

10     Q.    So your objective when you made the scene, was it

11     to make contact with Officer Roberts?

12     A.    It was.  I knew he was there by himself and that he

13     had several people that he had his eyes on.

14     Q.    And where did you park your squad car that evening

15     before you got out on foot?

16     A.    Right here at the curb (indicating).

17     Q.    So right there.  And what did you do next?

18     A.    I got out of my vehicle and I ran north, north of

19     Walgreens through here up to where Officer Roberts was.

20     I saw his vehicle with a white van there.

21     Q.    Based on when you first received the call I believe

22     you said across the street on Poplar Avenue, how long did

23     it take you to get to that location where you exited your

24     vehicle?

25     A.    Seconds, probably 30 seconds.

*DIRECT - BRIAN DAY*                                                      279

1    *Q.*    Okay.  And once you exited your vehicle and started

2    running, what did you see?

3    *A.*    As I approached, I saw Officer Roberts, his patrol

4    car, and he was standing in front of a white van.  He had

5    his weapon out and he appeared to be issuing commands to

6    people.

7    *Q.*    Okay.  And did you see any individuals in your line

8    of view?

9    *A.*    At that time I could not.  I could tell that he was

10   yelling into the van and that there were people in the

11   van.

12   *Q.*    At what point did you recognize what he was doing

13   and what was going on?

14   *A.*    As soon as I got within hearing distance of him, he

15   shouted to me that he had two people and that there were

16   another -- there was at least one more person running

17   through the field, and then he pointed over this

18   direction (indicating).

19   *Q.*    So what's the first thing you saw -- when did you

20   first recognize that there were more people on the scene

21   than what he had in the van?

22   *A.*    He told me that somebody was running through the

23   field.  And as I approached here, he directed me towards

24   the field.

25             **THE DEFENDANT:**  Objection, Your Honor.

UNREDACTED TRANSCRIPT

1          **THE COURT:**  What's your objection?

2          **THE DEFENDANT:**  He's relaying hearsay

3   information, Your Honor, that no one else verified to

4   anything regarding –– because taking the example he's

5   giving here, Your Honor, Officer Roberts never verified

6   he said any of this, Your Honor.

7          **THE COURT:**  Overruled.  Go ahead.

8   **BY MR. SUMMERS:**

9   *Q.*    When you –– at what location on this map, if you

10  could instruct us on this map, what location on the map

11  were you when you first noticed other possible suspects?

12  *A.*    Okay.  I was here (indicating).

13  *Q.*    Okay.  And what did you see?

14  *A.*    From there I saw two individuals running through

15  the field kind of in this general direction (indicating).

16  *Q.*    What were –– what was the clothing?  What were they

17  wearing?

18  *A.*    One was dressed in appeared to be a doctor's outfit

19  like a lab coat, and then another was dressed in black.

20  *Q.*    Okay.  And as you were running, did you –– at that

21  point did you make pursuit of those two individuals?

22  *A.*    I did.  I started running here through this

23  drainages area and got in behind him there in the open

24  field.

25  *Q.*    I'm going to pass forward three photos.

DIRECT - BRIAN DAY                                          281

1           **MR. PRITCHARD:**  Judge, these have been shown

2    to Mr. Jackson.

3           **THE COURT:**  Why don't we identify the exhibit

4    number for the record.

5           **MR. PRITCHARD:**  These are new.  They haven't

6    been introduced yet.

7           **THE COURT:**  I'm sorry.  Go ahead.

8    **BY MR. SUMMERS:**

9    Q.    Officer Day, if you could look at these three

10   photos I've just passed you, do you recognize what these

11   photos depict?

12   A.    I do.

13   Q.    What do they depict?

14   A.    The field where I initiated my foot pursuit and

15   chased the two individuals.

16   Q.    And they are in fact an active depiction of that

17   field that you had to run through?

18   A.    Yes.

19   Q.    The one depicted on this overhead map?

20   A.    Yes, sir, these pictures are the exact same

21   pictures of the aerial view we see there.

22          **MR. SUMMERS:**  Your Honor, I would ask these be

23   moved in as a collective exhibit.  I'll defer to --

24          **THE COURT:**  All right.  Mr. Jackson, any

25   objection?

UNREDACTED TRANSCRIPT

1           (The defendant and elbow counsel conferred).

2           **THE DEFENDANT:**  Yes, Your Honor.  I would like

3    to object, Your Honor, and I would like to ask a

4    question.  What is the relevance of these photos, Your

5    Honor?

6           **THE COURT:**  Well, I can't respond to that,

7    Mr. Jackson.  Just let me know if you have any objection

8    and what your objection is.

9           **THE DEFENDANT:**  Well, yes, sir, I have an

10   objection based on the relevance of these photographs.

11   Could the prosecution tell us what's the relevance?

12          **THE COURT:**  Overruled.  Go ahead.

13          **THE CLERK:**  Collective Exhibit 9.

14          (Said items were marked as Collective Exhibit

15          9).

16          **MR. SUMMERS:**  Your Honor, may I publish

17   these --

18          **THE COURT:**  Okay.

19          **MR. SUMMERS:**  -- to the jury?

20   **BY MR. SUMMERS:**

21   *Q.*   Officer Day, if you could, and I do notice it's

22   daytime, if you can tell us when this photo was taken and

23   of what it depicts?

24   *A.*   This photo is taken of the field north of

25   Walgreens.  In reference to what I did, this is where I

DIRECT - BRIAN DAY                                                283

1    observed the two individuals and began a foot pursuit.

2    Q.    When were these photos taken?

3    A.    They were taken during the daytime during a

4    follow-up visit to that area.

5    Q.    Is that when you, in fact, walked that scene again?

6    A.    Yes.

7    Q.    And so that accurately depicts the path you took in

8    order to track down the two suspects you saw in the

9    field?

10   A.    Correct.

11   Q.    Okay.  And I believe --

12         Again, we will refer back to the map, but to just

13   kind of explain the map and where we are in the photo,

14   where are we and where are we facing as we are looking in

15   this picture?

16   A.    We are facing west.  In the background you can see

17   Poplar Avenue and Taco Bell.  We would be north of the

18   Walgreens building.

19   Q.    So from the drainage ditch area, you have to

20   traverse the entire field to get over to Taco Bell?

21   A.    Correct.

22   Q.    Is that the direction you were heading?

23   A.    Yes.

24   Q.    Again, this is another view.  If you could describe

25   the view, the angle and what we are looking at.

UNREDACTED TRANSCRIPT

DIRECT - BRIAN DAY                                                    284

1    A.    We are looking east here towards the back of

2    Walgreens, which is actually where I parked my car, and

3    we are looking back across the field from the opposite

4    direction.  We are still across the field from Taco Bell.

5    Q.    At this point, are you in the middle of the field?

6    A.    Yes.

7    Q.    Okay.  And how far are the suspects you are

8    pursuing from you at this point?

9    A.    When I originally saw them at the north end of the

10   field, they were already passed this drainage area.  They

11   were running in what I would call the flat ground, which

12   is further south.

13   Q.    At this time, did you -- were you noticing any

14   evidence or were you just pursuing?

15   A.    I did, I saw the two individuals running through

16   the field, and between myself and them, there appeared to

17   be sort of a breadcrumb trail of clothing, white clothing

18   items.

19   Q.    Were both of the individuals you were pursuing

20   still clad in -- what were the two individuals you were

21   pursuing clad in at this point?

22   A.    At that point one was in all black, and the other

23   was in what appeared to be a white doctor's coat, which

24   also appeared to be what was on the ground ahead of me.

25   Q.    Okay.  And if we could show the last photo, I

1    believe.  And, again, if you could instruct the jury

2    exactly what we are looking at here.

3    A.    Right as I entered the drainage area to start my

4    foot pursuit, that would be the view I had going towards

5    Taco Bell.  It appeared at the time that the two

6    individuals were running more towards this sign over

7    here, which is down by Poplar Avenue, just the general

8    direction.

9    Q.    Okay.  We can reflect back now to the map, and

10   maybe that will help you give a good explanation of the

11   field.  And with this overhead view --

12          **THE COURT:**  Hold on one second.  Terry, can

13   you clear the mark or Mr -- now go ahead.

14          **MR. SUMMERS:**  Thank you, Your Honor.

15   **BY MR. SUMMERS:**

16   Q.    Using the device, the telestrator, if you could,

17   show the route with which you pursued the suspects that

18   you saw in the vehicle.

19   A.    I began here, and we came down through the drainage

20   area here, and then back up on to this flat ground is

21   around the time that I really got close behind them.  And

22   then we moved this direction, they were going to run just

23   to the right of that sign towards Taco Bell (indicating).

24   Q.    And as you made your way further through the field,

25   what happened?

*DIRECT - BRIAN DAY*                                                    286

1    *A.*    As we got to the edge of the field, to this road

2    next to Taco Bell --

3    *Q.*    Is that -- do you need the picture moved up?

4    *A.*    If we could scoot it up, we could see Taco Bell.

5    As we approached this area, I was issuing commands that I

6    was a police officer, stop, get on the ground the entire

7    time of the chase.  And as we approached that area right

8    there, the two males stopped, turned around, as one of

9    them turned around to face me, produced a handgun and

10   pointed it at me.

11   *Q.*    What did you have to do?

12   *A.*    At the same time I drew my weapon, ordered him to

13   the ground, I didn't have a safe shot.  I didn't want to

14   be in his line of fire, so I started running a little

15   northbound to get out of the way.  At that time, they

16   turned around and continued running again.

17   *Q.*    Okay.  And where did the pursuit continue to after

18   that?

19   *A.*    The two individuals began running this way very

20   close to each other.  They stopped here briefly in this

21   parking lot of Taco Bell.  They continued this way, and

22   at that time they split and went these two directions.

23   *Q.*    Okay.  And did you see what happened when they

24   stopped briefly?  Could you tell from your advantage?

25   *A.*    I heard -- as they stopped there, this parking lot

*DIRECT - BRIAN DAY*                                                            287

1    was full of customers.  Taco Bell was busy.  And I heard

2    a voice yell at someone to get in the mother fucking car.

3    Q.    How long did they stay at the vehicle or how long

4    did you see the pause or --

5    A.    Approximately 20 or 30 seconds.

6    Q.    Did that allow you to gain some distance?

7    A.    I did.  I gained ground on them.  So by the time we

8    were in front of Taco Bell, I was almost within arm's

9    reach.

10   Q.    And what happened next?

11   A.    They split.  One of the individuals ran up the Taco

12   Bell drive-through here, which was full of customers, and

13   the other one, all I saw was they continued running this

14   direction (indicating).

15   Q.    At this time, you had already made contact with

16   Officer Roberts.  Could you at your vantage point notice

17   any more officers on the scene?

18   A.    I could not.

19   Q.    What did you then personally decide to do when they

20   split?

21   A.    I decided to chase the individual that had drawn

22   the weapon on me.  That was the individual that was

23   running north through the drive-through, so I followed

24   him and pursued him up through the drive-through lane on

25   foot.

UNREDACTED TRANSCRIPT

1   Q.    I'll pass forward a photo to you.  If you could,

2   tell me what is in the photo I passed forward?

3   A.    In this photo I see the Taco Bell drive-through as

4   you are looking north past the restaurant back towards

5   where you would order your food.

6   Q.    When was that photo taken that you are looking at?

7   A.    That photo was taken the day we revisited the area

8   to get orientation during the daytime.

9   Q.    Does that accurately depict the varied path you

10  took the evening of 5-21-12?

11  A.    Yes, it does.

12          **MR. SUMMERS:**  Your Honor, I would ask that

13  we -- that that be placed into evidence as exhibit --

14          **THE COURT:**  Any objection, Mr. Jackson?

15          **MR. SUMMERS:**  -- next numbered exhibit.

16          **THE DEFENDANT:**  No objection, Your Honor.

17          **THE COURT:**  All right.  Without objection, it

18  will be marked as the next exhibit.

19          **THE CLERK:**  Exhibit 10.

20          (Said item was marked as Exhibit 10).

21          **MR. SUMMERS:**  If I could publish that, Your

22  Honor?

23          **THE COURT:**  All right.  Go ahead.

24  **BY MR. SUMMERS:**

25  Q.    If you could, Officer Day, explain to the jury what

UNREDACTED TRANSCRIPT

*DIRECT - BRIAN DAY*                                          289

1    this photo depicts?

2    *A.*    Sure.  We have a Taco Bell drive-through here.

3    Poplar Avenue would be back down, down below this line

4    here.  Over here we have a FedEx Photo Express training

5    building in the alleyway, and of course, if you are

6    familiar with the area, Target, that shopping center

7    would be up that direction (indicating).

8    *Q.*    And did you pursue the individual that had drawn

9    his weapon on you down this alley?

10   *A.*    I did.  Just as you see in this picture at the time

11   that night there were cars in the drive-through, so we

12   ran, both of us, right up this alley here.  Then he

13   crossed over this direction near this fence and jumped

14   over the fence (indicating).

15   *Q.*    Okay.  I'll pass forward on that note some more

16   photos.  And I passed several photos.  If you could look

17   through those and tell me what those are photos of?

18   *A.*    These are photos of a black semi-automatic handgun

19   lying in some mulch and landscaping.

20   *Q.*    Do those accurately depict that weapon as you, that

21   area, first of all, as it appeared that night to you?

22   *A.*    It does, yes.

23          **MR. SUMMERS:**  If we could -- well, if we could

24   move that in as Collective Exhibit -- the next numbered

25   collective exhibit?

UNREDACTED TRANSCRIPT

*DIRECT - BRIAN DAY*                                                     290

1              **THE COURT:**  Any objection, Mr. Jackson?

2              **THE DEFENDANT:**  No, sir.

3              **THE COURT:**  Without objection, it will be

4    marked as the next exhibit.

5              **MR. SUMMERS:**  Before we publish those, if we

6    could look at the map, I wanted to get...

7              **THE CLERK:**  Collective Exhibit 11.

8              (Said items were marked as Collective Exhibit

9              11).

10   **BY MR. SUMMERS:**

11   *Q.*    Officer Day, if you could instruct the jury again

12   as to your path of pursuit and to where you saw Mr.

13   Frazier?

14             **THE COURT:**  Mr. Summers, let me interrupt just

15   a second.  I want to be sure I'm clear and that the jury

16   is also.  Can you widen your view just a little?  I want

17   to be sure we are seeing where Walgreens is and the path

18   that he says he followed and so forth so there is not any

19   confusion about that.

20             So, Officer, if you would just identify where

21   the Walgreens store would be in this photo.

22             **THE WITNESS:**  Yes, sir, the Walgreens store is

23   the large building in the center of the screen.

24             **THE COURT:**  Just touch the screen and show us.

25             **THE WITNESS:**  This would be Walgreens

UNREDACTED TRANSCRIPT

1    (indicating).

2             **THE COURT:**  And I think you've already shown

3    the foot pursuit that you followed that evening.

4             **THE WITNESS:**  Correct, the foot pursuit I

5    started here, and in the general direction went like that

6    (indicating).

7             **THE COURT:**  Okay.  Now, move your photo, if

8    you would, Mr. Pritchard, so that -- I just want to be

9    sure the jury is clear about --

10            Now if you would show us, Officer, I think you

11   made reference to Taco Bell, where is the Taco Bell?

12            **THE WITNESS:**  Yes, Your Honor, this would be

13   Taco Bell (indicating).

14            **THE COURT:**  Again, show us where you testified

15   about a drive-through.

16            **THE WITNESS:**  Yes, sir, we pursued here.  The

17   individual I followed came up the drive-through lane this

18   way and eventually over the fence there (indicating).

19            **THE COURT:**  Is everyone clear on the

20   testimony?  Okay.  All right.  Now go ahead.

21            **MR. SUMMERS:**  Thank you, Your Honor.  Again,

22   Your Honor, thank you for that.  We will next, if we

23   could publish the photos that we've just shown Officer

24   Day.

25   **BY MR. SUMMERS:**

DIRECT - BRIAN DAY                                                    292

1    Q.    Officer Day, what does this photograph depict?

2    A.    This photo shows the black semi-automatic handgun

3    that was displayed against me during the foot pursuit and

4    where it was located in the landscaping and mulch by the

5    fence.

6    Q.    Okay.  Now that mulch area in that fence, is that

7    the area where you saw the suspect jump the fence?

8    A.    That's correct.  That's in the general area of the

9    Taco Bell drive-through where he jumped over the fence to

10   access the alley.

11   Q.    Is that the area you just showed us on the overhead

12   map?

13   A.    That is correct.

14   Q.    When did you first notice this weapon?

15   A.    After I had already taken the individual into

16   custody, I was 100 percent certain that a gun had been

17   pulled on me, but it was not on the individual when we

18   took him into custody.  I immediately retraced our steps

19   of the entire foot pursuit and located the gun just right

20   there at the fence.

21   Q.    Okay.  And you did that shortly there after taking

22   the suspect that you apprehended in custody?

23   A.    Correct, that was immediately after.

24   Q.    And did you, did you detain that suspect or did you

25   have another officer aid you in that?

DIRECT - BRIAN DAY                                                    293

1    A.    I had another officer aid me.  We handcuffed that

2    individual, and I said, I've got to go back and look for

3    the gun, so I had the other officer take the suspect.

4    Q.    Okay.  And when you -- you retraced your steps back

5    to this particular photo?

6    A.    Correct.

7    Q.    Location.  Now I'll, let's proceed to the next

8    photo, if you could tell the jury.  It may be much of the

9    same.  Is that again the same location?

10   A.    That is.

11   Q.    Is it an accurate depiction of that evening?

12   A.    Yes.

13   Q.    Is that the weapon?

14   A.    That's the weapon.

15   Q.    Is that a closeup of the same weapon?

16   A.    That is.

17   Q.    Okay.  And did you -- in securing that weapon, did

18   you in fact tag that or did you wait for someone else to

19   do that?

20   A.    I stood by it and let our detective come actually

21   pick the weapon up and secure it into evidence.

22   Q.    Which detective was that?

23   A.    Detective Brian Kiersey.

24   Q.    So you were there when he secured that weapon?

25   A.    I was.  I stood by with that weapon until he picked

UNREDACTED TRANSCRIPT

*DIRECT – BRIAN DAY*                                                    294

1    it up and put it into evidence.

2    Q.    If you could tell me what the picture I just passed

3    you shows.

4    A.    This is the alley behind the FedEx property in

5    Collierville.  This would be the alley that you would

6    encounter as you jumped over the fence by Taco Bell.

7    Q.    And is that the alley where you ordered the suspect

8    you apprehended to stop?

9    A.    That's correct.

10            **MR. SUMMERS:**  Your Honor, if we could mark

11   that as an exhibit --

12            **THE COURT:**  Next exhibit?  Any objection,

13   Mr. Jackson?

14            **THE DEFENDANT:**  No, sir, Your Honor.

15            **THE COURT:**  All right.  Without objection, it

16   will be marked as the next exhibit, Mr. Haley.

17            **THE CLERK:**  Exhibit 12.

18            (Said item was marked as Exhibit 12).

19   **BY MR. SUMMERS:**

20   Q.    If you could, Officer Day, please tell the jury

21   exactly what this is a photo of.

22   A.    It's a photo of the property behind FedEx with a

23   dumpster.

24   Q.    And in this photo, if you could, show the jury

25   where exactly was the suspect you apprehended that

*DIRECT - BRIAN DAY*                                                    295

1    evening arrested.

2    *A.*    Observed the suspect run across the lot from Taco

3    Bell and the fence to back in this area (indicating).  It

4    took me a minute to get over the fence.  When I got over

5    the fence, he was behind the dumpster.

6    *Q.*    And is that when you then caught up to him?

7    *A.*    Yes, we stopped around this area, ordered him -- I

8    already knew that they were armed or that that individual

9    was armed, ordered him to come out from behind the

10   dumpster with his hands up and he did so.

11   *Q.*    You did mention that you had the assistance of an

12   Officer Akin?

13   *A.*    Yes.

14   *Q.*    Where did Officer Akin enter the scene from?

15   *A.*    Officer Akin jumped over the fence with me.  He

16   said he saw me running on foot pursuit and joined me at

17   the fence.  Knowing that the suspect was armed, we didn't

18   both want to jump over the fence and into a gun fight, so

19   we covered each other and jumped over the fence together.

20   *Q.*    And I'll pass forward three more photos.  I believe

21   it's three.  If you could, tell me what these photographs

22   depict.

23   *A.*    Those would be the white doctor's coat that was

24   part of the so-called bread crumb trail that I saw when I

25   ran through the field.

*DIRECT - BRIAN DAY*                                                    296

1    *Q.*    And are those accurate depictions of the mask and

2    the lab coat that you saw in the field that evening?

3    *A.*    Yes.

4              **MR. SUMMERS:**  Okay.  And, Your Honor, if I

5    could have that marked as a Collective Exhibit I believe

6    that's 13?

7              **THE COURT:**  Any objection?

8              **THE DEFENDANT:**  No objection.

9              **THE COURT:**  It will be marked as the next

10   exhibit.

11             **THE CLERK:**  Collective Exhibit 13.

12             (Said items were marked as Collective Exhibit

13             13).

14             **MR. SUMMERS:**  Before I publish, if I may pass

15   forward the final, we could do it all at once.

16             **THE COURT:**  And I'm assuming that Mr. Jackson

17   has seen all of these before.

18             **MR. SUMMERS:**  Yes, Your Honor, per your

19   instructions, I did show those.

20   **BY MR. SUMMERS:**

21   *Q.*    Officer Day, could you please tell me what's in

22   that photo as well?

23   *A.*    It's a photo of a surgical type mask, white

24   surgical mask laying on the ground.

25   *Q.*    Is that part of the crumb trail that you had

UNREDACTED TRANSCRIPT

1    testified to?

2    A.    It was.

3              **MR. SUMMERS:**  I guess if we could have that

4    marked as an exhibit?

5              **THE COURT:**  Any objection, Mr. Jackson?

6              **THE DEFENDANT:**  No objection.

7              **THE COURT:**  It will be marked as the next

8    exhibit.

9              **THE CLERK:**  Exhibit 14.

10             (Said item was marked as Exhibit 14).

11             **MR. SUMMERS:**  Your Honor, may I publish

12   Exhibit 14?

13             **THE COURT:**  You may.

14   **BY MR. SUMMERS:**

15   Q.    If you could, please tell the jury what's in this

16   picture and where it's located?

17   A.    That's the white doctor's coat, and it's located in

18   the field where the foot pursuit happened.

19             **THE COURT:**  One second.  Which exhibit are we

20   looking at now?

21             **MR. SUMMERS:**  Sorry, Your Honor.

22             **MR. PRITCHARD:**  This is Exhibit 13, Your

23   Honor.

24             **THE COURT:**  13?  Go ahead.

25   **BY MR. SUMMERS:**

*DIRECT - BRIAN DAY*                                                     298

1    Q.    I noticed the drainage ditch in the background.

2    Where was this lab coat in relation to the area of your

3    pursuit, the beginning, the end?

4    A.    The lab coat was closer to the beginning of the

5    pursuant near the drainage area, which is closer to

6    Walgreens.

7    Q.    If we could move forward through I believe

8    Exhibit 13, and what does this picture depict?

9    A.    Appears to be the same image, closer zoom.

10   Q.    And again?

11   A.    Same.

12   Q.    If we could publish Exhibit 14.  And what is this a

13   picture of?

14   A.    The surgical mask.

15           **MR. SUMMERS:**  Your Honor, if I may just have

16   just a second.

17           **THE COURT:**  Okay.

18           **MR. SUMMERS:**  Your Honor, if I could republish

19   Exhibit Number 1?

20           **THE COURT:**  Hold on, you need something?

21           **THE DEFENDANT:**  I would like to object, Your

22   Honor, on the basis of again the relevance of these

23   exhibits constantly being displayed in front of the jury,

24   Your Honor.  It is already established that a crime has

25   been committed, Your Honor, and I think that would be

1    prejudicial and especially in light of every time I

2    object, you overrule it.  That may cause the jury to

3    think that you are correct, I'm wrong.  They are

4    insinuating my guilt based of other suspects' evidence

5    that are not even here on trial today, Your Honor.  It's

6    already established a crime has been committed, Your

7    Honor, but constantly showing this same evidence over and

8    over again may play in the jury's mind it's connected

9    with me, and that's prejudicial, Your Honor.

10             **THE COURT:**  Any response?

11             **MR. SUMMERS:**  Your Honor, I believe all the

12    evidence is highly relevant to the crime scene that

13    evening as Officer Day has told the story.  It

14    corroborates the scene as he saw it that night, what he

15    saw the individuals wearing.  It goes to, again,

16    connecting evidence that was found in the van to evidence

17    that was found in the field.  I believe it is extremely

18    relevant, Your Honor.

19             **THE COURT:**  Anything else, Mr. Jackson?

20             **THE DEFENDANT:**  Yes, sir, I disagree with

21    that, Your Honor, because that does not tie that evidence

22    to me, Your Honor.  That's still prejudicial, Your Honor.

23    Even though it identifies a crime being committed by

24    certain suspects, Your Honor, it does not tie them to me,

25    Your Honor.

1              **THE COURT:**  All right.  Well, the objection

2     will be overruled.  The witness has testified that he

3     responded to a call that night.  He's a police officer

4     with the Collierville Police Department.  He responded to

5     a armed robbery in progress call that evening, and he's

6     just testifying to what he personally observed.  So that

7     would be admissible.  It will be overruled.  Go ahead.

8              **MR. SUMMERS:**  Your Honor, if I could republish

9     Exhibit 1.

10    **BY MR. SUMMERS:**

11    *Q.*    Officer Day, just for orientation for the jury as

12    well as the Court, if you could once again describe to us

13    where in the path the mask and lab coat were recovered or

14    viewed by yourself on the evening of 5-21-12?

15    *A.*    Generally speaking, it would be back in this area

16    here, which is where the pursuit began (indicating).

17    *Q.*    Okay.  Is that the general area also where you

18    first made contact or first viewed the two suspects?

19    *A.*    It is.

20             **MR. SUMMERS:**  Your Honor, I believe that

21    concludes my examination.

22             **THE COURT:**  Mr. Jackson, would you like to

23    cross-examine?

24                        CROSS-EXAMINATION

25    **BY THE DEFENDANT:**

CROSS - BRIAN DAY                                                    301

1    Q.    Officer Day, I have a few questions regarding when

2    you say you got on -- you arrived on the scene to back up

3    Officer Roberts, approximately what time or how long in

4    time span if you can remember was the time from when you

5    actually arrived at the scene to meeting up with Officer

6    Roberts?

7    A.    The time it took me from the time I arrived in my

8    police car to the time I met the area with Officer

9    Roberts is no more than 30 seconds.

10   Q.    So is it pretty much a fair conclusion in your

11   opinion that the time he say he got on the scene with the

12   potential suspect and the time he say he seen a suspect

13   flee, approximately how close in time would you say you

14   were there to see that?  Because you say, if I'm not

15   mistaken, by the time you arrived up there to towards

16   that area, you seen two suspects fleeing; is that

17   correct?

18   A.    I saw the two suspects fleeing as I entered the

19   field upon the direction of Officer Roberts.

20   Q.    Did you ever see the two suspects where they fled

21   from or where did they come from?  Did they come from the

22   van or did they come from somewhere else?

23   A.    I couldn't see where they came from.  Officer

24   Roberts said that he had two running and pointed towards

25   the field, and when I saw them running through the field,

UNREDACTED TRANSCRIPT

1    I gave chase.

2    Q.   If I'm not mistaken, you just said that Officer

3    Roberts said he seen two running -- didn't you say or he

4    said himself that he only seen one suspect flee?

5            **THE COURT:**  Mr. Jackson, this witness was not

6    in the courtroom when the other witness testified so --

7            **THE DEFENDANT:**  Okay.

8            **THE COURT:**  -- keep that in mind.

9            **THE DEFENDANT:**  Okay.

10   **BY THE DEFENDANT:**

11   Q.   Who told you that one suspect was fleeing, as said

12   that earlier in your testimony?

13   A.   Officer Roberts said that he had suspects in the

14   field.

15   Q.   But you just said that he said that he had two

16   suspects fleeing.  Which one is correct?

17   A.   I don't know how many he said he had fleeing at the

18   time.  I know that he pointed toward the field and told

19   me that they, they were running in the field.

20   Q.   So they could possibly allude to more than one,

21   obviously, of course, right?

22   A.   Right.

23   Q.   Let me ask you this; at the time that the call went

24   out that a crime occurred with a business being robbed or

25   vandalized, et cetera, what was the description given out

*CROSS - BRIAN DAY*                                                      303

1    to dispatch, any local law enforcement?

2    *A.*    The description was the armed robbery in progress

3    at Walgreens, and they were male blacks, I believe two

4    male blacks.

5    *Q.*    That was the only description, no other specific

6    identifying characteristics?

7    *A.*    Clothing descriptions were white, white coats and a

8    black hoodie, I believe.

9    *Q.*    So two male suspects, et cetera, white lab coats,

10   et cetera, et cetera, pretty fair general, but in the way

11   of specific identification, if you seen these people, you

12   would be able to identify them, correct?

13   *A.*    Yes.

14   *Q.*    Okay.  Let me ask you this, as you are a officer of

15   the law, would that have anything to do with you seeing

16   two occupants in the vehicle?  Would that arise your

17   suspicion to stop if you seen someone attempt to try to

18   get in a vehicle and run, or how would your instincts

19   kick in as a law enforcement officer regarding this

20   question?

21          **THE COURT:**  Mr. Jackson, if you will, reask

22   your question.  You lost me somewhere there.

23   **BY THE DEFENDANT:**

24   *Q.*    Dealing with two occupants in the vehicle, and you

25   have a description of two suspects who committed a crime,

UNREDACTED TRANSCRIPT

CROSS - BRIAN DAY                                                    304

1   but you see two occupants in a vehicle, would that cause

2   you to stop these occupants or basically ascertain were

3   there any -- what are they doing in a certain location

4   and if they know anything regarding the crime, or would

5   you automatically stop them and pull them out to search

6   and/or arrest them?  What would be your protocol

7   basically as a law enforcement officer?

8   A.    I'm not really sure I understand the question.

9          THE COURT:  Let's break it down to -- let's

10  simplify it to just one question at a time.  Maybe that

11  will help.

12  BY THE DEFENDANT:

13  Q.    Sorry.  You received a call about a suspect

14  committing a crime, correct?

15  A.    Correct.

16  Q.    The description you gave that you just stated was

17  two male blacks, et cetera, white lab coats, et cetera,

18  et cetera, okay.  What was the description given to you

19  as compared to the suspects in the vehicle?

20  A.    I never saw anybody in the vehicle.  The way we

21  work with law enforcement is that officer said that he

22  was fine there and directed me to the next phase of the

23  incident.

24  Q.    Okay.  And according to your knowledge, that

25  officer, he was fine there, that's what you just stated,

1   correct?

2   A.    I had another other officer arriving behind me.  In

3   the progression of officers arriving, it would be my job

4   to go next to the next phase of the incident.

5   Q.    The next phase, according to you, your knowledge,

6   was that you were in pursuit of two other suspects, they,

7   right?

8   A.    Correct.

9   Q.    Okay.  So in your opinion, would there be any

10  reason to detain any other people on that scene,

11  according to your knowledge now that you know about the

12  situation?

13  A.    Are you asking my responsibility as to the vehicle?

14  Q.    Yeah.

15  A.    No, there was already an officer on that vehicle.

16  There were more officers arriving behind me, so the

17  priority for me would be any suspects fleeing on foot.

18  Q.    And there was no description of any vehicle or

19  anything like that?  Did you all get a description of a

20  alleged vehicle or anything of that nature?

21  A.    I don't recall.  Me personally, I don't recall

22  hearing a description of the vehicle.

23  Q.    On dispatch.  What about any suspicious looking

24  vehicles, did you get any description of that over the

25  dispatch?

1   A.    As I arrived on scene, I heard Officer Roberts on

2   the radio advise that he had a vehicle parked at

3   Walgreens in the lot, and he was going to be with that

4   vehicle.

5   Q.    Then that car didn't come out as far as a vehicle

6   being, looking suspicious according to a crime, right?

7   A.    I don't recall.

8            (The defendant and elbow counsel conferred.)

9   **BY THE DEFENDANT:**

10  Q.    Okay.  Just to back up for a second, when you say

11  you seen the two suspects fleeing, correct, or you were

12  told?

13  A.    I saw them fleeing in the field, yes.

14  Q.    Okay.  So approximately what time -- by the time

15  you arrived on the scene with Officer Roberts, you said

16  it was literally a span between 30 seconds, correct?

17  A.    Yes.

18  Q.    So when you got there, you say you seen the

19  suspects fleeing already in the field, or did you see

20  them at a vehicle?

21  A.    I approached Officer Roberts who directed me -- at

22  that time, I could not see the field.  I could see

23  Officer Roberts in front of the van.  He indicated to me

24  that I needed to be heading toward the field.  And when I

25  entered the edge of the field is when I saw two

*REDIRECT - BRIAN DAY*                                                    307

1    individuals running.

2    *Q.*    So according to your testimony, you never seen two

3    individuals towards the vehicle or anything of that

4    nature?

5    *A.*    No, by the time I arrived, I saw Officer Roberts

6    with his weapon out in front of the van and then Officer

7    Roberts directing me toward the field.  When I entered

8    the field, I saw two people running.

9               **THE DEFENDANT:**  No further questions, Your

10   Honor.

11              **THE COURT:**  Any redirect?

12              **MR. SUMMERS:**  Very briefly, Your Honor.

13                    REDIRECT EXAMINATION

14   **BY MR. SUMMERS:**

15   *Q.*    Mr. Jackson asked you several times about dispatch,

16   and I just wanted to ask about that.  If you could

17   explain to the jury what is dispatch?

18   *A.*    Our dispatch is our 911 operators, the same

19   individuals you would encounter if you dialed 911.  They

20   also communicate to us by radio.  So when the call came

21   out that a robbery was being committed at Walgreens, it

22   was received by our dispatchers, 911 operators, they

23   immediately turn around and tell us over the radio what's

24   going on, and that's who we communicate with during the

25   incident.

*REDIRECT - BRIAN DAY*

1   Q.    And that communication from them is they are not on

2   the scene?

3   A.    No, they are not.

4   Q.    Okay.  And further, other communications between

5   officers, do y'all have radios?

6   A.    We do.  We all have radios.  It's all the same

7   channel, so we communicate with each other and dispatch

8   at the same time.

9   Q.    Was all of that going on at one time that evening?

10  A.    It was.  We were receiving calls from dispatch and

11  then as Officer Roberts arrived on the scene, we were

12  receiving radio traffic from Officer Roberts' dispatch

13  and also the other officers who were on the way.

14          **MR. SUMMERS:**  No further questions, Your

15  Honor.

16          **THE COURT:**  Thank you, Officer Day.  You can

17  step down.

18          (Witness excused).

19          **THE COURT:**  Call your next witness.

20          **MR. SUMMERS:**  Yes, Your Honor.  The United

21  States could call Officer Tolbert.

22          **THE COURT:**  Ladies and gentlemen, anytime we

23  are waiting on a witness to come in or something, if you

24  want to stand up and stretch, you need to move around a

25  little and that helps, feel free to do so.

*DIRECT - ERIC TOLBERT*                                          309

1                          ***ERIC TOLBERT,***

2    having been first duly sworn, took the witness stand and

3    testified as follows:

4              **THE COURT:**  Sir, if you would come up and have

5    a seat in the witness chair, make yourself comfortable

6    and adjust the microphone however you need to so we can

7    hear your testimony clearly.

8              **THE WITNESS:**  Yes, sir.

9              **THE COURT:**  All right.  Mr. Summers.

10             **MR. SUMMERS:**  Your Honor, I believe

11   Mr. Jackson is reviewing the potential photographs.

12             **THE COURT:**  Okay.

13             **MR. SUMMERS:**  Your Honor, for the record,

14   these are photographs that have been given to Mr. Jackson

15   in discovery.  I just wanted to apprise him of what we

16   would be using.

17                      DIRECT EXAMINATION

18   **BY MR. SUMMERS:**

19   *Q.*    Officer, please state your full name for the

20   record, first and last, and if you could spell it for the

21   benefit of the court reporter.

22   *A.*    Eric Tolbert, E-R-I-C, T-O-L-B-E-R-T.

23   *Q.*    Officer Tolbert, where are you currently employed?

24   *A.*    Collierville Police Department, Collierville

25   Tennessee, Shelby County.

*DIRECT - ERIC TOLBERT*                                                  310

1    Q.    How long have you been with the Collierville Police

2    Department?

3    A.    Since May 2009.

4    Q.    In exercising your duties with the Collierville

5    Police Department, did you have occasion to respond to a

6    scene on May 21st, 2012, at 824 West Poplar?

7    A.    Yes, I did.

8    Q.    Now particularly on that evening, what area of that

9    corner did you respond to?

10   A.    I responded from the area of headquarters, and per

11   dispatch, they had advised Officer Brian Day said that

12   there was two suspects running westbound from the area of

13   Walgreens, so I bypassed the area of Walgreens at that

14   address right at the area of 880 West Poplar, just west

15   of a Taco Bell restaurant on Poplar Avenue.

16   Q.    Were you in a squad car that evening?

17   A.    Yes, sir, I was.

18   Q.    Were you by yourself?

19   A.    Yes, sir, I was.

20   Q.    And you said you made entry at 880 West Poplar?

21   A.    I bypassed the area at 880 West Poplar in my patrol

22   unit, yes, sir.

23   Q.    Why did you make that decision?

24   A.    To attempt to see if I could locate the subjects

25   that were running westbound.

*DIRECT - ERIC TOLBERT*                                               311

1   Q.   Okay.  And if I could direct your attention towards

2   the map.

3              **MR. SUMMERS:**  Your Honor, if I may publish

4   Exhibit 1?

5              **THE COURT:**  Okay.

6   **BY MR. SUMMERS:**

7   Q.   Have you had a chance to look at this map?

8   A.   Yes, sir.

9   Q.   Are you oriented with this map?

10  A.   Yes, sir, I am.

11  Q.   What are we looking at right here?

12  A.   This appears to be the Walgreens building right

13  here (indicating).

14  Q.   Okay.  If we move over --

15             **THE COURT:**  Officer, you can touch the screen

16  and it will --

17             **THE WITNESS:**  Yes, this appears to be the

18  Walgreens building here (indicating).

19  **BY MR. SUMMERS:**

20  Q.   If we move over a little bit, can you please tell

21  me what that view is of?

22  A.   This is going to be Poplar westbound --

23             **THE COURT:**  Hold on one second.  Why don't you

24  clear that.  I know you don't have enough hands to do all

25  this, but if you can clear that.

UNREDACTED TRANSCRIPT

*DIRECT - ERIC TOLBERT*                                          312

1              Now go ahead, Officer.

2         **THE WITNESS:**  Okay.  This is westbound Poplar

3    Avenue right here, and this is going to the Taco Bell

4    restaurant at 880 West Poplar (indicating).

5    **BY MR. SUMMERS:**

6    *Q.*    What path did you traverse to get entry point, did

7    you come that direction down Poplar, which side?

8    *A.*    Yes, sir, I traveled westbound on Poplar Avenue

9    just past the Taco Bell restaurant.

10   *Q.*    So at that entrance, is that where you entered?

11   *A.*    No, sir, actually I went beyond that point.

12   *Q.*    Okay.

13   *A.*    This is a store front shopping area just west of

14   880 West Poplar, and I actually pulled in to this parking

15   lot traveling back eastbound based off the information

16   that my partner provided over the radio.

17   *Q.*    And that partner was Officer Day?

18   *A.*    Yes, sir, Officer Day.

19   *Q.*    Where did you ultimately park your squad car?

20   *A.*    I parked my squad car right here at this opening

21   because they advised that the subjects, one of the

22   subjects was observed to jump the gate right over here in

23   this area back behind this shopping center.  So I just

24   parked my vehicle right here kind of at that opening

25   between the shopping center and 880 West Poplar, Taco

                    UNREDACTED TRANSCRIPT

*DIRECT - ERIC TOLBERT*                                                313

1    Bell (indicating).

2    *Q.*    After you parked your vehicle, what did you do?

3    *A.*    I happened to observe one male subject later

4    identified to be Christofer Broden, he appeared to look

5    like what I would say, if I can say it, a cartoon

6    burglar.  He had a face mask that was on.  He had a bag

7    in his hand, a white bag.  He was wearing a black

8    sweatshirt, black pants, dark stocking cap, and he was

9    running actually eastbound around the store front going

10   this way on eastbound (indicating).

11   *Q.*    When did you first notice Mr. Broden and what he is

12   wearing?

13   *A.*    I first noticed him as I was driving through this

14   parking lot right here.  I happened to notice him running

15   along the store front, and then as soon as I parked my

16   vehicle I noticed him attempt to pass by my patrol unit.

17   *Q.*    If you could mark for us on the map where you first

18   saw for the first time Mr. Christofer Broden?

19   *A.*    I first saw him right over here in this area

20   running eastbound.

21   *Q.*    And at that point, you parked your squad car?

22   *A.*    Yes.

23   *Q.*    And began a foot pursuit?

24   *A.*    Yes, sir.

25   *Q.*    Where ultimately did you catch up with Mr. Broden?

UNREDACTED TRANSCRIPT

*DIRECT - ERIC TOLBERT*                                                    314

1    A.    He was about 10 yards ahead of me, and I was able

2    to catch up with him and actually detain him right here

3    at this entrance just east of 880 West Poplar, the Taco

4    Bell restaurant.  This is the entrance that goes into

5    another shopping center, a Target shopping center, the

6    drive (indicating).

7    Q.    And when you detained him, was he armed?

8    A.    No, sir, not at the time.

9    Q.    And did you -- this evening was one of your

10   responsibilities to collect any evidence?

11   A.    It was after everything, after I transported, I

12   think I transported Javon Frazier to jail.

13   Q.    At that point you did participate in the processing

14   of evidence?

15   A.    I assisted, yes, sir.

16   Q.    But on that evening at this point your

17   responsibility was to detain Mr. Broden?

18   A.    Yes, sir.

19   Q.    Where did you place him?

20   A.    I placed him into a partner's patrol unit,

21   Officer -- I can't remember the name off the top of my

22   head right now.  He just, he retired from our police

23   department, but I placed him in this patrol unit because

24   he was the one that actually assisted and pulled up with

25   us.

DIRECT - ERIC TOLBERT                                    315

1    Q.    Okay.  I'm going to pass forward a couple of

2    photos.  And, Officer Tolbert, if you could tell me what

3    is depicted in those photos?

4    A.    The first picture showing the area of the store

5    front right around the area that I parked my vehicle, my

6    patrol unit just west of 880 West Poplar.

7    Q.    And the second picture?

8    A.    The second picture is actually going to be front

9    drive of a Taco Bell and their parking lot, the area

10   where I actually was on foot pursuit of Christofer

11   Broden.

12            **MR. SUMMERS:**  Your Honor, at this time I would

13   ask that these pictures be marked as Collective

14   Exhibit -- the next numbered collective exhibit.

15            **THE COURT:**  Any objection?

16            **THE DEFENDANT:**  No objection, Your Honor.

17            **THE COURT:**  It will be marked as the next

18   collective exhibit.

19            **THE CLERK:**  Exhibit 15.

20            (Said items were marked as Collective Exhibit

21            15).

22            **MR. SUMMERS:**  Your Honor, may I publish those?

23            **THE COURT:**  You can.

24   **BY MR. SUMMERS:**

25   Q.    Officer Tolbert, if you can explain to me and to

UNREDACTED TRANSCRIPT

*DIRECT - ERIC TOLBERT*                                              316

1    the jury what's depicted in this photograph?

2    A.    This is the store front area just west of 880 West

3    Poplar, Taco Bell.  Taco Bell is going to be just east of

4    this picture.  I actually parked my patrol unit right

5    around this area, kind of blocking off this entry point

6    into the back area of the store front (indicating).

7    Q.    And if we could move to the next photo, it might

8    help.  And exactly what angle is this photo taken from?

9    A.    This is facing eastbound.  This is eastbound facing

10   Poplar.  And this is going to be the front of Taco Bell.

11   Taco Bell is going to be positioned right here.  And this

12   is the area where I did the foot pursuit of Christofer

13   Broden (indicating).

14   Q.    From the direction of where you parked your

15   vehicle?

16   A.    Yes, sir.

17   Q.    And I noticed that these two photos are in the

18   daytime.  When were these taken?

19   A.    It was in the daytime, I think in the afternoon.

20   Q.    Okay.  And were these recently?

21   A.    Yes, sir, they were.

22   Q.    And was this when we were walking the scene again?

23   A.    Yes, sir, it was.

24   Q.    Is this an accurate depiction from that evening of

25   exactly the path you had to take in order to apprehend

DIRECT - ERIC TOLBERT                                                317

1    Christofer Broden?

2    A.    Yes, sir, it is.

3    Q.    I'm going to move on to the next phase of your

4    investigative duties.  You said you began participating

5    in the process of the collection of evidence?

6    A.    Yes, sir.

7    Q.    And on the day similar to when we viewed the crime

8    scene, did you also accompany -- or did you also go out

9    to the van with other officers in order to look for, to

10   evaluate evidence that was still in the van?

11   A.    Yes, sir.

12   Q.    If you could, tell the jury what was the condition

13   of the van and where was it?

14   A.    The van was actually in a locked position.  It was

15   in our seizure lot at Collierville Police Department.

16   It's off of Keogh Road.  It was locked and secured in the

17   seizure lot.

18   Q.    What is kept in the seizure lot?

19   A.    The seizure lot, it keeps all the vehicles, large

20   pieces of property that we're unable to keep in our

21   actual property room in our detective division.

22   Q.    Was the evidence within that van, was it sealed on

23   your property lot?

24   A.    Yes, sir, it was.

25   Q.    And do you remember the day that you went out to

UNREDACTED TRANSCRIPT

*DIRECT - ERIC TOLBERT*                                              318

1   view this van again?

2   A.    Yes, sir, I do.

3   Q.    And I'm going to pass forward -- I guess I'll start

4   with some photos.

5         Officer, I'm going to pass a picture up.  If you

6   could tell the jury what -- could you first describe --

7   do you recognize the picture?

8   A.    Yes, sir, I do.

9   Q.    What's in that picture?

10  A.    The Chrysler Town and Country van.

11  Q.    Is that van the van as it appeared on the day that

12  you reevaluated it on your seizure lot?

13  A.    Yes, sir.

14  Q.    And that is an accurate photo of that van?

15  A.    Yes, sir, it is.

16              **MR. SUMMERS:**  Your Honor, I would ask that

17  that be marked the next numbered exhibit.

18              **THE COURT:**  Any objection, Mr. Jackson?

19              **THE DEFENDANT:**  No objection.

20              **THE COURT:**  It will be marked as the next

21  exhibit.

22              **THE CLERK:**  Exhibit 16.

23              (Said item was marked as Exhibit 16).

24              **MR. SUMMERS:**  If we could publish that.

25              (Pause).

UNREDACTED TRANSCRIPT

*DIRECT - ERIC TOLBERT*                                          319

1    **BY MR. SUMMERS:**

2    *Q.*    And, Officer Tolbert, can you describe to the jury

3    what's in this photo?

4    *A.*    Yes, sir, this is going to be the white Town and

5    Country Chrysler van that was seized on the night of

6    May 21st, 2012, in regards to the aggravated robbery.

7    *Q.*    Were you present when this photo was taken?

8    *A.*    Yes, sir, I was.

9    *Q.*    In fact, did you take the photo?

10   *A.*    Yes, I did.

11   *Q.*    And if you could just inform the jury, what was the

12   condition that day when you went out to the lot and first

13   started to view this van?

14   *A.*    When we came up to the van, it was secured in our

15   locked lot, so we had to get the keys to unlock the gate

16   to this lot.  It's our seizure lot.  And then we had to

17   actually open up the keys that were seized from that

18   date, May 21st, 2012, to be able to unlock the locked

19   doors of the Chrysler Town and Country van.

20   *Q.*    Had those keys also been marked and tagged in

21   evidence?

22   *A.*    Yes, sir, they were.

23   *Q.*    So in order to get into the van, you had to use

24   those keys?

25   *A.*    Yes, sir.

UNREDACTED TRANSCRIPT

*DIRECT - ERIC TOLBERT*                                         320

1    Q.    Okay.  So had the van been locked and closed in its

2    current condition since the night of May 21, 2012?

3    A.    Yes, sir.

4    Q.    I'll show you another photo.

5          **MR. PRITCHARD:**  Your Honor, this is what's

6    previously been marked as Exhibit 3.

7    **BY MR. SUMMERS:**

8    Q.    Officer Tolbert, could you please tell the jury

9    what you see in this picture?

10   A.    Yes, sir.  It's going to be the same Chrysler Town

11   and Country van.  That's going to be -- it looks, appears

12   to be on the night of the actual event that occurred as

13   it was parked right behind the Walgreens parking lot just

14   north of Walgreens.

15   Q.    Did you have a chance personally to observe this

16   van that evening?

17   A.    Yes, sir, I did.

18   Q.    Is this an accurate depiction of that van?

19   A.    Yes, sir, it is.

20   Q.    This is the exact van that you searched later?

21   A.    Yes, sir.

22   Q.    Officer Tolbert, I've passed you forward a bag.  If

23   you could open that bag and tell me what the contents

24   show.

25   A.    Okay.  This is going to be a blue Columbia bag,

*DIRECT - ERIC TOLBERT*                                                      321

1   backpack.

2   Q.    And in that backpack that you are viewing, is that

3   a backpack that you collected as evidence?

4   A.    Yes, sir, I did.

5   Q.    Did you in fact tag and seal that bag on the day

6   that you went to the vehicle?

7   A.    Yes, sir, I did.

8   Q.    If you could tell me what's -- what are the

9   contents of that bag?

10  A.    Inside the bag it had various written and

11  typewritten paperwork.  It had a blue glove with a box of

12  Wolf .9 millimeter full metal jacket dark gray

13  ammunition.  It was about 30 rounds in that box.  It was

14  a box of 50.

15  Q.    So that was located within a backpack?

16  A.    Yes, sir, it was.

17  Q.    The backpack that you are holding there?

18  A.    Yes, sir.

19  Q.    What else is in that backpack?

20  A.    It had -- let me see, I listed it here on this

21  property receipt.  Miscellaneous photos, Total Rewards

22  card that had the name of Ronnie Jackson displayed on it,

23  Fitz Rewards Key card, bulk alcohol prep pads, an LG cell

24  phone battery, two bottles of clear liquid, and two

25  orange staplers.

*DIRECT - ERIC TOLBERT*                                           322

1          **MR. SUMMERS:**  Your Honor, I ask that that be

2    marked into evidence as collective exhibit, the next

3    numbered collective exhibit.

4          **THE COURT:**  Any objection?

5          (The defendant and elbow counsel conferred).

6          **THE DEFENDANT:**  Yes, sir, Your Honor.  I would

7    just like to note the objection on the record, general

8    objection based on prejudice, Your Honor.

9          **THE COURT:**  Based on prejudice?

10         **THE DEFENDANT:**  Yes, sir.

11         **THE COURT:**  All right.  Overruled.

12         **THE CLERK:**  Collective Exhibit 17.

13         (Said items were marked as Collective Exhibit

14         17).

15   **BY MR. SUMMERS:**

16   *Q.*   If you could open that bag.

17   *A.*   Yes, sir.

18   *Q.*   And within that bag, what do you see?  What kind of

19   work or what's in there?

20   *A.*    It appears to be typewritten paperwork and

21   handwritten paperwork.  It looks like school work.

22   *Q.*    Okay.  And within this bag and amongst the school

23   work you said that you also -- you recovered a what, what

24   else did you find?

25   *A.*    I recovered -- it was a blue latex glove, and

DIRECT - ERIC TOLBERT                                            323

1    inside the blue latex glove is a box that displayed the

2    name brand of Wolf brand of ammunition.  It was a .9

3    millimeter dark gray in color full-metal jacket, .9

4    millimeter rounds.

5    Q.    And at this time I'll pass forward to you another

6    exhibit, a bag.  If you could, is this a bag from that

7    day when you collected more evidence?

8    A.    Yes, sir.

9    Q.    And you sealed that bag and of course collected the

10   evidence in there?

11   A.    Yes, sir, I did.

12   Q.    If you could open it and tell us what's inside.

13   A.    This is going to be the blue latex glove, and this

14   is the box of the Wolf .9 millimeter ammunition, and

15   inside it had a count of 30 rounds in a box of 50, and

16   they are dark gray in color.

17             MR. SUMMERS:  Okay.  And, Your Honor, at this

18   time, if I can mark that --

19   BY MR. SUMMERS:

20   Q.    What else is in that bag?  Let me make sure I've

21   covered everything that's in that.

22   A.    Yes, it was a Southwest Tennessee Community College

23   lanyard with an ID card that has printed Ronnie Jackson

24   on it and a picture.  And also there is -- it's a cloth

25   that appears to be one of the masks, and it's kind of

*DIRECT - ERIC TOLBERT*                                                 324

1    make shift with a knot, and inside it it had

2    approximately 18 or 19 rounds of ammunition.  It's a mix,

3    both .9 millimeter -- well, .9 millimeter rounds, one

4    being the dark gray Wolf .9 millimeter full metal jacket,

5    and it's a ELD .9 millimeter hollow point.

6               **MR. SUMMERS:**  Okay.  And, Your Honor, at this

7    time I ask that the evidence collected there might be

8    marked into evidence as the next numbered collective

9    exhibit.

10              **THE COURT:**  Any objection, Mr. Jackson?

11              (The defendant and elbow counsel conferred.)

12              **THE DEFENDANT:**  Yes, sir, Your Honor.  I would

13   like to object, Your Honor, on the ground that the

14   evidence is falsified, Your Honor.

15              **THE COURT:**  The evidence is falsified?

16              **THE DEFENDANT:**  Yes, sir.

17              **THE COURT:**  Let's have a side bar.

18              Mr. Woods, you can come up, if you would like

19   to.

20              (The following occurred at the bench:)

21              **THE COURT:**  Okay.  Mr. Jackson, what's your

22   basis for alleging that it's falsified?

23              **THE DEFENDANT:**  That evidence, Your Honor, was

24   not found in the bag.  That's when -- when I get the turn

25   to cross-examine him, I was going to bring it out in my

*DIRECT - ERIC TOLBERT*                                          325

1    questioning, but if that evidence was found in my bag,

2    Your Honor, it would have been taken a picture of it in

3    the bag, it would be inventoried.  But I got pictures

4    that the stuff is on the floor.  And I know for a fact,

5    Your Honor, I was in high school -- I mean in college.

6    That is not my image, Your Honor.  I don't know if law

7    enforcement put it there or one of the suspects, Javon or

8    Christofer put it there.  That wasn't in the bag, Your

9    Honor.

10              **THE COURT:**  Well, you can bring that up on

11    cross-examination.

12              **THE DEFENDANT:**  That's what I wanted to do,

13    but I just wanted to object in general because of that,

14    but I don't know the proper grounds to allege, but that's

15    what I'm getting at because that is not my evidence.

16              **THE COURT:**  Any response?

17              **MR. SUMMERS:**  It's not a proper objection,

18    Your Honor, for rules of evidence.

19              **THE COURT:**  I'll overrule the objection, but

20    again, that would appear to be something you could bring

21    up in cross-examination.  Okay.

22              (The following occurred in open court:)

23              **THE COURT:**  Okay.  Mr. Summers, let's see, you

24    had moved to admit, let's see, it was the glove and the

25    ammunition and the ID card.  Was there anything else

*DIRECT - ERIC TOLBERT*                                                    326

1    included in that exhibit?

2              **MR. PRITCHARD:**  No, sir, that's everything.

3              **THE COURT:**  Is that correct, Mr. Summers, you

4    move for admission of that?

5              **MR. SUMMERS:**  That is correct.

6              **THE COURT:**  Mr. Haley, let's mark that as the

7    next exhibit.

8              **THE CLERK:**  Yes, Your Honor, Collective

9    Exhibit 18.

10             (Said items were marked as Collective Exhibit

11             18).

12             **MR. SUMMERS:**  Thank you, Your Honor.

13   **BY MR. SUMMERS:**

14   *Q.*   Officer Tolbert, if we could look through some of

15   those contents again and publish those to the jury, if

16   you could, I guess we will begin with the student ID.

17             **MR. SUMMERS:**  If we could publish that, Your

18   Honor.

19             **MR. PRITCHARD:**  Which exhibit do you want?

20             **MR. SUMMERS:**  I guess the last -- the

21   backpack.  Let's start with the bag.

22             **MR. PRITCHARD:**  The backpack?

23             **MR. SUMMERS:**  Exhibit 17.

24             **THE COURT:**  I believe the last one was 18; is

25   that correct, Mr. Haley?

*DIRECT - ERIC TOLBERT*                                                327

1          **THE CLERK:**  The very last one was 18.

2          **THE COURT:**  The very last one was 18.

3          **MR. SUMMERS:**  I was going to -- I guess --

4    okay.  I guess 18 had the card in it.  I'm sorry.  I'm

5    getting my numbers confused.  Yes, you were right,

6    Mr. Pritchard.

7    **BY MR. SUMMERS:**

8    *Q.*    Officer Tolbert, if you could tell the jury exactly

9    what this is.

10   *A.*    Yes, sir, this is going to be the blue latex glove,

11   and inside the blue latex glove when I recovered this

12   property inside the white Chrysler Town and Count van on

13   our seizure lot, it contained this black Wolf brand .9

14   millimeter full metal jacket, dark gray round ammunition,

15   and they are a packaged inside that Wolf box.  And it was

16   approximately 30 rounds.

17   *Q.*    Again, that ammunition was found in the backpack

18   that included documents or like homework belonging to

19   Mr. Jackson; is that correct?

20   *A.*    Yes, sir, that's correct.

21   *Q.*    Officer Tolbert, if you could describe to the jury

22   what this is a picture of.

23   *A.*    It's going to be a lanyard with a plastic covering

24   showing Southwest Tennessee Community College student ID

25   card with the printed name of Ronnie Jackson on it with a

*DIRECT - ERIC TOLBERT*                                              328

1    picture as well right above it.

2              **THE COURT:**  Mr. Pritchard, adjust your zoom,

3    if you would, a little so we can see that a little

4    better.  Now.

5    **BY MR. SUMMERS:**

6    *Q.*    Officer Tolbert, if you could instruct the jury as

7    to what's on the projector.

8    *A.*    Yes, sir.  What it appears to be, like a cloth mask

9    that turned into a makeshift bag using a knot to try to

10   tie it together containing around 18 to 19 rounds of

11   mixed ammunition, one being the gray Wolf brand .9

12   millimeter full-metal jacket, and the other being ELD

13   brand hollow point .9 millimeter round.

14   *Q.*    Okay.  Officer Tolbert, if you could tell me what

15   I've just handed you, what are those photos of?

16   *A.*    This is going to be photos that I had taken on the

17   day that I went to the seizure lot to inspect the van

18   after unlocking it and the interior.

19   *Q.*    If you could go through and tell me what's in each

20   one.

21   *A.*    The first picture is going to be the rear passenger

22   side seat on the driver's side.  It's going to show this

23   blue Columbia backpack and the contents that are around

24   it and within it.

25   *Q.*    Okay.  What's the next --

*DIRECT - ERIC TOLBERT*                                                329

1          **THE DEFENDANT:**  Could he repeat that?

2          **THE COURT:**  You want him to repeat that?

3          **THE DEFENDANT:**  Yes, sir.

4          **THE COURT:**  If you would repeat what you just

5    said.

6          **THE WITNESS:**  It's going to be in the back

7    passenger seat behind the driver's side.  It's the blue

8    Columbia backpack with the contents that are within it

9    and contents and items that are around it in that area.

10   **BY MR. SUMMERS:**

11   *Q.*    Okay.  What else in is in the picture?

12   *A.*    On the picture, it's showing three city citations,

13   traffic violations, moving violations that were issued,

14   and it has a black -- appears to be a cloth bag that has

15   a Dollar General name printed on it, a white plastic bag

16   and various paperwork and items around.

17   *Q.*    Does that picture accurately reflect and does the

18   other one accurately reflect the van as you were viewing

19   it that day and as you were taking photographs and

20   collecting evidence?

21   *A.*    Yes, sir.

22   *Q.*    Again, those three traffic citations, they were

23   located in that vehicle?

24   *A.*    Yes, sir, they were.

25   *Q.*    You did take a picture of those?

*DIRECT - ERIC TOLBERT*                                                     330

1   *A.*    Yes, sir.

2   *Q.*    Did you also collect those in evidence?

3   *A.*    Yes, sir, we did.

4   *Q.*    And the next picture, what does that reflect?

5   *A.*    Okay.  The next picture is going to be me holding

6   the back end of the .9 millimeter full-metal jacket Wolf

7   dark gray round.

8   *Q.*    Okay.  And that round was located inside the

9   backpack?

10  *A.*    Yes, sir, it is.

11  *Q.*    And what's the last picture of?

12  *A.*    Okay.  Next picture is showing a closeup around the

13  backpack with the white cloth that's wrapped up in the

14  knot containing the 18 to 19 loose rounds of ammunition,

15  .9 millimeter ammunition.

16  *Q.*    And of course, again, all of those pictures

17  accurately reflect the evidence as you collected it as

18  we've entered it today on that evening --

19  *A.*    Yes, sir.

20  *Q.*    -- that day?

21          **MR. SUMMERS:**  Now if we could, Your Honor, ask

22  that the pictures be moved into evidence as the next

23  numbered collective exhibit?

24          **THE COURT:**  Any objection?

25          **THE DEFENDANT:**  No objection, Your Honor.

UNREDACTED TRANSCRIPT

*DIRECT - ERIC TOLBERT*                                                    331

1          **THE COURT:**  Marked as the next exhibit.

2          **THE CLERK:**  Collective Exhibit 19.

3          (Said items were marked as Collective Exhibit

4          19)

5          **MR. SUMMERS:**  Your Honor --

6    **BY MR. SUMMERS:**

7    *Q.*    Did I leave a picture out?  If you can describe

8    what's in the picture.

9    *A.*    It's going to be a picture of the contents that

10   were inside this blue Columbia backpack.  It's just

11   showing various folders, a binder of paperwork,

12   handwritten paperwork and looks like a box of the alcohol

13   wipes, prep wipes.

14         **MR. SUMMERS:**  Your Honor, if I could have that

15   as a collective exhibit, that picture added to that.

16         **THE COURT:**  Without objection, it will be

17   marked as the next exhibit.

18         **THE DEFENDANT:**  What exhibit is that, Your

19   Honor?

20         **THE COURT:**  I'm sorry?

21         **THE DEFENDANT:**  What exhibit is that marked?

22         **THE COURT:**  19.

23         **THE DEFENDANT:**  Thank you.

24   **BY MR. SUMMERS:**

25   *Q.*    Officer Tolbert, if you could explain to the jury

*DIRECT - ERIC TOLBERT*                                                    332

1    what's depicted in this photo?

2    *A.*    It's going to be the blue Columbia backpack.  This

3    is going to be on the back passenger side -- I mean back

4    passenger seat on the driver's side.  It's going to have

5    contents that are shown within it and around it along

6    with the three citations in the front right here

7    (indicating).

8    *Q.*    Okay.

9    *A.*    And then this is a blue -- I'm sorry.  This is

10   going to be a black cloth type material bag that had the

11   name Dollar General on it.

12   *Q.*    And that backpack is the same we just moved into

13   evidence today?

14   *A.*    Yes, sir, it is.

15   *Q.*    Sitting up with you?

16   *A.*    Yes, sir, that's correct.

17   *Q.*    If you could, describe what's in this photo.

18   *A.*    Okay.  This is contents that are around the

19   backpack.  And right here, this is that, that white

20   cloth-like material mask that's the hand knotted up

21   containing the 18 to 19 rounds of .9 millimeter

22   ammunition that was mixed with the Wolf and the ELD.

23   *Q.*    And that photo is of the contents of the bag?

24   *A.*    Yes, sir, that is.

25             **THE DEFENDANT:**  Objection.  Excuse me, Your

UNREDACTED TRANSCRIPT

DIRECT - ERIC TOLBERT                                                    333

1    Honor.  Could he repeat that, Your Honor?  I'm not sure.

2    Did he say that was inside the bag or around the bag?

3                **THE COURT:**  Well, which was it, Officer?

4                Are you talking about what's in the cloth?

5                **THE WITNESS:**  Yes, sir, what he circled, yes,

6    sir.

7                **THE COURT:**  What's circled?  Are you saying

8    when you first saw it it was inside the bag or outside

9    the bag?

10               **THE WITNESS:**  It appears to be inside the bag.

11   I'm unable to really recall if it was inside the bag at

12   that time.

13               **THE COURT:**  All right.

14   **BY MR. SUMMERS:**

15   *Q.*   If you could, tell the jury what's depicted in this

16   photo.

17   *A.*   This is the interior of the backpack.  It's showing

18   handwritten paperwork, binders and the alcohol prep pads.

19   *Q.*   Did you have a chance to observe what was in these

20   binders, or did you look through that?

21   *A.*   Yes, sir, I did.  I kind of glanced at most of the

22   paperwork that was inside there, yes, sir.

23   *Q.*   What kind of paperwork was it, if you remember?

24   *A.*   It was handwritten paperwork, appeared to be school

25   work, handwritten material, paragraphs, it looked like he

*DIRECT - ERIC TOLBERT*                                                    334

1    may have been in classes that involved politics.

2    Q.    When you say "he," who are you referring to?

3    A.    Mr. Ronnie Jackson.

4    Q.    And finally what is this picture of?

5    A.    That's the back end of the .9 millimeter Wolf brand

6    full-metal jacket round.

7    Q.    If you could tell the jury, you pulled that

8    particular bullet out of where?

9    A.    Out of the backpack.

10   Q.    And was it in the blue latex glove that was knotted

11   up or where was that one?

12   A.    Yes, sir, if you see right here in the background,

13   it's kind of blurred, but that's the actual blue latex

14   glove, and it contained the Wolf box brand of ammunition

15   that I pulled the .9 millimeter Wolf brand round out of.

16   Q.    In your duties throughout the process of this

17   investigation and examining the evidence that was

18   collected on the night of 5-21-12 as well as the evidence

19   that you collected on this day, did you have an

20   opportunity to observe both of the weapons that were

21   collected by Detective Kiersey at the crime scene?

22   A.    Yes, sir, I did.

23   Q.    Did you have an opportunity to observe the

24   ammunition that was included in the clips found with

25   those weapons?

UNREDACTED TRANSCRIPT

*DIRECT - ERIC TOLBERT*                                                    335

1    *A.*    Yes, sir.

2    *Q.*    Okay.  And can you tell me if this ammunition

3    depicted in this photo that was collected out of the

4    backpack, does it have any similarity to any of that

5    ammunition?

6    *A.*    Yes, sir, it did.

7    *Q.*    And tell me what similarity.

8    *A.*    In the .9 millimeter Kel-Tec round that was

9    located -- the Kel-Tec handgun that was located in the

10   front of the GNC shopping center just prior to the

11   location where I got on the foot chase with Christofer

12   Broden, one of the clips, the magazines that contained .9

13   millimeter rounds contained the Wolf brand .9 millimeter

14   rounds.

15   *Q.*    Okay.

16   *A.*    Yes, sir.

17   *Q.*    We will see if we can find a picture of --

18         (Pause).

19   **BY MR. SUMMERS:**

20   *Q.*    Officer Tolbert, are you familiar with that photo?

21   *A.*    Yes, sir.

22   *Q.*    Okay.  If you could, do you recognize what's

23   depicted in that photo?

24   *A.*    Yes, sir, this is the .9 millimeter magazine that

25   is for the Kel-Tec handgun that was located in front of

*DIRECT - ERIC TOLBERT*                                          336

1   the GNC store just prior to the location where I got on

2   the foot chase with Christofer Broden.

3   Q.    Is that picture an accurate depiction where that

4   clip was located on the night of 5-21-12?

5   A.    Yes, sir, it is.

6   Q.    Is that the same clip that you later examined in

7   relation to the crime scene that we've just spoken of?

8   A.    Yes, sir.

9   Q.    Were the bullets in that clip those of a similar

10  nature to the ones that were just placed on the

11  projector?

12  A.    Yes, sir, it is.

13         **MR. SUMMERS:**  Your Honor, I would ask now that

14  that picture be moved into evidence as the next numbered

15  exhibit.

16         **THE COURT:**  Any objection?

17         **THE DEFENDANT:**  No objection, Your Honor.

18         **THE COURT:**  It will be marked as the next

19  exhibit.

20         **THE CLERK:**  Exhibit 20.

21         (Said item was marked as Exhibit 20).

22  **BY MR. SUMMERS:**

23  Q.    Now, if you could explain to the jury what's

24  depicted in this photograph?

25  A.    Yes, sir, this is the magazine that's showing on

UNREDACTED TRANSCRIPT

DIRECT - ERIC TOLBERT                                        337

1    the concrete in the area of -- this was located in the

2    area around GNC just prior to the location where I got on

3    the foot chase with Christofer Broden.  It's shown to be

4    loaded with a .9 millimeter round.

5    Q.    And that is accurately as you saw it that evening?

6    A.    Yes, sir, it was.

7    Q.    Okay.  And that is where in relation to where you

8    made entry to the scene that evening?

9    A.    It was just west of my location of where I parked

10   my vehicle.  It was just north of my location where I

11   parked my vehicle as well, around the area of the store

12   front, just west of 880 West poplar, the Taco Bell.

13   Q.    Was it in the same area that you referred to on our

14   map earlier as to where you first saw the suspect that

15   you pursued, Mr. Christofer Broden?

16   A.    Yes, sir, that's correct.

17   Q.    I'm going to pass up two more photos.

18         If you could, do you recognize those photos?

19   A.    Yes, sir, I do.

20   Q.    And what do they depict?

21   A.    It's picture of a handgun holster.  It's a black

22   handgun holster with the name brand Mil-Tec U.S.A. on it.

23   Q.    You've taken a photograph, is that photograph --

24   what else is in that photograph?

25   A.    It's the Columbia blue backpack.

DIRECT - ERIC TOLBERT                                    338

1    *Q.*    And where did you locate that holster?

2    *A.*    It was right around the area of the back passenger

3    seat behind the driver's side inside the white Town and

4    Country van.

5    *Q.*    Okay.  And did you, did you tag that and place that

6    into evidence as well?

7    *A.*    Yes, sir, I did.

8              **MR. SUMMERS:**  Your Honor, I would ask that

9    this next photo be marked as the next numbered collective

10   exhibit.

11             **THE COURT:**  Any objection?

12             **THE DEFENDANT:**  No objection, Your Honor.

13             **THE COURT:**  It will be marked as the next

14   exhibit.

15             **THE CLERK:**  Exhibit 21.

16             (Said items were marked as Collective Exhibit

17             21)

18   **BY MR. SUMMERS:**

19   *Q.*    Officer, if you could explain to the jury what this

20   is a picture of?

21   *A.*    This is going to be one side with velcro stitched

22   on.  It's the black handgun holster, Mil-Tec brand.

23   *Q.*    Okay.  And just for clarification, you did take

24   that picture -- did you set the holster on top of that?

25   *A.*    Yes, sir, I did.

UNREDACTED TRANSCRIPT

*DIRECT - ERIC TOLBERT*                                          339

1    *Q.*    If you could also go back, when you first evaluated

2    the blue backpack as it sat in the van, what was its

3    condition?

4    *A.*    The condition of the backpack, it was -- I really

5    can't recall.  I just know everything was kind of

6    disheveled inside the van.

7    *Q.*    Specifically, was the backpack sealed?

8    *A.*    Yes, sir, it was.

9    *Q.*    It was located where?

10   *A.*    The backpack was located in the back passenger seat

11   behind the driver's seat.

12   *Q.*    And you found the holster where?

13   *A.*    The holster was actually located in the front

14   floorboard near the driver's seat.

15           **MR. SUMMERS:**  Your Honor, if we could, if I

16   could pass one more.  No, actually let's pass the

17   collective exhibit here.

18   **BY MR. SUMMERS:**

19   *Q.*    Officer Tolbert, if you could tell me what is -- is

20   that a bag that you collected on the day that you

21   collected all this evidence at the lot and the seized

22   van?

23   *A.*    Yes, sir, it is.

24   *Q.*    If you could, open it up and tell me what's inside

25   that.

*DIRECT - ERIC TOLBERT*                                            340

1    A.    It's going to be a white respirator mask, surgical

2    mask.  It's going to be various printed and handwritten

3    paper items, various receipts, Social Security card with

4    the printed name Ronnie Jackson, Jr, various photographs,

5    letters with the name handwritten Ronnie Jackson, printed

6    Southwest Tennessee Community College letter with the

7    name Ronnie Jackson, a printed flyer, a Koran book, a

8    certificate of birth for Ronnie Jackson, Jr.  There is

9    two citations.  I know we got three total.  More printed

10   paperwork.  Some of it is stuck in the bag.  This is the

11   black Mil-Tec U.S.A. handgun holster with the velcro

12   stitched on it.  This is a cloth-like bag with a company

13   name of Dollar General.  There is three citations for

14   moving violations, and they all appear to be in regards

15   to the white Chrysler 1999 Town and Country van, and they

16   are all signed with the name of Ronnie Jackson for state

17   summons.  This is a Family Dollar white plastic bag, a

18   gray dark IM901 bag, a loose surgical mask, and another

19   Advance Auto Parts plastic bag, white plastic bag.

20   Q.    All of the things you've just gone through and

21   collected you collected from that van?

22   A.    Yes, sir, I did.

23   Q.    Where were they in general?  Were they all in kind

24   of the same place, or if you could, to the best of your

25   memory?

*DIRECT - ERIC TOLBERT*                                                341

1   *A.*    Well, a lot of the items were disheveled inside the

2   van's interior.  We located the three citations, the

3   traffic citations, the birth certificate and Social

4   Security card in the front passenger seat.  The citations

5   were located in the glove box.

6           **MR. SUMMERS:**  Your Honor, at this time I would

7   ask that this evidence be moved in as the next numbered

8   collective exhibit.

9           **THE COURT:**  Any objection?

10          **THE DEFENDANT:**  No objection, Your Honor.

11          **THE COURT:**  It will be marked as the next

12  collective exhibit.  I don't know, how is the best way,

13  Mr. Haley, to --

14          **MR. PRITCHARD:**  I was just going to have him

15  mark the outside of the bag.

16          **THE COURT:**  Just be sure everything stays

17  together.  We've got a lot of items that we don't want to

18  get separated.

19          **THE CLERK:**  Collective Exhibit 22.

20          (Said items were marked as Collective Exhibit

21          22).

22          **THE COURT:**  Mr. Summers, we are going to need

23  to take our lunch break before too long.  How much longer

24  would you anticipate you are going to need?

25          **MR. SUMMERS:**  Your Honor, I do not anticipate

*DIRECT - ERIC TOLBERT*                                                    342

1   too much longer with Officer Tolbert.  I believe we

2   are -- I believe we are -- I want to make sure I get all

3   the evidence in.  I don't want to make any promises, Your

4   Honor.  It could be another 15 minutes or less.

5            **THE COURT:**  You want to go on take your break

6   or finish this witness?

7            **JUROR:**  Finish.

8            **THE COURT:**  Let's go ahead then.

9            **MR. SUMMERS:**  And I guess if we could go

10  through -- I guess we'll show the, citations.

11  **BY MR. SUMMERS:**

12  *Q.*    Officer Tolbert, if you could, tell the jury what

13  they are looking at.

14  *A.*    That is two traffic citations for the State of

15  Tennessee, Shelby County, City of Memphis.  It is

16  displaying the name, if you can read it, printed at the

17  top, Ronnie Jackson.  It's very light and faint right

18  here, but it also states Ronnie Jackson and gives a

19  vehicle description of the 1999 Chrysler Town and Country

20  van.  The same right here, 1999 white Chrysler Town and

21  Country van.

22  *Q.*    Okay.  Again, those were found in the glove box?

23  *A.*    Yes, sir, they were.

24  *Q.*    What is this?

25  *A.*    This is another City of Memphis, Shelby County

*DIRECT - ERIC TOLBERT*                                              343

1    traffic citation.  It is going to have the name printed

2    at the top of Ronnie Jackson, and it's also showing a

3    display of the 1999 white Chrysler Town and Country van.

4    *Q.*    Okay.  What is this?

5    *A.*    It is a Social Security card with the printed name

6    of Ronnie Jackson, Jr.

7    *Q.*    Where was this located?

8    *A.*    It was located in the front passenger seat around

9    the area of the glove box.

10   *Q.*    And what is this we are looking at?

11   *A.*    This is a certificate of live birth with the

12   printed name of Ronnie Jackson, Jr.

13   *Q.*    And what is that?

14   *A.*    That's going to be the black handgun holster with

15   the name brand Mil-Tec, U.S.A.

16   *Q.*    That's the same holster depicted in the photo we

17   viewed earlier?

18   *A.*    Yes, sir, it is.

19   *Q.*    That was the same one, you said found in the front

20   floorboard of the van?

21   *A.*    Yes, sir, on the driver's side.

22   *Q.*    Driver's side?

23   *A.*    Yes, sir.

24            **THE DEFENDANT:**  Objection.  Could you repeat

25   that again, Your Honor, the question and the answer, he

UNREDACTED TRANSCRIPT

DIRECT - ERIC TOLBERT                                          344

1    just gave?

2              **MR. SUMMERS:**  I was asking the location of

3    where he recovered the holster.

4              **THE DEFENDANT:**  What did he respond?

5              **THE WITNESS:**  The front floorboard driver's

6    side.

7              **THE DEFENDANT:**  Okay.  Thank you.

8    **BY MR. SUMMERS:**

9    Q.    If you could tell the jury, what's depicted in this

10   photo?

11   A.    This is going to be the black cloth-like bag with

12   the name Dollar General printed on it.

13   Q.    Officer Tolbert, what's depicted in this photo?

14   A.    It's going to be a white cloth-like material,

15   surgical mask.

16   Q.    Was that also -- where was that located?

17   A.    It was located in the vehicle's interior.  They

18   were scattered throughout the vehicle's interior on the

19   floorboard.

20   Q.    And the second item that's been placed on the

21   projector?

22   A.    It's a white respirator mask, and it was also

23   located in the vehicle's interior around the floorboard.

24   Q.    Officer Tolbert, I've just passed another bag up to

25   you, if you could tell me the contents of that bag?

DIRECT - ERIC TOLBERT                                          345

1    A.    Yes, sir, this is going to be the set of car keys

2    for the white Chrysler Town and Country van.

3    Q.    Are these the keys that you used to gain access to

4    this van?

5    A.    Yes, sir.

6    Q.    Are they the same keys that were seized on the

7    night of 5-21-2012, the night of the robbery at

8    Walgreens, 824 West Poplar?

9    A.    Yes, sir, they were.

10          **MR. SUMMERS:**  Your Honor, if I could have that

11   moved into evidence as the next exhibit.

12          **THE COURT:**  Any objection?

13          **THE DEFENDANT:**  No objection, Your Honor.

14          **THE COURT:**  All right.  It will be marked as

15   the next exhibit.

16          **THE CLERK:**  Exhibit 23.

17          (Said item was marked as Exhibit 23).

18   **BY MR. SUMMERS:**

19   Q.    Officer Tolbert, if you could tell the jury what is

20   now placed on the projector?

21   A.    It's a set of keys that go to the white Chrysler

22   Town and Country van.

23   Q.    These are the keys that you used to gain access to

24   that van in order to collect this evidence?

25   A.    Yes, sir.

UNREDACTED TRANSCRIPT

DIRECT - ERIC TOLBERT                                    346

1    Q.    I'm going to pass another group of photos to you,

2    and we can quickly go through them.  I believe it is

3    stuff the jury may have already seen, but it may be

4    educational.

5         Officer Tolbert, are you familiar with all those

6    photos?

7    A.    Yes, sir, I am.

8    Q.    Were they taken the day that you evaluated the

9    evidence in the van?

10   A.    Yes, sir, they are.

11   Q.    Did you in fact take those photos?

12   A.    Yes, sir, I did.

13   Q.    Okay.  And if you could go through them and

14   generally tell the jury -- or what is depicted in each of

15   those photographs?

16   A.    The first picture is going to be a picture of the

17   black cloth-like material Dollar General bag.  I just

18   kind of spread it out so it would be easily readable and

19   visible.  The second photo is going to be a picture of

20   the mixed loose rounds that were located in the white

21   cloth-like material mask that was used to be knotted up

22   to hold the 18, 19 rounds of the Wolf .9 millimeter

23   full-metal jacket and the ELD .9 millimeter hollow point

24   rounds.  The next picture going to be a closeup of the

25   main brand of the box of Wolf .9 millimeter ammunition

*DIRECT - ERIC TOLBERT*                                                       347

1    rounds that were recovered along with the blue glove in

2    the background.  The next picture is going to be a

3    picture of the blue latex glove and a little bit of the

4    Wolf .9 millimeter brand brown box sticking out of the

5    glove.

6         The next picture is going to be a picture of the

7    cloth-like material mask that was used to be knotted up

8    to hold the 18 to 19 mixed rounds of .9 millimeter

9    ammunition.

10        The next picture is going to be a white plastic bag

11   containing a crumbled white surgical mask.  The next

12   photo is going to be a Auto Plan Winchester payment

13   receipt with the name printed on it of Ronnie Jackson,

14   Jr.  And the last picture is going to be a Tennessee

15   Department of Revenue Taxpayer Vehicle and Services

16   Division envelope with the printed name on the interior,

17   Ronnie Jackson, Jr.

18   *Q.*    And these photos were again taken by you on the

19   date this evidence was collected?

20   *A.*    Yes, sir, they were.

21             **MR. SUMMERS:**  Your Honor, at this time I would

22   ask to move that in as the next collective numbered

23   exhibit.

24             **THE COURT:**  Any objection?

25             **THE DEFENDANT:**  No objection, Your Honor.

UNREDACTED TRANSCRIPT

*DIRECT - ERIC TOLBERT*                                      348

1          **THE COURT:**  It will be marked as the next

2    exhibit.

3               (Said items were marked as Collective Exhibit

4               24).

5          **THE CLERK:**  Collective Exhibit 24.

6    **BY MR. SUMMERS:**

7    *Q.*    Officer Tolbert, tell the jury if you can what this

8    is a picture of.

9    *A.*    This is going to be the black cloth-like material,

10   the Dollar General bag.  I spread it out to get a better

11   picture and display of the printed material.

12   *Q.*    Officer Tolbert, what's in this picture?

13   *A.*    This is going to be a picture of the rounds that

14   were located inside the cloth-like mask that was

15   makeshift into a knot, the loose .9 millimeter Wolf

16   rounds, full-metal jacket rounds and the ELD hollow point

17   .9 millimeter rounds.

18   *Q.*    And this picture?

19   *A.*    This picture is going to be a closeup of the box of

20   the Wolf brand .9 millimeter ammunition along with the

21   background showing the blue latex glove.

22   *Q.*    Again, the ammunition was wrapped in that glove?

23   *A.*    Yes, sir, it was.

24   *Q.*    And that collectively was inside of the backpack?

25   *A.*    Yes, sir, it was.

*DIRECT - ERIC TOLBERT*                                          349

1    Q.    And this picture?

2    A.    This picture is of a small portion of the Wolf

3    brand .9 millimeter ammunition box inside the blue latex

4    glove.

5    Q.    And this picture?

6    A.    That is a closeup of the cloth-like material

7    surgical mask that was used to be a make shift knot as a

8    bag to hold the 18 to 19 rounds of loose .9 millimeter

9    ammunition.

10   Q.    This picture?

11   A.    This is a plastic bag containing one white crumbled

12   surgical mask.

13   Q.    What's this a picture of?

14   A.    This is an Auto Plan Winchester payment receipt

15   with the printed name of Ronnie Jackson, Jr.

16   Q.    And in this photo?

17   A.    That's the Taxpayer and Vehicle Services Division

18   Department of Revenue -- can you bring that picture down

19   a little bit?  Tennessee Department of Revenue, Taxpayer

20   and Vehicle Service Division envelope with the name in

21   the interior printed, Ronnie Jackson, Jr.

22            **MR. SUMMERS:**  Your Honor, if I may just have a

23   moment.

24            **THE COURT:**  Okay.

25            **MR. SUMMERS:**  Your Honor, I have no further

UNREDACTED TRANSCRIPT

1   questions.

2                   **THE COURT:**  Okay.  Ladies and gentlemen, we

3   will take our lunch break.  Let's try to be back and

4   ready to proceed by 1:30.  As I told you yesterday, there

5   is not a lot available here, but there are restaurants

6   within walking distance.  Hopefully it's still a pretty

7   day outside if you want to try to go for lunch.  Again,

8   let me remind you, do not discuss the case or allow

9   anyone to discuss the case with you.  Don't do any type

10  of independent research or investigation.  And we will

11  see you back here at 1:30, okay.

12                  (The following occurred outside the presence

13                  of the jury:)

14                  **THE COURT:**  Anything from the government

15  before we recess?

16                  **MR. PRITCHARD:**  No, Your Honor.

17                  **THE COURT:**  Anything from you, Mr. Jackson,

18  before we recess?

19                  (The defendant and elbow counsel conferred.)

20                  **THE DEFENDANT:**  No, Your Honor.

21                  **THE COURT:**  Then, Officer Tolbert, I also

22  remind you that you need to return to testify when we

23  return from lunch.

24                  **THE WITNESS:**  Yes, sir.

25                  **THE COURT:**  All right.  Mr. Haley, let's

UNREDACTED TRANSCRIPT

CROSS - ERIC TOLBERT                                           351

```
1   recess until 1:30.
2            THE CLERK:  Yes, Your Honor.  All rise this
3   Court is now in recess until 1:30.
4            (Recess).
5            THE COURT:  Let's see, Officer Tolbert, if you
6   would come back up and take the stand, and I'll remind
7   you that you remain under oath.
8            THE WITNESS:  Yes, sir.
9            THE COURT:  Are we ready to proceed?
10           MR. PRITCHARD:  We are, Your Honor.
11           THE COURT:  Ready to proceed?
12           THE DEFENDANT:  Yes, Your Honor.
13           THE COURT:  Bring in the jury, please.
14           COURT SECURITY OFFICER:  Yes, Your Honor.
15           (The following occurred in the presence of the
16           jury:)
17           THE COURT:  Please be seated.  All right.
18           Let's see, Mr. Jackson, would you like to
19   cross-examine?
20           THE DEFENDANT:  Yes, Your Honor.
21           THE COURT:  All right.  Go ahead.
22                        CROSS-EXAMINATION
23   BY THE DEFENDANT:
24   Q.   Officer Tolbert, good afternoon.
25           THE DEFENDANT:  I have a few questions, Your
```

UNREDACTED TRANSCRIPT

*CROSS - ERIC TOLBERT*                                          352

1    Honor, and also I'll be putting some of the exhibits on

2    the screen.

3                **THE COURT:**  All right.  Just tell Mr. Woods

4    which ones you want him to display, and he can take care

5    of that for you.  Have they already been admitted into

6    evidence?

7                **MR. WOODS:**  Yeah.

8                **THE DEFENDANT:**  Yes, sir, they have.

9                **THE COURT:**  They should be up here already I

10   would assume.

11               **THE DEFENDANT:**  I just don't remember the

12   exact numbers, but I think Mr. Woods has the exact

13   numbers, the exact exhibits.

14               **THE COURT:**  Well, we are going to need to

15   refer to it on the record so we know which one it is.

16               **THE DEFENDANT:**  We can, Your Honor.

17               **THE COURT:**  As long as you can identify them.

18   **BY THE DEFENDANT:**

19   *Q.*   First question I have, Mr. Tolbert, Officer

20   Tolbert, did you state that the van was locked prior to

21   inventorying it?

22   *A.*   Yes, sir, it was.

23   *Q.*   And that you also had to get the keys out of some

24   property to unlock it before you inventoried it?

25   *A.*   Yes, sir.

CROSS - ERIC TOLBERT                                                    353

1    Q.    Is it fair to insinuate that you made this specific

2    statement to try to show that the van wasn't touched

3    before you inventoried it?

4    A.    That's correct, yes, sir.

5    Q.    In other words, that also whatever you recorded

6    would be accurate and correct; is that correct?

7    A.    That's correct, yes, sir.

8    Q.    Are you aware that the van was searched the night

9    of the crime and possibly afterwards?

10   A.    It was searched the night of the crime, yes, sir.

11   Q.    So is it possible also that the things being

12   scattered throughout the van came from that search?

13   A.    If you can repeat the question?

14   Q.    Is it possible that the items that were scattered

15   throughout the van in various places, could that have

16   come from that previous search?

17   A.    It could have, yes, sir.

18   Q.    Do you know for sure whether or not it did?

19   A.    I'm not for sure, no, sir.

20   Q.    Next question --

21              (The defendant and elbow counsel conferred).

22   **BY THE DEFENDANT:**

23   Q.    What we have on the screen now is Exhibit 19.

24   That's not it.  According to this exhibit that you

25   recall, the items inside this bag, are these items inside

UNREDACTED TRANSCRIPT

*CROSS - ERIC TOLBERT*                                          354

1    the bag or around the bag?  Would you specify that?

2    A.    In the picture it's a closeup view.  It appears

3    that it's inside the bag, but just for clarification

4    purposes, just around the area of the bag.

5    Q.    So basically you are not really sure or can you

6    remember whether or not it's in or outside the bag?

7    A.    I'm unable to recall if it's inside the bag, but it

8    was around the area of the bag, yes, sir.

9    Q.    That's a pretty fair response.

10        Go to the next one, please.

11        Question.  Why are some of the pictures taken with

12   some items still inside the backpack and some are taken

13   outside where items are outside the backpack?

14   A.    We searched the vehicle prior to taking these

15   pictures, and some of the items are a little scattered

16   around from the area of the backpack.  As you can see,

17   it's open, but when we came in contact with the backpack,

18   after we opened the vehicle, it was secured and closed.

19   Q.    I'm not sure I understand that answer.  Prior to

20   you getting -- first of all, who are you referring to

21   when you say "we"?  Was someone with you?

22   A.    Yes, sir, it was myself, Officer Day, Officer

23   Roberts, Officer Edwards, all the officers that were

24   involved with the event that night on May 21st, 2012.

25   Q.    Okay.  And your answer to the question of why are

UNREDACTED TRANSCRIPT

CROSS - ERIC TOLBERT                                                    355

1    some inside the backpack, why some are out, your answer

2    to that was?

3    A.    The items inside the backpack were all inside the

4    backpack.  The items that are outside the backpack, they

5    may have been searched and moved around but still in the

6    general area where they were located.

7    Q.    Okay.  You mentioned that some ammo was found also;

8    is that correct?

9    A.    Yes, sir, that's correct.

10   Q.    And did you mention that the ammo was found inside

11   the backpack?

12   A.    Yes, sir, that's correct.

13   Q.    Could you tell me why you didn't take a picture of

14   the ammo inside the backpack?

15   A.    It was just at the time when we were taking the

16   photographs, which we just took general pictures of the

17   basic area where we located specific items, and that one

18   was just one that wasn't taken.

19   Q.    So ammo isn't a specific item that you would look

20   for in a violent crime?

21   A.    It is a specific item, but it just wasn't taken, a

22   picture.

23   Q.    Just wasn't taken.  Did you think it wasn't

24   important at that time not to take a picture of

25   ammunition from a crime of violence?

UNREDACTED TRANSCRIPT

*CROSS - ERIC TOLBERT*

1    A.    I do think it was important, but possibly at the

2    time these photos were taken it just wasn't located or

3    observed at that time.

4    Q.    Next question, are there any fingerprints on the

5    ammunition that you found?

6    A.    We didn't check the ammunition for fingerprints,

7    no, sir.

8    Q.    You didn't think that would be relevant or

9    important?

10   A.    It would be important, but I'm not a detective

11   specifically.  I'm just a crime scene tech, so I took

12   photographs of what we located.

13   Q.    It's part of your job description or function to

14   turn over ammunition or evidence like that to get tested?

15   A.    We seized the evidence that we located inside the

16   van, all the materials, and CID has the opportunity, our

17   Detective Division has the opportunity to go further from

18   there as far as if they need to dust for prints.

19   Q.    Well, actually, I don't think that's a direct or

20   proper answer to the question.

21            **THE COURT:**  Wait, Mr. Jackson.  Don't comment

22   on his answer.

23            **THE DEFENDANT:**  Sorry about that, Your Honor.

24            **THE COURT:**  If you want to reask it or if you

25   think you need to delve further, you can, but don't

CROSS - ERIC TOLBERT                                           357

 1    comment on what your opinion is about his answer, okay.

 2    **BY THE DEFENDANT:**

 3    Q.    Excuse me.  Let me clarify.  Is it your

 4    responsibility to turn over that evidence such as ammo to

 5    get fingerprinted or tested?

 6    A.    It's my responsibility to turn over the property

 7    that's seized, and it goes to our detective division.

 8    Q.    Let me clarify that again.  Is it your

 9    responsibility to turn over that ammo that you found in

10    this particular crime to get fingerprinted?

11    A.    No, sir, it's my responsibility just to turn in the

12    property that we find to our detective division.

13    Q.    Let me ask that again.  Not the property that you

14    find.  Is it your responsibility to turn over the ammo

15    that you found in this case to people to get tested for

16    fingerprints?  That's the question.

17    A.    No, it's not my responsibility to turn over the

18    ammo for them to print it, but it's my responsibility to

19    turn over the ammo to our detective division.

20              **THE DEFENDANT:**  Moving on to the next

21    question, Your Honor.

22    **BY THE DEFENDANT:**

23    Q.    Is it true, that you --

24              (The defendant and elbow counsel conferred).

25              **THE DEFENDANT:**  Sorry about that, Your Honor.

UNREDACTED TRANSCRIPT

CROSS - ERIC TOLBERT                                                    358

1    I would like the Court to reflect that I'm displaying

2    Exhibit 19 again.

3                **THE COURT:**  Okay.

4    **BY THE DEFENDANT:**

5    *Q.*    You stated -- pardon me.

6                **THE DEFENDANT:**  Mr. Woods?

7                (The defendant and elbow counsel conferred)

8    **BY THE DEFENDANT:**

9    *Q.*    Okay.  You also stated that you found some

10   citations in the vehicle; is that correct?

11   *A.*    Yes, sir, that's correct.

12   *Q.*    Can you tell me where were those found again?

13   *A.*    Those were found in the glove box in the front

14   passenger area of the vehicle.

15   *Q.*    Okay. Do you remember that before the lunch break

16   you also stated that you found those citations inside the

17   backpack?

18   *A.*    Not the citations.

19   *Q.*    And the bag under the -- say the Dollar General

20   bag, do you know where that was found, do you remember?

21   *A.*    It was in the area of the back passenger seat

22   behind the driver's seat.

23   *Q.*    Next question.  Why would you place these items on

24   top of one another like this bag, citations, et cetera,

25   with the gun holster as well, that you say you found?

CROSS - ERIC TOLBERT                                                    359

1    A.    They were just the items that we located that had

2    relevance, so we made sure we placed them all together.

3    Q.    And what was the -- where was the gun holster found

4    again?

5    A.    The gun holster was found in the floorboard of the

6    front driver's side seat.

7    Q.    It was in the front seat area?

8    A.    It was in the front driver's side floorboard in

9    front of the front seat, yes, sir.

10   Q.    Do you recall before we went to lunch recess again

11   that you stated the holster was found on the back seat

12   passenger area behind the driver's seat?

13   A.    No, sir, I stated it was on the floorboard on the

14   front driver's side.

15   Q.    You do realize that your answers are recorded,

16   don't you?

17   A.    Yes, sir.

18   Q.    Okay.  Next question.  You being the inventory

19   person, by these pictures being taken, you don't think

20   this kind of insinuates some type of guilt or something

21   of some sort by you placing these items like this on top

22   of one another?

23   A.    No, sir.

24          MR. PRITCHARD:  Argumentative, Your Honor.

25   That's not a proper question.

CROSS - ERIC TOLBERT                                        360

1          **THE COURT:**  I'll let him respond.  Go ahead

2    and answer.

3          **THE WITNESS:**  No, sir.

4    **BY THE DEFENDANT:**

5    *Q.*    It was stated that -- did anyone come out with

6    you -- if I'm not mistaken, I heard a comment that

7    someone came with you to review the scene, the crime

8    scene again with you?

9    *A.*    Yes, sir, that's correct.

10   *Q.*    Would that gentleman be one of the gentlemen

11   sitting at this table here?

12   *A.*    Yes, sir, it is.

13   *Q.*    Could you specify which one is it?

14   *A.*    It's going to be Prosecutor Russell.

15         **THE DEFENDANT:**  Prosecutor Russell, can you

16   raise your hand so we will know who?

17         **THE COURT:**  Well, let's just -- is that who

18   you are identifying?

19         **THE WITNESS:**  Yes, sir.

20         **THE DEFENDANT:**  Could the record reflect who

21   this gentleman is?

22         **THE WITNESS:**  That's going to be the

23   prosecutor to this case, Bo Russell.

24   **BY THE DEFENDANT:**

25   *Q.*    So this gentleman, prosecutor came out with you to

UNREDACTED TRANSCRIPT

CROSS - ERIC TOLBERT                                                 361

1    review the scene.  Do you recall the time, the date and

2    time of this?

3    A.    It was in the daytime.  I'm not specific on the

4    date.

5    Q.    Well, let's say, trying to narrow down, was it this

6    year, the year of the crime, in 2012 or --

7    A.    It was this year, 2014, yes, sir.

8    Q.    So it was pretty recent.  Someone came to just

9    inventory a scene with you.  Do you feel that that is

10   kind of odd or appropriate?

11   A.    No, sir.

12   Q.    And just to clarify this, when the prosecutor came

13   with you to review this crime scene again, did you all go

14   back to this vehicle where this evidence was?

15   A.    Yes, sir, we did.

16   Q.    Did you touch anything?

17   A.    Did we go back to the vehicle to touch anything?

18   Q.    Yes, sir.

19   A.    Yes, we touched.

20   Q.    Things were moved around.  When were these pictures

21   taken if you don't mind me asking?

22   A.    It's on the property receipt.  I can't recall the

23   specific date.

24   Q.    Do you think it's the day he may have came out with

25   you that you all took these pictures?

UNREDACTED TRANSCRIPT

CROSS - ERIC TOLBERT                                                     362

1    A.    Yes, sir, it was.

2    Q.    Okay.  Didn't you just remember, you just stated

3    that you and three other officers were there the day you

4    took these pictures; is that correct?

5    A.    That's correct, yes, sir.

6    Q.    Well, I would like to ascertain specifically who

7    was with you the day you took these pictures?  Was it the

8    prosecutor or the officers that were involved with the

9    scene or the crime that night?

10   A.    It's the prosecutor along with Officer Brian Day,

11   Officer Chris Roberts, Officer Ashley Edwards, everyone

12   that was involved with that case.

13   Q.    So, wow --

14            **MR. PRITCHARD:**  Judge, I object to the extra

15   comments.

16            **THE COURT:**  Mr. Jackson, I've warned you once

17   you don't need to comment on his answers, okay.

18            **THE DEFENDANT:**  I didn't comment on his

19   answers.

20            **THE COURT:**  It appears that you are.  So just

21   don't comment on his responses.  Just listen to what he

22   says and then ask your next question.

23            **THE DEFENDANT:**  Yes, sir.  Yes, sir, Your

24   Honor.

25            **THE COURT:**  All right.

UNREDACTED TRANSCRIPT

CROSS - ERIC TOLBERT                                                    363

1    **BY THE DEFENDANT:**

2    *Q.*    Now back to this evidence, exhibits --

3              **THE DEFENDANT:**  I would like the record to

4    reflect, Your Honor, I'm about to display exhibit

5    number --

6              **MR. WOODS:**  18.

7              **THE DEFENDANT:**  -- Number 18.

8              **THE COURT:**  Okay.

9              (Pause).

10             **THE COURT:**  Mr. Pritchard or Mr. Summers, you

11   don't have any of our exhibits, do you?

12             **MR. PRITCHARD:**  We do not, Your Honor.  They

13   are all up there.

14             **THE COURT:**  What are we looking for, 18?

15             (Pause).

16             **THE DEFENDANT:**  Correction, Your Honor.  This

17   is Exhibit 24 we are about to review.

18             **THE COURT:**  Okay.

19             **THE DEFENDANT:**  There will be two different

20   slides of it as well.  This one exhibit has two different

21   pictures.

22             **THE COURT:**  But this is 24; is that correct?

23             **THE DEFENDANT:**  Yes, sir.

24   **BY THE DEFENDANT:**

25   *Q.*    Officer Tolbert, based on your recollection, could

UNREDACTED TRANSCRIPT

*CROSS - ERIC TOLBERT*

1    you tell us what we are reviewing right now?

2    A.    Yes, sir, this is going to be the blue latex glove,

3    the end of the blue latex glove, and inside it you see

4    the black box containing the Wolf brand .9 millimeter

5    dark gray full-metal jacket rounds.

6    Q.    And the picture, is it turned upside down?  Could

7    you tell us, this carpet looking -- what is that?  Where

8    is this located?

9    A.    That's actually in our headquarters.  The photo was

10   taken after everything was seized.  I just made sure I

11   got a closeup of that picture.

12   Q.    So do you have, according to your recollection, any

13   photos that you did take of this ammo inside the vehicle?

14   A.    Unless it's already been displayed, I haven't seen

15   it today, no, sir.

16   Q.    So you don't recall any pictures of this ammo being

17   taken in the van?

18   A.    I don't recall.

19   Q.    But you can verify that this picture of this ammo

20   was taken not in the van but somewhere in your

21   headquarters?

22   A.    Yes, sir, it was taken at headquarters.

23   Q.    Next question.  My next question, do you honestly

24   feel or do you want to comment or not that you were

25   basically kind of led to place the evidence as it was

UNREDACTED TRANSCRIPT

1    stacked based on the backpack, the Dollar General bag,

2    the gun holster, et cetera, the citations, do you feel

3    that this gentleman being a prosecutor of this case told

4    you to do that?

5    A.    No, sir.

6    Q.    You don't feel that way?

7    A.    No, sir, I actually placed all the items together

8    in that area when I was taking the photos.

9    Q.    And you did state if I'm correct that the

10   ammunition that you found, it fit the weapon of the

11   suspect that you were chasing, is that correct, or the

12   gun that you found; is that correct?

13   A.    Yes, sir, that's correct.

14   Q.    Who did that weapon belong to?

15   A.    I don't know who the weapon belonged to

16   specifically, but it was in the area where I was chasing

17   on foot Christofer Broden.

18   Q.    Okay.  And what type of weapon was that that was

19   found?

20   A.    It was a Kel-Tec .9 millimeter handgun.

21   Q.    Do you recall any statement of Mr. Broden or anyone

22   made to you regarding that weapon, whether it was theirs

23   or if it was my weapon or anyone gave it to them?

24   A.    No, sir, I didn't speak with Mr. Broden in regards

25   to anything further from the investigation other than

*REDIRECT - ERIC TOLBERT*                                        366

1    catching him and placing him into custody.

2    *Q.*    That weapon, did you seize that weapon or someone

3    else came and seized the weapon?

4    *A.*    Our detective with our police department, Kiersey,

5    he seized the weapon, yes, sir.

6    *Q.*    Are you aware of whether any fingerprints were

7    found on that weapon?

8    *A.*    I'm not sure.

9              **THE DEFENDANT:**  At this time, I have no

10   further questions, Your Honor.

11             **THE COURT:**  All right.  Any redirect?

12             **MR. SUMMERS:**  Briefly, Your Honor.

13                       REDIRECT EXAMINATION

14   **BY MR. SUMMERS:**

15   *Q.*    If I may pass this first one.  I'm going to ask you

16   to review these documents.  What documents are you

17   holding in your hands?

18   *A.*    This is a crime scene photo log that I generated on

19   the day that we took the photos from the seizure lot of

20   the white Chrysler Town and Country van.

21   *Q.*    That crime scene photo log, did you create it

22   yourself?

23   *A.*    Yes, sir.

24   *Q.*    Did you also take all the photos?

25   *A.*    Yes, sir, I did.

*REDIRECT - ERIC TOLBERT*                                               367

1    *Q.*    And did you take those photos at the same time that

2    you were collecting evidence from that van?

3    *A.*    Yes, sir, I did.  Well, I took pictures prior to

4    collecting all the evidence from the van.

5    *Q.*    So that was all done on the same day?

6    *A.*    Yes, sir, it was.

7    *Q.*    On that day, were you also accompanied by

8    prosecutors in this case, including myself?

9    *A.*    Yes, sir.

10   *Q.*    And did we in fact observe the little bit of what

11   you were doing?

12   *A.*    Yes, sir, we did.

13   *Q.*    Did we touch anything or get into the van?

14   *A.*    No, sir.

15   *Q.*    Did you do the search?

16   *A.*    Yes, sir, I did.

17   *Q.*    Okay.  Did you collect the evidence and bag the

18   evidence and tag the evidence?

19   *A.*    Yes, sir, I did.

20   *Q.*    Is the evidence that you've opened today in court

21   exactly the way you found it in that van that day?

22   *A.*    Yes, sir, it is.

23   *Q.*    And the photos of that evidence that you've taken,

24   did you in fact take those photos yourself?

25   *A.*    Yes, sir, I did.

*REDIRECT - ERIC TOLBERT*                                                368

1  Q.    And I guess Mr. Jackson was asking you about the

2  way things were arranged.  If you could explain now to

3  the jury perhaps why you arranged some things the way you

4  did or the way that whole process took place.

5  A.    Yes, sir.  Initially what I do, based off of

6  training as a crime scene technician, we take photos of

7  the entire exterior of the van before actually entering

8  into the van and make sure that we take photos of

9  everything that we observe inside the van.  I did a basic

10 walk-around of the van, took exterior photos, went inside

11 the van, picked up anything that seemed pertinent and

12 moved it into a general location that I can place just to

13 take general photos, but anything else I made sure I take

14 photos in that specific location.

15 Q.    And as far as the procedures for searching the van,

16 again, you began a new search on the day that we

17 accompanied you; is that correct?

18 A.    Yes, sir.

19 Q.    Is that February 12 of 2014?

20 A.    Yes, sir, I dated it on here February 12th, 2014,

21 and it was 4:15 p.m.

22 Q.    That's included on your log there of the

23 photographs?

24 A.    Yes, sir, it is.

25         **MR. SUMMERS:**  Your Honor, at this time I ask

UNREDACTED TRANSCRIPT

*REDIRECT - ERIC TOLBERT*                                      369

1    to move the photo log into evidence as the next exhibit,

2    I believe, singular.

3                    **THE COURT:**  Any objection?

4                    **THE DEFENDANT:**  Yes, sir, Your Honor.

5                    **THE COURT:**  Has Mr. Jackson seen it?

6                    **MR. PRITCHARD:**  He has.  I can show it to him

7    again.

8                    **THE DEFENDANT:**  I'm trying to make sure, Your

9    Honor.

10                   I would like to object to this, Your Honor.

11    This does not look professional.  I don't know what this

12    is, Your Honor.

13                   **THE COURT:**  I think the witness has already

14    testified to what it is.

15                   **THE DEFENDANT:**  But my objection is the fact

16    that the prosecutor never gave me this, it looks as if

17    it's rewritten in, it could be written in today or

18    anything, Your Honor.

19                   **MR. PRITCHARD:**  Judge, that's not an

20    appropriate characterization of how we provided stuff to

21    Mr. Jackson.  I think that needs to be reflected to the

22    jury.

23                   **THE COURT:**  Let me ask, was this either

24    provided or available during discovery?

25                   **MR. PRITCHARD:**  Yes, Your Honor.

1          **THE COURT:** All right. I'll overrule the

2     objection. It will be admitted.

3          **THE CLERK:** Exhibit 25.

4          (Said item was marked as Exhibit 25)

5          **MR. SUMMERS:** Your Honor, it was also attached

6     to the documents I provided Mr. Jackson before

7     examination of Mr. Tolbert per the Court's instructions.

8     **BY MR. SUMMERS:**

9     *Q.* And, Officer Tolbert, if you would direct the

10    jury's attention to this log, and what exactly are we

11    looking at here?

12    *A.* It's a crime scene photo log, a printed copy of the

13    photo log, and I have to handwrite everything as far as

14    the subject, which is the white Chrysler Town and Country

15    van, the type of scene it is, it's at the seizure lot for

16    an agg robbery follow-up. It's got two pages total. And

17    then the case number, the file number, which shows the

18    year, and then the actual file number report. And it has

19    up to 25 rows of where you can place in your information,

20    and then it has the date, the time, the location, CPD

21    seizure lot off of Keogh Road, and the description, the

22    Chrysler Town and Country van with the tag, and then

23    exterior and then the type of film I used throughout the

24    whole entire day of taking the photos was a Canon

25    Powershot E3000 IS digital camera.

REDIRECT - ERIC TOLBERT                                    371

1    Q.    Were we went present when you were taking those
2    photos?
3    A.    No, sir, you guys actually left prior to me taking
4    these photos.
5    Q.    When you are creating this photo log, do you do it
6    at the time you are taking the pictures?  Do you do it
7    after when you review the film of what you've taken, how
8    do you do that?
9    A.    Can you repeat the first part of the question?  I'm
10   sorry.
11   Q.    I'm sorry.  When you create this, do you create
12   this at the scene as you are taking the photos or do you
13   do it later when you are reviewing the photos?
14   A.    Yes, sir, I make sure I review the photos, and I
15   made a rough log on a different sheet of paper.  It's
16   actually like a small binder, just the time that I take
17   the photos and the actual location just to make sure it's
18   in sync with what I write down on the description.
19   Q.    And then you translate that log on to this log?
20   A.    Yes, sir, that's correct.
21   Q.    Do you do this for accuracy?
22   A.    Yes, sir, I do.
23   Q.    And if I could show you -- I believe there was some
24   other, on the tags that were on these bags, I believe
25   they are somewhere.  I have copies of them.  We will

UNREDACTED TRANSCRIPT

*REDIRECT - ERIC TOLBERT*                                                    372

1    provide just one of them I believe to him if that would

2    be helpful.

3         Officer Tolbert, if you could describe the tag on

4    that bag, what is that, the piece of paper that's

5    attached?

6    A.    This is a Collierville Police Department property

7    receipt.

8    Q.    Okay.  Did you create that?

9    A.    Yes, sir, I did.

10   Q.    Why did you create that?

11   A.    Anything that we actually tagged physically into

12   evidence, we have to make sure we document it, and we

13   have to document the information as the owner of the

14   property, the location and the description of the

15   property.

16   Q.    And did you create those logs in this case?

17   A.    Yes, sir, I did.

18   Q.    Did you collect the evidence in those bags that

19   were associated with those tags?

20   A.    Yes, sir, I did.

21   Q.    Did you do it -- and what day does that log list

22   that you did this on?

23   A.    It's showing 2-12-2014.

24   Q.    The specific bags that we've handed you today and

25   the logs that we've gone through, you created yourself on

*REDIRECT — ERIC TOLBERT*                                          373

1    the day that we were with you at the scene at the seizure

2    lot?

3    *A.*    That's correct, yes, sir.

4    *Q.*    Did we have anything to do with these evidence

5    logs?

6    *A.*    No, sir.

7    *Q.*    Any of the prosecutors or any prosecutors with you

8    that day?

9    *A.*    No, sir, we didn't.

10   *Q.*    Did you view them until after you came in to

11   observe them with us?

12   *A.*    Yes, sir.

13   *Q.*    Is that when we viewed them again?

14   *A.*    Yes, sir, that's when we viewed them again.

15          **MR. SUMMERS:**   Okay.  And I guess, Your Honor,

16   if we could now -- I believe that's part of the exhibit.

17   Is that part of exhibit -- so if we could just publish

18   Exhibit --

19          **MR. PRITCHARD:**   Judge, this is Exhibit 18.

20          **MR. SUMMERS:**   -- 18, just the log, just to

21   show jury what we are talking about.

22   **BY MR. SUMMERS:**

23   *Q.*    If you could just walk the jury through the process

24   you did here in order to demarcate what you placed in

25   this particular bag and how you demarcate on the ticket

UNREDACTED TRANSCRIPT

REDIRECT - ERIC TOLBERT                                              374

1    itself the time of when you did it and what all you did

2    to create the ticket.

3    A.    Again, this is a Collierville Police Department

4    property receipt page, and it shows submitted by, and it

5    has just seized from seizure lot from the Tennessee tag

6    of the Chrysler Town and County, received by, that's my

7    name and badge number, the date, 2-12-2014, at the time

8    4:15 p.m. along with the file number for the report.  The

9    owner of property, just put defendant and then the

10   defendant's name, Mr. Ronnie Jackson, along with the

11   detailed description of item number, the quantity, and

12   then the description of what the property is.

13   Q.    In processing the crime scene on 2-12-2014, did you

14   independently make the decision as to what and how you

15   packaged the evidence that you collected?

16   A.    Yes, sir.

17   Q.    Okay.  Did you independently decide what photos you

18   thought were important and where you should take them

19   from?

20   A.    Yes, sir, I did.

21   Q.    So you independently created the evidence and the

22   evidence logs that were taken from the van on that day?

23   A.    Yes, sir.

24   Q.    And, again, everything in that van on that day had

25   been locked and sealed since the night of May 21, 2012;

UNREDACTED TRANSCRIPT

REDIRECT - ERIC TOLBERT                                         375

1    is that correct?

2    A.    Yes, sir, that's correct.

3    Q.    Okay.  And in regards to the testimony of -- with

4    the bullets, the ammunition, the Wolf ammunition, again,

5    that ammunition, where was that located when you found it

6    on the date that you created these evidence logs and

7    created these bags?

8    A.    The box of ammunition containing the Wolf, the Wolf

9    ammo, the dark gray full-metal jacket, .9 millimeter

10   rounds, that was located inside the blue Columbia

11   backpack.

12   Q.    Was that backpack sealed?

13   A.    Yes, sir, it was.

14   Q.    In order to discover the contents of that bag and

15   find those bullets, what did you have to do?

16   A.    Actually had to open the bag up and look inside and

17   see what kind of contents were there inside the bag.

18   Q.    Did you evaluate -- did you find it immediately or

19   did you have to evaluate what the other contents were?

20   A.    It stuck out.  It stuck out upon opening the bag,

21   just the way the glove was, it appeared to be filled with

22   something, yes, sir.

23   Q.    And at that time is that when you started to, I

24   believe, take photos of it?  Did you take photos of it?

25   Did you move it?  How did you then process that scene?

REDIRECT - ERIC TOLBERT                                          376

1    A.    I just removed it from the bag and showed my

2    partners what I located, looked inside the box to see

3    exactly how many rounds may have been inside the box and

4    then put it back as I saw it and just placed it back in

5    the van as I was taking photos.

6    Q.    You did take some photos of that, I believe?

7    A.    I believe so, but I just didn't see it today, so I

8    can't recall.

9    Q.    Would your evidence log help you -- I'm sorry --

10   your photo log help you in regards to what you took a

11   photo of that day?

12   A.    Yes, sir, it would.

13   Q.    If we can pass that.  And if you would, while you

14   are looking, how many total pictures did you take?

15   A.    Took a total of 35 pictures.

16   Q.    Okay.

17   A.    It appears I took photos of the Wolf .9 millimeter

18   full-metal jacket rounds with the blue latex glove.  It

19   just doesn't show a description of it being specifically

20   inside the van or what location inside the van.

21   Q.    But you included that in the photos that you took

22   on that day?

23   A.    Yeah, it was included.

24   Q.    Okay.  And you included -- and let me pass just for

25   further instruction, if I could pass some more photos to

1    you, so you can explain.

2            **THE DEFENDANT:**  Your Honor, could you for the

3    record allow him to clarify what he just said regarding

4    not remembering whether or not the ammo was inside the

5    van or not by him not having the log?

6            **THE WITNESS:**  It's just not written down on

7    the log that it was taken, the picture was taken inside

8    the van of the .9 millimeter rounds.  They were seized

9    from inside the van.  It's just showing that the pictures

10   were taken, but it doesn't show a specific location.

11           **THE DEFENDANT:**  You mean a specific location

12   of the ammo inside the van?

13           **THE WITNESS:**  Yeah, the specific location of

14   where the picture was taken — well, the blue latex glove

15   containing the box of 30 count Wolf .9 millimeter rounds,

16   full-metal jacket.  It just doesn't say that it was a

17   picture taken inside the van.

18           **THE COURT:**  All right.  Go ahead.

19   **BY MR. SUMMERS:**

20   *Q.*    If you would, tell me what that's a picture of.

21   *A.*    This is going to be a picture of the exterior

22   showing open doors to the Town and Country van on the

23   passenger side, and it's going to show partial interior

24   of the front seat and back seat passenger side.

25   *Q.*    Is this —

REDIRECT - ERIC TOLBERT                                   378

1          **THE DEFENDANT:**  Could we put these on the
2    screen, Your Honor?
3          **THE COURT:**  Hold on, Mr. Jackson.  You'll have
4    an opportunity.  I'll give you another chance.  Go ahead.
5    **BY MR. SUMMERS:**
6    Q.    And if you could, is this an example of the kind of
7    photo you were talking about first where you take a
8    picture of the perimeter?
9    A.    Yes, sir, that's correct.
10   Q.    So you took several photos like this of the outside
11   of the van?
12   A.    Yes, sir.
13   Q.    And then you began to process the evidence in the
14   van and take some photos of pictures of evidence in the
15   van?
16   A.    Yes, sir, that's correct.
17   Q.    So you both took pictures and collected evidence
18   from inside of the van?
19   A.    Yes, sir.
20   Q.    Then you evaluated that evidence and created logs?
21   A.    Yes, sir.
22   Q.    Tagged and sealed it and have opened it today in
23   court?
24   A.    Yes, sir, that's correct.
25   Q.    Is that an accurate depiction of the process that

UNREDACTED TRANSCRIPT

*REDIRECT - ERIC TOLBERT*                                    379

1    you went through on February 12th, 2014?

2    *A.*    Yes, sir.

3    *Q.*    And this evidence search of course was supplemental

4    or in addition to what was done originally by Detective

5    Kiersey at the crime scene on the night of May 21,

6    2014 -- sorry -- 2012?

7    *A.*    Yes, sir, that's correct.

8    *Q.*    It was?

9    *A.*    That's correct.

10            **MR. SUMMERS:**  Your Honor, no further

11   questions.  And finally, I'm sorry, if I can move that

12   that final picture be marked as the next exhibit.

13            **THE COURT:**  Any objection, Mr. Jackson?

14            **THE DEFENDANT:**  Yes, sir, could I see that

15   again, Your Honor?

16            No, sir, Your Honor, but I would like to

17   recross.

18            **THE COURT:**  All right.  Let me mark this

19   first.  All right, Mr. Haley.

20            **THE CLERK:**  Exhibit 26, Your Honor.

21            (Said item was marked as Exhibit 26).

22            **THE COURT:**  Okay.  Mr. Jackson, you can

23   recross.

24            **MR. SUMMERS:**  Your Honor, if I could just

25   publish this real quick?

*REDIRECT - ERIC TOLBERT*                                                    380

1  **BY MR. SUMMERS:**

2  *Q.*    And, Officer Tolbert, if you could describe to the

3  jury what this photo is.

4  *A.*    Okay.  This is going to be on our CPD seizure lot.

5  It's showing the exterior of the white Town and Country

6  Chrysler van with the front passenger and passenger side

7  back door open, and you can see a little bit of the

8  interior of the vehicle from the exterior.

9  *Q.*    And is that photo an accurate depiction of the way

10 you saw the van that day when you were processing it?

11 *A.*    Yes, sir.

12 *Q.*    And when you walked on the scene that day, what was

13 the condition of the van?

14 *A.*    It was locked and secured, and then we had to

15 unlock the vehicle, and upon opening the doors, you could

16 see inside.  Everything was kind of laid out in various

17 places and disheveled.

18 *Q.*    Was it -- and it was disheveled because it was --

19 was it in the exact same condition it was left in from

20 the date of May 21, 2012?

21 *A.*    Yes, sir.

22            **MR. SUMMERS:**  Okay.  No further questions.

23            **THE COURT:**  All right.  Mr. Jackson, any

24 recross?

25            **THE DEFENDANT:**  Yes, sir.

UNREDACTED TRANSCRIPT

*RECROSS - ERIC TOLBERT*                                                  381

1            **THE DEFENDANT:**  Your Honor, I would like the

2       Court to reflect that we are about to view Exhibit 24.

3            **THE COURT:**  Okay.

4                     RECROSS-EXAMINATION

5

6       **BY THE DEFENDANT:**

7       *Q.*    Officer Roberts (sic), could you please tell us

8       what this picture here is?

9       *A.*    It's a closeup of a white plastic bag, and the

10      inside of the bag it appears to be a surgical mask,

11      cloth-type material surgical mask.

12      *Q.*    Do you recall where this bag and mask is?

13      *A.*    It was within the vehicle's interior, the white

14      Chrysler Town and Country's interior on the floorboard.

15      *Q.*    You don't know what part of the floorboard, you

16      don't recall?

17      *A.*    I don't recall.

18      *Q.*    Did you make a statement in so many words in your

19      examination by the prosecution that you take pictures of

20      whatever you consider pertinent to the investigation?

21      *A.*    Yes, sir.

22      *Q.*    Can you describe or define the word "pertinent" in

23      your definition, what it means?

24      *A.*    Important within that period of time.

25      *Q.*    And did you feel that this mask here was pertinent

*RECROSS - ERIC TOLBERT*                                                    382

1    to the investigation?

2    *A.*    Yes, sir.

3    *Q.*    And what about the ammunition that was taken,

4    photographed at some facility of yours, you don't feel

5    that was pertinent to take a picture of that at the scene

6    as well?

7    *A.*    I did.

8    *Q.*    But did you?

9    *A.*    Again, I can't recall unless I go through all my

10   photos.

11   *Q.*    Do you recall who actually took the picture at some

12   away facility?

13   *A.*    I took the photo.

14   *Q.*    Do you recall why you took the photo away from the

15   crime scene?

16   *A.*    It was in the property, so I decided to take a

17   photo closeup to make sure you could see the name brand

18   inside the latex glove.

19   *Q.*    I would like to ask a question in a hypothetical

20   situation.  If a murder occurred and you're an

21   investigator, the murder occurred inside of a house and a

22   person got stabbed to death, and you found a bloody knife

23   under the couch, would you take it back to a facility to

24   picture it or photograph it, or would you raise the couch

25   up, draw a line around it, specifically identify it, then

RECROSS - ERIC TOLBERT                                                    383

1    take a picture at the scene, what would you do?

2    A.    I would take a picture at the scene.

3    Q.    But you don't think it's pertinent to take a

4    picture of some ammunition that you allege was in a

5    backpack belonging to Ronnie Jackson at the scene?

6    A.    I do find it pertinent.

7            **THE DEFENDANT:**  I have no further questions,

8    but I would like to address the Court, Your Honor,

9    regarding this witness.  Even though he's a law

10   enforcement officer --

11           **THE COURT:**  Wait.  Does that conclude your

12   questioning?

13           **THE DEFENDANT:**  Yes, sir.

14           **THE COURT:**  All right.  Thank you, Officer.

15   You are free to go.

16           (Witness excused).

17           **THE COURT:**  Let's have a quick side bar.

18           (The following occurred at the bench:)

19           **THE COURT:**  Okay.  Mr. Jackson?

20           **THE WITNESS:**  With all due respect, Your

21   Honor, I feel this is highly prejudicial.  This is a law

22   enforcement officer.  I respect that, but his testimony

23   is inconsistent.  I feel that that may inflame the jury,

24   Your Honor, or inflame prejudice in the jury, Your Honor,

25   based on his testimony.  They may feel out of respect

UNREDACTED TRANSCRIPT

384

1    he's an officer to take what he's saying, but obviously

2    he's contradicting himself, Your Honor.  And I feel

3    that's prejudicial even with respect to the prosecution

4    case, Your Honor.  I feel this man was coerced in some

5    kind of way that he may not admit and won't admit it

6    regarding taking these pictures.  This is not a fair

7    trial, Your Honor.  He admitted.  Basically in so many

8    words he admitted, right, he didn't take pictures of some

9    important evidence from a crime scene, didn't take no

10   pictures in this backpack that belong to me?  It doesn't

11   make sense to me, Your Honor, even with respect to their

12   case, Your Honor.

13             **THE COURT:**  Any response?

14             **MR. SUMMERS:**  Well, Your Honor, I believe

15   he'll have arguments at the closing of the proof in order

16   to get his spin on what he thinks has happened, and he

17   also has cross-examination to inquire as to an officer

18   about whatever he thinks -- theory he's trying to

19   advance.  But as far as -- I don't hear an evidentiary

20   objection, so I don't know how to respond.

21             **THE DEFENDANT:**  Well, I respect that response.

22   Would it be proper in the sense of -- or possible that

23   you can check the mindset of the jury regarding that, or

24   would it be improper?

25             **THE COURT:**  No, sir, I can't do that.

UNREDACTED TRANSCRIPT

1              **THE DEFENDANT:**  Can't do that.

2              **THE COURT:**  What I will do, Mr. Jackson, is

3    when I read the jury instructions, one of the

4    instructions that I will give them is it's their

5    responsibility to determine the credibility of each

6    witness --

7              **THE DEFENDANT:**  Okay.

8              **THE COURT:**  -- to decide how much they

9    believe, if they believe it all, believe part of it, or

10   none of it.  And that's their job, and that's why we give

11   everybody the opportunity to question the witnesses in

12   front of the jury.

13             **THE DEFENDANT:**  Right.

14             **THE COURT:**  So the jury has to decide, well,

15   we believe this version or that version or neither

16   version or whatever it may be.

17             **THE DEFENDANT:**  Okay.

18             **THE COURT:**  And you can argue whatever you

19   believe is appropriate as long as there is evidence to

20   support your argument.

21             **THE DEFENDANT:**  Okay.

22             **THE COURT:**  Now there are limits.  I mean if

23   you start saying, well, you know, this guy went out and

24   bought these bullets and stuck them in there and so forth

25   and so on, there has to be evidence to support that.  It

1    can't be just strictly this is my opinion, okay.

2              **THE DEFENDANT:**  Yes, sir.

3              **THE COURT:**  All right.

4              (The following occurred in open court:)

5              **THE COURT:**  Call your next witness.

6              **MR. SUMMERS:**  The next witness, Your Honor,

7    would be Officer Rhea.

*DIRECT - CORY RHEA*                                                387

1                        ***CORY RHEA,***

2    having been first duly sworn, took the witness stand and

3    testified as follows:

4             **THE COURT:**  Officer, if you will take the

5    witness chair, make yourself comfortable, and speak into

6    the microphone.

7             All right, Mr. Summers.

8                        DIRECT EXAMINATION

9    **BY MR. SUMMERS:**

10   *Q.*    Please state your name, first and last name for the

11   Court, and spell your first and last name for the court

12   reporter.

13   *A.*    Cory Rhea, C-O-R-Y, Rhea, R-H-E-A.

14   *Q.*    And, Officer Rhea, I see you are in uniform.  Are

15   you currently employed as an officer?

16   *A.*    Yes, sir, I am.

17   *Q.*    Were you are employed?

18   *A.*    Collierville Police Department.

19   *Q.*    How long have you been with the Collierville Police

20   Department?

21   *A.*    Four years.

22   *Q.*    In exercising your duties with the Collierville

23   Police Department, did you have cause to respond to the

24   location of 824 West Poplar Avenue on the night of

25   May 21, 2012?

1    *A.*    Yes, sir, I did.

2    *Q.*    What drew you to that location?

3    *A.*    When I arrived at work on that evening, a robbery

4    went out over the radio.  I was told to get in my car and

5    get in service.  When I arrived, I went to the location

6    just down Poplar Avenue from Walgreens in front of a

7    shopping center where we found some evidence in regard to

8    the subjects that had been put under arrest for the

9    robbery.

10   *Q.*    Okay.  And that location, was it at or near a Taco

11   Bell west of the Walgreens?

12   *A.*    Yes, sir, it was.

13   *Q.*    That was at or around 880 West Poplar?

14   *A.*    Yes, sir.

15   *Q.*    And I'll hand you -- first, I guess, if I could

16   direct your attention to Exhibit 1, see if we can't

17   figure out where you were.

18        And first, Officer Rhea, just so you can orient

19   yourself, are you familiar with this overhead picture?

20   *A.*    Yes, sir.

21   *Q.*    Okay.  And can you tell the jury what we are

22   looking at here?

23   *A.*    This area right here, that's the Walgreens, 824

24   West Poplar.  This would be an open field just west of

25   the Walgreens in between Walgreens and Taco Bell.  And

*DIRECT - CORY RHEA*                                                    389

1    this shopping center right here in the area would be 880

2    West Poplar (indicating).

3    Q.    On the evening of May 21, where did you -- where

4    did you enter that shopping center?  How did you approach

5    the scene?

6    A.    I pulled my patrol car into this drive located

7    directly right there (indicating) and was stopped there

8    by a lieutenant.  And at that time I walked up to this

9    area right here where we located a female's purse,

10   multicolored purse, and shortly after that a weapon and a

11   magazine.

12   Q.    Okay.  What was your duty on the scene that night?

13   A.    To locate and secure evidence.

14   Q.    Okay.  And is this the evidence that you

15   particularly were responsible for?

16   A.    Yes, sir.

17   Q.    What did you do?

18   A.    I located the female's purse, a weapon and a

19   magazine and stood by that evidence until our detective

20   made the scene to actually secure it and tag it into

21   evidence.

22   Q.    Okay.  Was that Detective Kiersey?

23   A.    Yes, sir, it was.

24   Q.    So you observed Detective Kiersey come to your

25   location on the scene and tag and mark the evidence you

UNREDACTED TRANSCRIPT

*DIRECT - CORY RHEA*                                                      390

1    were standing by into evidence?

2    *A.*    Yes, sir.

3    *Q.*    Okay.  I'm going to pass some pictures to you.  If

4    you could take a look at those and see if you can

5    recognize them.  And I believe a picture of the shopping

6    center -- the first picture, we will start with that one,

7    if you could, when you've oriented yourself, explain to

8    the jury what you are looking at.

9    *A.*    This is about the center of the shopping center

10   that's facing Poplar Avenue at 880.  The purse was

11   located first.  It was somewhere in front of the

12   chiropractor's office.  And the pistol was actually

13   located just west of that just at the corner of the GNC.

14   And the magazine was located in between the two right at

15   the front door of the GNC.

16   *Q.*    Those photographs that you are looking at, are they

17   accurate depictions of the evidence as you saw it the

18   night of May 21, 2012?

19   *A.*    Yes, sir.

20            **MR. SUMMERS:**  Your Honor, I would ask that

21   this be moved in as collective exhibit, the next number

22   that would be reflected.

23            **THE COURT:**  Any objection?

24            **THE DEFENDANT:**  No, Your Honor.

25            **THE COURT:**  It will be marked as the next

UNREDACTED TRANSCRIPT

DIRECT - CORY RHEA                                                    391

1    collective exhibit.

2              THE CLERK:  Collective Exhibit 27.

3              (Said items were marked as Exhibit 27)

4              MR. SUMMERS:  Your Honor, may I publish these?

5              THE COURT:  You can.

6    BY MR. SUMMERS:

7    Q.    Officer Rhea, if you could tell us what we are

8    looking at in this picture?

9    A.    This is 880 West Poplar.  This is the store front

10   that's actually facing Poplar Avenue.  It's just west of

11   the Taco Bell.

12   Q.    And this picture is during the day.  When was

13   this -- were you -- when was this taken?

14   A.    This was taken in I believe it was the second week

15   of February.

16   Q.    Okay.  Was that the day we walked out to the -- we

17   walked the scene together?

18   A.    Yes, sir.

19   Q.    Did you direct our attention to this scene?

20   A.    Yes, sir.

21   Q.    Is this where you recovered the evidence that you

22   recovered?

23   A.    Yes, sir.

24   Q.    Is that an accurate depiction of that area?

25   A.    Yes, sir, it is.

UNREDACTED TRANSCRIPT

1    Q.    And what is this a picture of?

2    A.    This is a picture of that same shopping center.  At

3    the very bottom is where we located the female's purse.

4    Q.    Okay.  Is that picture an accurate depiction of

5    where that person was on the evening of May 21 of 2012?

6    A.    Yes, sir.

7    Q.    And on this particular photograph, is this -- this

8    is actually a picture that was taken on the evening of

9    which you were standing next to the purse; is that

10   correct?

11   A.    Yes, sir.

12   Q.    And what is this a picture of?

13   A.    This is a picture of the same shopping center.  At

14   the bottom of the screen is the magazine that we located

15   in front of GNC.  And at the top of the screen is the

16   picture of the weapon that we located in between GNC and

17   a small restaurant.

18   Q.    Again, is this a picture that was taken on that

19   evening of the evidence that you were standing next to?

20   A.    Yes, sir, it is.

21   Q.    And what is this a picture of?

22   A.    This is a picture of the weapon that we located in

23   front of the GNC just after one of the other officers

24   took one of our suspects into custody.

25   Q.    Okay.  Is that a picture that was taken on the

*CROSS - CORY RHEA*

1   evening when you were standing next to this evidence

2   waiting for Detective Kiersey to tag it into evidence?

3   A.   Yes, sir.

4        **MR. SUMMERS:**  Your Honor, I believe that

5   concludes our examination.

6        **THE COURT:**  Mr. Jackson, any questions?

7        **THE DEFENDANT:**  Yes, sir.

8                    CROSS-EXAMINATION

9   **BY THE DEFENDANT:**

10  Q.   Just a few brief questions.  Regarding these

11  pictures you just seen, Officer, what size type of

12  ammunition fits these type of weapons and the clip you

13  just seen previously before this picture?

14  A.   It's a .9 millimeter.

15  Q.   What type of ammunition would fit that .9

16  millimeter?

17  A.   I don't recall what was in this exact weapon, but

18  that's a .9 millimeter.

19  Q.   So only .9 millimeter type ammunition would fit

20  this weapon?

21  A.   Yes, sir.

22  Q.   Okay.  And the clip that they just seen before this

23  clip laying on the ground underneath where this weapon

24  was found, what type of clip was that as to what type of

25  weapon, if you recall?

*REDIRECT — CORY RHEA*                                              394

1    *A.*    It was a magazine for a .9 millimeter weapon.

2    *Q.*    Okay.  So did it fit this weapon or was it another

3    weapon?

4    *A.*    It fit this weapon.

5              **THE DEFENDANT:**  No further questions, Your

6    Honor.

7              **THE COURT:**  Any redirect?

8              **MR. SUMMERS:**  No, Your Honor.

9              **THE COURT:**  All right.  Officer Rhea, thank

10   you.  You can step down.

11             **MR. SUMMERS:**  Your Honor, let me ask him one

12   question.

13             **THE COURT:**  I'm going to hold you to that one

14   question.

15                     REDIRECT EXAMINATION

16   **BY MR. SUMMERS:**

17   *Q.*    Again, you were present when this evidence was

18   collected?

19   *A.*    Yes, sir.

20   *Q.*    Okay.  And but you didn't see what other evidence

21   was collected; is that correct?

22   *A.*    That's correct.

23             **MR. SUMMERS:**  Okay.  No further questions.

24             **THE COURT:**  I think that was two.  Go ahead.

25             **MR. SUMMERS:**  I'm sorry, Your Honor.  I

UNREDACTED TRANSCRIPT

*REDIRECT – CORY RHEA*

1    apologize.

2                    (Witness excused).

3                    **THE COURT:**  Call your next witness.

4                    **MR. PRITCHARD:**  We call Sara Cox to the stand.

5                    **THE COURT:**  Anybody want to stand up for a

6    minute and stretch?  We need a break?  Are we doing okay?

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **SARA COX,**

2      having been first duly sworn, took the witness stand and

3      testified as follows:

4                **THE COURT:**  Ma'am come around, if you would,

5      take a seat in the chair, make yourself comfortable, and

6      adjust the microphone so we can hear your testimony.

7                Mr. Pritchard, Go ahead.

8                      DIRECT EXAMINATION

9      **BY MR. PRITCHARD:**

10     *Q.*    Good afternoon.

11     *A.*    Good afternoon.

12     *Q.*    Would you tell us your name and spell your first

13     and last name for the court reporter, please.

14     *A.*    My name is Sara Cox, S-A-R-A, C-O-X.

15     *Q.*    Ms. Cox, where are you currently being housed?

16     *A.*    Mason, Tennessee.

17     *Q.*    What sort of facility is at Mason, Tennessee?

18     *A.*    West Tennessee Detention Facility.

19     *Q.*    So you are in custody right now?

20     *A.*    Yes.

21     *Q.*    Have you entered a guilty plea to a charge of

22     robbery of a Walgreens in Collierville, May 21st, 2012?

23     *A.*    Yes.

24     *Q.*    And are you awaiting sentencing right now for that

25     conviction that you have?

UNREDACTED TRANSCRIPT

*DIRECT - SARA COX*                                                    397

1    *A.*    Yes.

2    *Q.*    Have you agreed to come in to court today and

3    testify as to your involvement and how you got involved

4    in that particular robbery on May 21st of 2012 at the

5    Walgreens in Collierville?

6    *A.*    Yes.

7    *Q.*    Let's go back then to 2012.  How did you become

8    involved in that particular incident on May the 21st?

9    *A.*    I met a friend, Chris, and he introduced me to

10   Ronnie.  And we were over at Chris's house for a while,

11   and they were discussing it, and we end up going to

12   Collierville, and he picked the Walgreens.

13   *Q.*    Let's back up a second.  When did you first meet

14   Chris?

15   *A.*    About nine, probably about nine or ten months

16   before the incident.

17   *Q.*    Okay.  Do you know Chris's last name?

18   *A.*    Broden.

19   *Q.*    Broden.  What was the relationship that you and

20   Chris had, were you friends?

21   *A.*    Friends.

22   *Q.*    And during the course of getting to know Chris, did

23   he ever have any conversations with you about crimes that

24   he was committing?

25   *A.*    Yes.

1   Q.    What did he tell you about that?

2   A.    He told me that him and a guy were going to rob

3   Family Dollar Stores.

4            **THE DEFENDANT:**  Objection, Your Honor.

5            **THE COURT:**  Hold on.

6            What's your objection?

7            **THE DEFENDANT:**  Your Honor, hearsay, Your

8   Honor.  Objection to asking about other people's

9   statements, Your Honor.  No one is here to cross-examine

10  whoever he's asking about.

11           **THE COURT:**  Okay.

12           **MR. PRITCHARD:**  Judge, it's a statement made

13  during the conspiracy in furtherance of a conspiracy, so

14  it would be an exception to the hearsay rule.

15           **THE DEFENDANT:**  Objection, Your Honor, we're

16  not here on conspiracy.

17           **THE COURT:**  Hold on.  Hold on.

18           Say that again, Mr. Pritchard.

19           **MR. PRITCHARD:**  Judge, it was a statement made

20  during the course of this criminal activity made in

21  furtherance of the criminal activity.

22           **THE COURT:**  Let's side bar.

23           (The following occurred at the bench:)

24           **THE COURT:**  At this point as far as the

25  hearsay objection and any exceptions, so far we've only

*DIRECT - SARA COX*                                           399

 1    got testimony about one potential robbery.

 2              **MR. PRITCHARD:**  That's correct.

 3              **THE COURT:**  And I thought she was about to go

 4    into other instances.

 5              **MR. PRITCHARD:**  That's correct.

 6              **THE COURT:**  But there is no testimony in the

 7    record regarding those at this point.

 8              **MR. PRITCHARD:**  That's true.

 9              **THE COURT:**  So I don't think the exception

10    would apply.

11              **MR. PRITCHARD:**  Judge --

12              **THE COURT:**  I mean I'm assuming what she's

13    going to testify to is Mr. Broden and Mr. Jackson have

14    been committing a series of robberies.  Is that basically

15    correct?

16              **MR. PRITCHARD:**  She's going to say Mr. Broden

17    told her about that in an attempt to recruit her to be

18    involved in their scheme.

19              **THE COURT:**  But so far there is no testimony

20    about any other robberies whatsoever.  So how can that

21    come in under the exception?

22              **MR. PRITCHARD:**  Because the statement is made

23    about the case that we are on trial here for this week,

24    and it's a statement made by one of the members of this

25    organization or group that was involved in the robberies

*DIRECT - SARA COX*                                                    400

1    to someone during the furtherance of this scheme to

2    commit these robberies.

3              **THE COURT:**  All right.  Let me ask it a

4    different way.  What other evidence is there going to be

5    about these other robberies?

6              **MR. PRITCHARD:**  Mr. Broden will testify to

7    each of the robberies that were committed, and we'll have

8    a victim from each of the robberies to testify that they

9    were robbed on the particular date in April or May of

10   2012.

11             **THE DEFENDANT:**  That would be hearsay on

12   hearsay --

13             **THE COURT:**  Hold on.

14             **THE DEFENDANT:**  Excuse me.

15             **THE COURT:**  So you are representing to the

16   Court there will be other testimony from the codefendant

17   regarding all of the other robberies alleged in the

18   indictment?

19             **MR. PRITCHARD:**  Yes, sir.

20             **THE COURT:**  As well as victims of these other

21   robberies?

22             **MR. PRITCHARD:**  That's correct, Your Honor.

23             **THE COURT:**  But you are just calling this

24   witness, what I would consider to be out of order, but

25   anyway, you are calling this witness at this time and you

*DIRECT - SARA COX*                                                    401

1    think she should be allowed obviously to testify to what

2    she was told?

3              **MR. PRITCHARD:**  That's correct.

4              **THE COURT:**  All right.  Now you can respond,

5    Mr. Jackson.

6              **THE DEFENDANT:**  Your Honor, I think that would

7    be prejudice toward my situation.

8              **THE COURT:**  Can I suggest you talk to your

9    elbow counsel just a second.

10             **THE DEFENDANT:**  All right.

11             (The defendant and elbow counsel conferred.)

12             **THE COURT:**  Now go ahead.

13             **THE DEFENDANT:**  I'm basically, Your Honor,

14   having a hard time understanding whether or not your

15   decision is to allow it or not.  That's basically what

16   I'm trying to --

17             **THE COURT:**  It's up to you to convince me why

18   I shouldn't allow it.

19             **THE DEFENDANT:**  Well, I kind of agree

20   according to what you were about to say, it's kind of out

21   of order.  I don't know of any other witnesses, having

22   been made aware of any other witnesses from these

23   robberies.  In my opinion, Your Honor, if they testify

24   according to a crime --

25             **THE COURT:**  Wait, and I apologize for

UNREDACTED TRANSCRIPT

*DIRECT - SARA COX*                                                    402

1    interrupting you, but let's don't talk about our

2    opinions.  Let's talk about the rules of evidence.

3              **THE DEFENDANT:**  Rules of evidence.

4              **THE COURT:**  That's what we have to rely upon,

5    and that's why I gave you another chance to speak with

6    Mr. Woods.  I think if you will -- I'll give you one more

7    chance to confer with him if you would like to.

8              (The defendant and elbow counsel conferred)

9              **THE COURT:**  And I apologize, Mr. Summers and

10   Mr. Pritchard, but I think this is necessary.

11             **MR. SUMMERS:**  I understand, Your Honor.

12             **MR. PRITCHARD:**  I understand, Your Honor.

13   That's fine.

14             (The defendant and elbow counsel conferred.)

15             **THE DEFENDANT:**  I understand now, Your Honor,

16   so basically it won't be any objection unless I see

17   basically other witnesses, is that true or kind of

18   accurate?  They said they have other witnesses to testify

19   according to --

20             **THE COURT:**  That's what they've said.  They

21   said they have other witnesses who will testify, Mr --

22   what's his name?

23             **MR. PRITCHARD:**  Mr. Broden.

24             **THE COURT:**  And Mr. Broden and other people

25   who say they were victims of the other robberies.

UNREDACTED TRANSCRIPT

1          **THE DEFENDANT:**  If they're a participant, are

2     they considered victims?  That's what I'm saying.

3          **THE COURT:**  No, Mr. Broden and other people

4     who I assume were at the Walgreens or wherever that will

5     say that they were robbed.

6          **MR. PRITCHARD:**  Employees of those stores that

7     were alleged in the indictment, yes, Your Honor.

8          **THE COURT:**  So you maintain your objection?

9          (The defendant and elbow counsel conferred.)

10          **THE DEFENDANT:**  I'll withdraw that objection,

11     Your Honor.  Excuse me for a second.

12          **THE COURT:**  Hold on.  Let me do it this way.

13          **MR. PRITCHARD:**  I think the safest thing for

14     me to do is to leave this testimony and say she had

15     conversations and not get into the details, and I'll move

16     on.

17          **THE COURT:**  My concern, Mr. Pritchard, and I

18     understand why you think it comes in.  My concern would

19     be, and I've had this happen, is if the codefendant

20     doesn't testify like you expect him to or like he's even

21     proffered or given a statement or whatever it is, then

22     I've got a mistrial, and I just don't want to go down

23     that road if I can avoid it.

24          **MR. PRITCHARD:**  I understand.  I think the

25     safest thing for me to do --

DIRECT - SARA COX                                              404

1              THE COURT:  I'm very cautious when we come to

2    these exceptions to hearsay in codefendant cases before

3    anyone else has offered testimony.

4              MR. PRITCHARD:  I understand.

5              THE COURT:  Okay.  So I'm going to sustain the

6    objection.

7              THE DEFENDANT:  Okay.

8              (The following occurred in open court:)

9              THE COURT:  All right.  Go ahead,

10   Mr. Pritchard.

11             MR. PRITCHARD:  Thank you, Your Honor.

12   BY MR. PRITCHARD:

13   Q.    So I believe where we left off, Ms. Cox, was that

14   you had known Mr. Broden for a period of time as a

15   friend?

16   A.    Yes.

17   Q.    Did there come a time in the course of your

18   friendship with Mr. Broden where you were asked to

19   participate in a robbery with Mr. Broden and others?

20   A.    Yes.

21   Q.    Tell us about the circumstances around that

22   conversation.

23   A.    We were at Chris's house and him and Ronnie were

24   discussing, you know, prior robberies, and they were

25   basically looking for a lookout.  And he asked me if I

*DIRECT - SARA COX*                                                                405

1    wanted to be involved.

2    *Q.*    When you say "he", who specifically are you

3    referring to?

4    *A.*    Ronnie.

5    *Q.*    Had you met Ronnie prior to this day you were at

6    Chris's house?

7    *A.*    No.

8    *Q.*    So this is the first time you met him?

9    *A.*    Yes.

10   *Q.*    Was anyone else there besides you and Ronnie and

11   Chris that day of this conversation?

12   *A.*    No.

13   *Q.*    So what did you say when they asked if you wanted

14   to be a lookout?

15   *A.*    I told them that I would go with them that night.

16   *Q.*    What was your understanding of what was going to

17   happen that night based on that conversation?

18   *A.*    That they were going to rob a store.

19   *Q.*    Was there any conversation at that particular time

20   about where the robbery would take place, what store it

21   would be?

22   *A.*    No, no.

23   *Q.*    And again who was it that asked you if you wanted

24   to be a lookout?

25   *A.*    Ronnie.

UNREDACTED TRANSCRIPT

DIRECT - SARA COX                                                    406

1    Q.    And did you agree to go with them that night?

2    A.    Yes.

3    Q.    So after you made that agreement with Mr. Jackson

4    and Mr. Broden, what did you do next?

5    A.    I left Chris's house, and I did a little running

6    around, and I think I met back up there with them at --

7    I'm not sure what time, but maybe a couple hours later,

8    so it was at dusk, and Ronnie wasn't there yet, and he

9    came.

10   Q.    So when you say "there," do you mean going back to

11   Chris's house?

12   A.    At Chris's house, yes.  Ronnie came about 30

13   minutes later when I arrived.

14   Q.    After you got back the second time?

15   A.    Yes.

16   Q.    Do you remember what kind of vehicle he was

17   driving?

18   A.    A white minivan.

19   Q.    And once he pulled up in the minivan, what if

20   anything did you and he and Chris Broden do?

21   A.    We got in the van, and we drove off and drove to

22   the store and picked up Frazier.

23   Q.    Who is that?

24   A.    Javon Frazier is the other guy.

25   Q.    Where, what part of town were you in?

*DIRECT - SARA COX*                                                    407

1    A.    It was a store on Winchester and Hacks Cross, East

2    Memphis area.

3    Q.    Some sort of convenience store, something like

4    that?

5    A.    Yes, the Z Market.

6    Q.    Z Market?

7    A.    Yes.

8    Q.    Had you met Javon Frazier before that night?

9    A.    No.

10   Q.    So how did it come about that Mr. Frazier got

11   together with you guys that particular evening of

12   May 21st, 2012?

13   A.    Could you repeat that?

14   Q.    Once you got to the Z Market, how did you guys

15   encounter Mr. Frazier?

16   A.    Frazier got in the van and he introduced hisself to

17   me and -- well, we drove off, and then that's when I

18   think we pulled up in Collierville, and they was trying

19   to figure which store they were going to rob.

20   Q.    Okay.  So let me back up just one second.  When you

21   were in the parking lot of the Z Market, did anybody get

22   out and go get Mr. Frazier or did he walk up to the van,

23   or I mean how did that happen?  Did somebody flag him

24   down?  How did he know to come get in that van?

25   A.    No, Ronnie went in the store and got him.

UNREDACTED TRANSCRIPT

DIRECT - SARA COX                                    408

1    Q.    Okay.  So Mr. Jackson gets out of the van, goes

2    inside and gets this other individual and they both come

3    back to the van?

4    A.    Yes.

5    Q.    And who's driving at this point?

6    A.    Ronnie.

7    Q.    Where are you seated inside the van?

8    A.    The passenger.

9    Q.    Front passenger?

10   A.    Front passenger side.

11   Q.    What about Broden and this other guy that just got

12   there?

13   A.    They were in the back.

14   Q.    Okay.  So you drive off towards Collierville, I

15   believe you said; is that correct?

16   A.    Yes.

17   Q.    And do you know where you went in Collierville?

18   A.    I'm not sure, on Poplar, on Poplar.

19   Q.    And what did you do once you got to Collierville?

20   A.    They decided to -- for the Walgreens.

21   Q.    Who is "they"?

22   A.    Chris and Ronnie.

23   Q.    Was there some conversation in the van in your

24   presence about that?

25   A.    I can't remember.

*DIRECT - SARA COX*                                                      409

1    Q.    Okay.  Do you know who decided or how they decided

2    it would be a particular store that they were going to

3    rob?

4    A.    Ronnie.

5    Q.    Ronnie decided that?

6    A.    Yes.

7    Q.    So when you first parked someplace there in

8    Collierville, where were you?

9    A.    We were across the street at a store.

10   Q.    Across the street from what?

11   A.    From the Walgreens.

12   Q.    And was -- I believe you said there was some

13   conversation about what store to rob?

14   A.    Yes, between the Walgreens and the Big Lots.

15   Q.    Who was having that conversation?  Who was talking

16   back and forth?

17   A.    It was Chris and Ronnie.

18   Q.    Was this other guy, Javon Frazier, participating in

19   the conversation at all?

20   A.    He was just going along with whatever.

21   Q.    So once it was decided that y'all would rob the

22   Walgreens, what happened next?

23   A.    We were at a store across the street from the

24   Walgreens, and they were counting between the sheriff

25   cars that were passing by, timing them.

*DIRECT - SARA COX*                                                    410

1    Q.    I will ask you who "they" is?

2    A.    Ronnie and Chris.

3    Q.    Okay.  So they were looking for how often a squad

4    car would come by?

5    A.    Yes.

6    Q.    How long would you say y'all sat there doing that?

7    A.    Maybe about 25, 30 minutes.

8    Q.    And then what happened, did you move from that

9    location to another place?

10   A.    Yes.  We moved to Walgreens and we were in a

11   parking lot next to the Walgreens.

12   Q.    Okay.

13   A.    And that's when Christofer and Javon got out the

14   van.

15   Q.    Okay.  Did anybody -- let me back up.  Who was

16   driving the van at that point in time?

17   A.    Ronnie.

18   Q.    And did anything happen before Javon and Broden got

19   out of the van?

20   A.    Yes, Ronnie passed Javon a gun.

21   Q.    Did you see the gun at all?

22   A.    Yes.

23   Q.    What did it look like?

24   A.    It was black.

25   Q.    Okay.

*DIRECT - SARA COX*                                                    411

1    *A.*    Kind of short.

2    *Q.*    Okay.  Do you know the difference by chance between

3    a revolver and semi-automatic?

4    *A.*    I don't.

5    *Q.*    So Ronnie hands -- go ahead and help yourself.

6           Did you see Ronnie hand the gun to Mr. Frazier?

7    *A.*    Yes.

8    *Q.*    Was there any conversation at that point in time

9    between Mr. Jackson and anybody or anyone else in the

10   van?

11   *A.*    I just remember Ronnie telling Javon, be careful,

12   the gun is a lemon squeeze or something.

13   *Q.*    The gun is a lemon squeeze?

14   *A.*    Yeah.

15   *Q.*    Do you have any idea what that means?

16   *A.*    I don't.

17   *Q.*    Was anybody -- were they carrying anything besides

18   Mr. Frazier, the gun that he got from Mr. Jackson, did

19   anybody have anything else with them that you saw?

20   *A.*    I can't remember.

21   *Q.*    Do you know whether -- did you see whether Broden

22   had a gun or not?

23   *A.*    Yes.

24   *Q.*    What did his gun look like?

25   *A.*    It was black.

UNREDACTED TRANSCRIPT

*DIRECT - SARA COX*                                                    412

1    Q.    Do you remember anything about how Broden and

2    Frazier were dressed?

3    A.    Almost all black when they were in the vehicle.

4    Q.    Okay.  Was there any talk about disguises or

5    anything else that people would be wearing, anything

6    along those lines that you recall?

7    A.    No.

8    Q.    So after Mr. Jackson handed the black gun to

9    Mr. Frazier, what happened next?

10   A.    That's when they got out the vehicle, and it was on

11   the side of the Walgreens, and once they got out, we

12   pulled around to the front side of the Walgreens and

13   parked.

14   Q.    Who is we at this point?

15   A.    Me and Ronnie, I'm sorry.

16   Q.    That's fine.  And you parked and did what?

17   A.    We parked and we went into the store.

18   Q.    You and Ronnie did?

19   A.    Me and Ronnie went into the store.

20   Q.    Do you know what the purpose of that was?

21   A.    For him to case it to see how many people were in

22   there.

23   Q.    Did he say that to you, that's why you are going in

24   the store?  How do you know that?

25   A.    He mentioned it to me before we went in.

UNREDACTED TRANSCRIPT

*DIRECT - SARA COX*                                                      413

1   Q.    So you went inside with Mr. Jackson; what did you

2   do when you got inside?

3   A.    He told me to go buy some pads.

4   Q.    Did you go get some?

5   A.    Yes.

6   Q.    And do you remember whether he bought anything or

7   not?

8   A.    He bought a drink.

9   Q.    And did you go to the register --

10  A.    Yes.

11  Q.    -- pay for the items?

12  A.    Yes, we went to the register, and he paid for the

13  items and we left out.

14  Q.    Okay.  We've met before, haven't we, to talk about

15  your testimony?

16  A.    Yes.

17  Q.    Do you remember at that point in time that we

18  looked at a store video, the inside of the Walgreens?

19  A.    Yes.

20  Q.    That was from May the 21st, that evening in 2012;

21  is that right?

22  A.    Yes.

23  Q.    And the video that you looked at, was that

24  accurately reflecting you and Mr. Jackson going inside

25  the store and making those purchases you just talked

UNREDACTED TRANSCRIPT

*DIRECT - SARA COX*                                                    414

1    about?

2    *A.*    Yes.

3            **MR. PRITCHARD:**  If we could just play a

4    snippet of that, Judge, to make sure she can authenticate

5    it.

6            (A video recording was played).

7    **BY MR. PRITCHARD:**

8    *Q.*    Do you recognize who that was walking through

9    there?

10   *A.*    Yes.

11   *Q.*    Who was that?

12   *A.*    That was me and Ronnie.

13   *Q.*    Did that fairly and accurately depict you and

14   Ronnie walking into the store that night?

15   *A.*    Yes.

16           **MR. PRITCHARD:**  Judge, if we could have that

17   marked as the next exhibit, please.

18           **THE DEFENDANT:**  Objection, Your Honor.

19           **THE COURT:**  Hold on.  Have you got it on a CD,

20   is that what you have?

21           **MR. PRITCHARD:**  We have it on CD, and then we

22   have clips of it on our Sanction program that we were

23   going to publish to the jury that way.

24           **THE COURT:**  So I'm assuming you are moving it

25   into evidence?

 1              **MR. PRITCHARD:**  Yes, we ask to have the CD

 2    entered into evidence as the next exhibit number.

 3              **THE COURT:**  What's your objection,

 4    Mr. Jackson?

 5              (The defendant and elbow counsel conferred).

 6              **THE DEFENDANT:**  Your Honor, I'd like to object

 7    on exclusion of this relevant evidence based on

 8    confusion, prejudice because, Your Honor, it only shows

 9    footage of going in the store, it don't show any actual

10    casing as they have alleged, Your Honor.  So it doesn't

11    prove these allegations.  It only shows walking inside a

12    store, Your Honor.

13              **THE COURT:**  Mr. Pritchard?

14              **THE DEFENDANT:**  Unless he has the rest of

15    it -- excuse me -- unless he has the rest of the footage

16    showing that.

17              **MR. PRITCHARD:**  Well, Judge, all I was doing

18    at that point in time was showing her a snippet of it so

19    she could authenticate that this is what she looked at

20    previously and that it fairly and accurately depicts the

21    scene inside the store that night.  We will publish the

22    rest of the video to the jury.  In terms of relevance, it

23    is relevant because it tends to prove a fact at issue in

24    the case.  I mean it's a very low threshold.

25              **THE COURT:**  Any further objection,

UNREDACTED TRANSCRIPT

*DIRECT – SARA COX*                                                    416

1    Mr. Jackson?

2         **THE DEFENDANT:**  I think if that's the

3    application, Your Honor, it would be fair to actually

4    show the footage so if it's an objection that we needed,

5    I will reserve it for that time, Your Honor, because if

6    he only showed a piece, but once entered into evidence

7    but it doesn't show everything, then how would I be able

8    to object?  I haven't seen it.

9         **THE COURT:**  I'm going to overrule your

10   objection at this point.  Obviously I can give some

11   curative instructions if I need to, or I can deal with it

12   if there is a problem.  At this point, the foundation has

13   been laid and I'm going to allow it to be introduced.

14        All right.  Let's mark that as the next

15   exhibit.

16        **THE CLERK:**  Exhibit 28.

17        (Said item was marked as Exhibit 28).

18        **MR. PRITCHARD:**  And, Your Honor, for the

19   record, again, this is all evidence that was made

20   available a long time ago to Mr. Jackson to view.  He

21   keeps saying he hasn't seen it, but it's not because he

22   hasn't had the opportunity to.  I want to make that clear

23   for the record.

24        **THE COURT:**  Okay.  Are you ready to display

25   it?

*DIRECT - SARA COX*                                                417

1              **MR. PRITCHARD:**  Yes, if we could publish it.

2              **THE COURT:**  All right.  Go ahead.

3                   (A video recording was played).

4    **BY MR. PRITCHARD:**

5    *Q.*    Ms. Cox, do you recognize who that was on that

6    particular portion of the video?

7    *A.*    Yes.

8    *Q.*    Who was that?

9    *A.*    Ronnie and me.

10                  (A video recording was played).

11   **BY MR. PRITCHARD:**

12   *Q.*    Ms. Cox, who was that at the register?

13   *A.*    That was me and Ronnie.

14   *Q.*    What were you doing?

15   *A.*    Purchasing the pads and the drink.

16             **MR. PRITCHARD:**  Judge, I would like to show

17   what's previously been marked as an exhibit to the

18   hearing.

19                  It's down there on the floor, Mr. Summers.

20                  For the record, Judge, this was previously

21   entered as Exhibit 8.

22             **THE COURT:**  You said Number 8?

23             **MR. PRITCHARD:**  Yes, Your Honor.

24   **BY MR. PRITCHARD:**

25   *Q.*    Ms. Cox, if you would take a look at the contents

*DIRECT - SARA COX*                                                    418

1    of that brown bag and see if you recognize what's in

2    there?

3    A.     Yes, this was the drink that Ronnie bought and the

4    Always pads I picked up.

5    Q.     Do you recognize that as being the purchases you

6    and Mr. Jackson made that evening?

7    A.     Yes.

8    Q.     Ms. Cox, after you and Mr. Jackson left the

9    Walgreens after making these purchase, what did you do?

10   A.     We pulled off and went to another store.

11   Q.     Where was that, do you remember?

12   A.     Across the street from the Walgreens.

13   Q.     Okay.  What did you do there?

14   A.     I believe he was going to get some gas or

15   something.  We were at a pump.  I'm not quite sure if he

16   did get gas or not.

17   Q.     Okay.  Just the two of you at this point?

18   A.     Yes.

19   Q.     And what, if anything, are you seeing Mr. Jackson

20   do at this point in time besides --

21   A.     He was still on the phone.

22   Q.     Do you know who he was talking to?

23   A.     Christofer.

24   Q.     How do you know that?

25   A.     Because I was hearing him directing him in the

*DIRECT - SARA COX*                                                      419

 1   store, and I could hear the people screaming.

 2   Q.    Let's just unpack that a bit.  You said you could

 3   hear him on the phone with him?

 4   A.    Ronnie on the phone with Christofer, and you can

 5   hear the people in the store.  You can hear them

 6   screaming.

 7              **THE DEFENDANT:**  Objection, Your Honor.

 8              (The defendant and elbow counsel conferred.)

 9              **THE COURT:**  On what basis?

10              **THE DEFENDANT:**  Your Honor, I object based on

11   speculation, Your Honor.  That doesn't sound like

12   confirming who I was on the phone with or I was on the

13   phone, Your Honor.  And I wasn't clear on whether she

14   said when, at what point in time, was I on the phone with

15   him in the store or outside of the store, Your Honor.

16   But it's based on speculation, Your Honor.

17              **THE COURT:**  I'm going to sustain it in part.

18   I don't think there has been an adequate foundation laid

19   as to the phone call at this point, so I'll sustain it in

20   that regard.

21              **MR. PRITCHARD:**  Sure.  Thank you, Judge.

22   **BY MR. PRITCHARD:**

23   Q.    Just the first concern Mr. Jackson had, after you

24   left the Walgreens I believe you said that you and Mr.

25   Jackson drove to the store nearby?

*DIRECT - SARA COX*                                               420

```
 1    A.    Yes.
 2    Q.    And the phone call that you were just discussing,
 3    was that a phone call that Mr. Jackson was having at the
 4    time that you were at this nearby store?
 5    A.    I'm sorry, could you repeat that again?
 6    Q.    Yeah, the phone call that you were just talking
 7    about you said was between Mr. Jackson and Mr. Broden --
 8    A.    Yes.
 9    Q.    -- where were you when you overheard that phone
10    call?
11    A.    Passenger side seat.
12    Q.    And where had you gone to -- were you still at the
13    Walgreens parking lot or another location?
14    A.    We were across the street at the store.
15    Q.    Okay.  And this was after you and Mr. Jackson left
16    the Walgreens making the purchases we just talked about?
17    A.    Yes.
18    Q.    Now, I had asked you before if you could hear the
19    conversation, could you hear the person's voice that
20    Mr. Jackson was talking to when he was having this phone
21    call?
22    A.    Yes.
23    Q.    Okay.  Did you recognize the voice?
24    A.    It was Christofer's.
25    Q.    Okay.  And I believe you heard something else
```

UNREDACTED TRANSCRIPT

*DIRECT - SARA COX*                                                              421

1   during the course of the call that you were talking

2   about, some noise in the background of the call?

3   A.    Yes, you could hear the people screaming.

4   Q.    And do you remember anything that Mr. Ronnie

5   Jackson was saying to Mr. Broden during this phone call?

6   A.    I can't, I can't recall exactly.

7   Q.    I believe you testified a moment ago that he was

8   directing Mr. Broden; what did you mean by that?

9   A.    Well, that was -- I'm sorry.  What was he saying?

10  Sorry.  He was just telling him to hold tight, and what

11  else was he saying?

12  Q.    This was Mr. Jackson you are talking about saying

13  hold tight?

14  A.    Yes.

15  Q.    And this phone call was taking place when you were

16  over at the pumps at the store across the street?

17  A.    Yes, we were both in the car then.

18  Q.    So he was still -- Mr. Jackson was still inside the

19  van with you?

20  A.    Yes.

21  Q.    Okay.  All right.  After hearing this conversation,

22  did you and Mr. Jackson go to another location?

23  A.    We went to -- we drove off to the Walgreens.

24  Q.    Where did you go once you got over back to that

25  area?

*DIRECT - SARA COX*                                             422

1   *A.*     In the back of the Walgreens.

2   *Q.*     What was back there in that particular area where

3   you and Mr. Jackson drove to?

4   *A.*     It was like some little businesses.

5   *Q.*     Were any of those businesses open back in there?

6   *A.*     No.

7   *Q.*     Were any other vehicles back there that you noticed

8   in that particular part of --

9   *A.*     I'm not sure.

10  *Q.*     And what did you do once you and Mr. Jackson got

11  back to that empty parking lot?

12  *A.*     That's when one of the -- either Javon or

13  Christopher ran to the van, was running to the van.

14  *Q.*     Did you see somebody running to the van?

15  *A.*     Yes.

16  *Q.*     How were they dressed?

17  *A.*     All black with a white medical coat and a white

18  mask around the mouth.

19  *Q.*     Okay.  And you were sort of pointing to your face

20  as you were doing that; was it something that was over

21  their face at the time?

22  *A.*     Yes.

23  *Q.*     Did that keep you from recognizing who it was,

24  whether it was Frazier or Broden?

25  *A.*     Yes.

UNREDACTED TRANSCRIPT

*DIRECT - SARA COX*                                                      423

1   Q.    Then how -- you said they were running towards the

2   van, did they get to the van?

3   A.    Yes.

4   Q.    Okay.  Tell us what happened, how close did they

5   get to the van?

6   A.    He got to the ran and I believe he pulled the

7   handle, and that's when we seen the -- me and Ronnie seen

8   the police and Ronnie said, there is the police, run.

9   Q.    And was Ronnie talking to you or talking to the

10  person?

11  A.    He was talking to the person, that was coming

12  toward -- I mean that was at the van.

13  Q.    Okay.  And what did that person outside the van do

14  at that point?

15  A.    They started running.

16  Q.    Okay.  Could you tell where they went from where

17  you were sitting?

18  A.    I think it was -- they ran on the opposite side and

19  was like toward I believe it was a Taco Bell near the

20  area or something to where they were.  I think that was

21  to the right of the Walgreens.

22  Q.    Did you see some police officers at that point in

23  time yourself?

24  A.    Yes.

25  Q.    Where were they?

*DIRECT - SARA COX*                                                    424

1    *A.*    In the front of the van.

2    *Q.*    Do you remember how the van was parked or how

3    Mr. Jackson had pulled into that particular area?

4    *A.*    It was kind of diagonal parked.  It wasn't a

5    straight park or anything like that.

6    *Q.*    Was it backed in or was the front end towards

7    the --

8    *A.*    The front end was toward the back of the Walgreens

9    pharmacy.

10   *Q.*    What happened after the person who was outside the

11   van started running away towards the Taco Bell?

12   *A.*    The police came toward the van and pointed the guns

13   and told us to get out the van and get on the ground.

14   *Q.*    And did you?

15   *A.*    Yes.

16   *Q.*    Were you arrested that night?

17   *A.*    Yes.

18          (Pause).

19   **BY MR. PRITCHARD:**

20   *Q.*    Ms. Cox, I want to show you a picture that's

21   already been admitted into evidence --

22          **MR. PRITCHARD:**  And, Judge, if you will give

23   me just a second, I'll tell you the exhibit number.

24          This will be Collective Exhibit 3, Your Honor.

25          **THE COURT:**  All right.

UNREDACTED TRANSCRIPT

*DIRECT - SARA COX*                                                    425

1    **BY MR. PRITCHARD:**

2    *Q.*    Ms. Cox, do you recognize what you see here in that

3    particular photograph?

4    *A.*    Yes, that was the van that Ronnie was driving that

5    night.

6    *Q.*    Is this the location where you and he were parked

7    kind of behind the Walgreens that night?

8    *A.*    Yes.

9    *Q.*    And was this where the van was parked when you were

10   arrested?

11   *A.*    Yes.

12   *Q.*    Do you remember where the police car was or how

13   many cars --

14   *A.*    In the front of the van parked like this

15   (demonstrating).

16   *Q.*    Go ahead.  I'm sorry.

17   *A.*    The police car was parked in front of the van face

18   on, face on.

19   *Q.*    Okay.  And was it just the one car at that time

20   initially?

21   *A.*    It was just the one car at that time, yes.

22   *Q.*    And how many officers were there to get you and

23   Mr. Jackson out of the van at first?

24   *A.*    At first I believe it was just one.

25   *Q.*    Now when you and Mr. Jackson first saw the police

DIRECT - SARA COX                                                426

1   on the scene, you said Mr. Jackson told the person

2   outside of the van to run off.  Did Mr. Jackson say

3   anything else to you while you were inside the van before

4   the officers got you out and put you on the ground?

5   A.    Yes, told me to tell them that I was his

6   girlfriend.

7   Q.    Was that true?

8   A.    No.

9   Q.    Well, actually I believe you testified earlier you

10  only met Mr. Jackson that day, is that what you are

11  saying?

12  A.    Yes.

13  Q.    So was there any sort of romantic relationship

14  between you and Mr. Jackson at that time?

15  A.    No.

16  Q.    Did he say anything else to you?  Did he tell you

17  to tell the police anything else beside that?

18  A.    Yes, he told me to tell them that we were having

19  oral sex.

20  Q.    Had you been having oral sex before the police

21  came?

22  A.    No, sir.

23  Q.    Ms. Cox, I would ask you to look around the

24  courtroom at this point, and if you recognize Mr. Jackson

25  here, would you please point him out and describe

1    something that he's wearing?

2    *A.*    Mr. Jackson is right there (indicating).  He's

3    wearing a white shirt and a white beanie.

4              **MR. PRITCHARD:**  Your Honor, I ask the record

5    reflect the witness has identified the defendant,

6    Mr. Jackson.

7              **THE COURT:**  The record will reflect the

8    witness has identified the defendant, Mr. Jackson.

9              **MR. PRITCHARD:**  I pass the witness, Your

10   Honor.

11             **THE COURT:**  All right.  Ladies and gentlemen,

12   can we continue?  Does anyone need a break?

13             All right.  Mr. Jackson, would you like to

14   cross-examine?

15             **THE DEFENDANT:**  Yes, Your Honor.

16             (The defendant and elbow counsel conferred)

17             **THE DEFENDANT:**  Are there any Jencks Act

18   statements, Your Honor?

19             **THE COURT:**  Mr. Pritchard?

20             **MR. PRITCHARD:**  We do have a statement

21   provided by Ms. Cox to the police department that I'm

22   tendering to Mr. Woods at this point, Your Honor.

23             **THE DEFENDANT:**  Your Honor, could I have time

24   to review this, please, Your Honor, no more than a few

25   minutes?

*CROSS - SARA COX*                                                    428

1          **THE COURT:**  I'll give you a few minutes.

2              Ladies and gentlemen, just stand and stretch

3   if you would like to.  If you need to take a break, we

4   will take one.  If not, we will stay where we are.

5              Are you ready to proceed, Mr. Jackson?

6          **THE DEFENDANT:**  Yes, sir, Your Honor.

7          **THE COURT:**  All right.  Ladies and gentlemen,

8   be seated, if you will.

9              Go ahead, Mr. Jackson.

10                      CROSS-EXAMINATION

11  **BY THE DEFENDANT:**

12  *Q.*    Ms. Cox, are you saying that you were introduced to

13  me the same day that a crime was committed?

14  *A.*    Yes.

15  *Q.*    Why would you randomly do a crime with someone you

16  just met the first day?

17  *A.*    Chris was there, too.  I knew Chris.

18  *Q.*    So Chris introduced you -- did Chris plan to

19  introduce you to me to do a crime; is that what you are

20  saying?

21  *A.*    Could you repeat that?

22  *Q.*    Did your friend Chris introduce you to me to do a

23  crime?

24  *A.*    Yes.

25  *Q.*    So you didn't know who I was.  Chris just telling

                      UNREDACTED TRANSCRIPT

*CROSS - SARA COX*                                                    429

1    you out of the blue --

2    A.    No, he had had previous conversations about them.

3    Q.    You and Chris did?

4    A.    Yes, Chris spoke about you before.

5    Q.    Can you tell me, quote exactly what you heard?  I

6    take that back.

7              **THE DEFENDANT:**  Withdraw that question, Your

8    Honor.

9              **THE COURT:**  I'll allow you to withdraw it.

10             (The defendant and elbow counsel conferred)

11   **BY THE DEFENDANT:**

12   Q.    Okay.  How long did you and Mr. Broden know each

13   other?

14   A.    We knew each other probably about six to nine

15   months before that incident happened.

16   Q.    Did you all share a common habit of anything that

17   you would care to inform us as far as any smoking or

18   drugs?

19   A.    Yes, we both took Lortab.

20   Q.    What was the effects of those tabs?  What would

21   they normally do to people who take them?

22   A.    It would have different effects on different

23   people, I guess.

24   Q.    Such as?

25   A.    Maybe you are a little more energetic, maybe

UNREDACTED TRANSCRIPT

*CROSS - SARA COX*                                                    430

1    someone was probably a little more relaxed.

2    Q.    Did those type of effects happen to you?

3    A.    Yes, it made me energetic.

4    Q.    Did you and Chris do any drugs before this crime

5    took place?

6    A.    Yes.

7    Q.    Were you and Chris the only one that knew of these

8    drugs you took?  Was Ronnie Jackson aware of this or

9    Javon Frazier?

10   A.    I'm not sure.

11   Q.    You also stated that you were in the van and I

12   passed Javon Frazier a gun?

13   A.    Yes.

14   Q.    You witnessed that?

15   A.    Yes.

16   Q.    Did I have on any gloves as I was driving or as I

17   passed some of these guns, as you can recall?

18   A.    I don't recall you having on gloves.

19   Q.    Would it be considered more memorable if I was, if

20   I did have on a pair of gloves as I was driving, would

21   you remember that?

22   A.    I'm not sure.  I don't know.  I'm not sure.

23   Q.    But could you describe the situation that happened,

24   you said I passed Javon Frazier a gun; do you remember

25   anything that I quoted to Javon Frazier?  How did I

                    UNREDACTED TRANSCRIPT

CROSS - SARA COX                                                    431

1    actually pass him the gun?  Did I say, here, take this or

2    how was it?

3    A.    Well, when y'all figured out that it was going to

4    be the Walgreens, and y'all I mean you and Christofer

5    figured out that it was going to be the Walgreens, you

6    told Javon that he was going to be going in.  And you

7    passed Javon the gun.  I'm guessing Javon didn't have a

8    gun.  And you passed Javon the gun and you told him, be

9    careful, it's a lemon squeeze.

10              **THE COURT:**  Sorry, what did you say at the

11   end, be careful what?

12              **THE WITNESS:**  Ronnie told Javon to be careful

13   with the gun because it was a lemon squeeze.

14   **BY THE DEFENDANT:**

15   Q.    Is that the only thing you saw that -- I just -- so

16   I just handed it to him, made the alleged statement you

17   said, just gave him the gun, that's it?

18   A.    Yes, you passed him the gun.

19   Q.    So I didn't wipe the gun off, clean the gun off,

20   just handed him a gun?

21   A.    I don't recall you wiping anything off or anything.

22   Q.    So pretty much --

23   A.    I recall you passing him the gun.

24   Q.    So if I passed him the gun and I didn't have a

25   chance to wipe the gun, would my fingerprints be on that

UNREDACTED TRANSCRIPT

*CROSS - SARA COX*                                                    432

1    weapon?

2              **MR. PRITCHARD:**  Judge, that's going to call

3    for speculation.  She's not qualified.

4              **THE COURT:**  Sustained.  That's not a proper

5    question for this witness, Mr. Jackson.

6              **THE DEFENDANT:**  Okay.  Regarding going into

7    the store, Your Honor, will we be able to view that

8    footage that the prosecutor put on?

9              **THE COURT:**  The footage that was played?

10              **THE DEFENDANT:**  Yes, sir.

11              **THE COURT:**  It's in the record so you can play

12    it.

13              **THE DEFENDANT:**  Yes, I would like to have that

14    played, if possible.  Do I need to get Mr. Woods?

15              **THE COURT:**  Well, I would imagine -- can you

16    play it for us?

17              **THE DEFENDANT:**  Can we see the entire footage?

18              **MR. PRITCHARD:**  Everything?

19              **THE DEFENDANT:**  Yeah, how long is it just so

20    the Court will know, a few minutes?

21              **MR. PRITCHARD:**  Judge, I guess just to

22    clarify, the way the video is set up, it's in segments

23    based on different camera angles.  There is a clip from a

24    certain camera, and then we have a clip from another

25    camera angle.  We can play all of it, but it's in

UNREDACTED TRANSCRIPT

*CROSS - SARA COX*                                                      433

1    separate clips is the way it was received in evidence.

2    So I'm not sure what Mr. Jackson wants.

3              **THE COURT:**  That's what I need to find out.

4    Is that what you want, Mr. Jackson, do you want to play

5    what's already been played, or do you want to play

6    whatever they have?

7              **THE DEFENDANT:**  Yes, sir, I would just like to

8    play the entire footage of the situation to tender some

9    questions to Ms. Cox so the jury will be aware of that

10   entire footage as well, Your Honor, while I'm asking

11   these questions.

12             **THE COURT:**  Play whatever you have then.

13                  (A video recording was played).

14             **THE DEFENDANT:**  That's it.  Thank you.

15   **BY THE DEFENDANT:**

16   *Q.*   Ms. Cox, based on the footage that was just

17   reviewed, could you describe what took place when we

18   walked into the store?

19   *A.*   Yes, we walked into the store, you put your arm

20   around me, and you told me to get some pads or something.

21   And I walked in and got the pads, and then I met you back

22   up at the register.

23   *Q.*   So you say I told you to get some pads?

24   *A.*   Uh-huh.

25   *Q.*   Did you walk just straight to go get the pads?  How

CROSS - SARA COX                                              434

1    did you go get the pads?  Can you describe your action

2    when you say I told you to get the pads, what did you

3    actually literally do?

4    A.    I'm sorry.  Excuse me?

5    Q.    When you say I told you to go and get some pads,

6    correct?

7    A.    Yes.

8    Q.    Can you describe, from me telling you that, what

9    exactly did you do in that store?

10   A.    I went and got the pads.

11   Q.    Did you do anything else?

12   A.    No.

13   Q.    You went and got the pads and what did you do after

14   that?

15   A.    We met back at the register.

16   Q.    So from walking in the door you just see on that

17   footage --

18   A.    Yes.

19   Q.    -- you went straight to get some pads?

20   A.    Yes.

21   Q.    Did you kind of pretty much being familiar with

22   that store know where the pads were located already?

23   A.    I looked up and in the stores they have on specific

24   aisles what is on the aisle like maybe wipes and feminine

25   products.

UNREDACTED TRANSCRIPT

*CROSS - SARA COX*                                                          435

1    Q.    That's how you knew?

2    A.    Yes.

3    Q.    So you were able to basically pretty much go

4    straight to the aisle, get them, come straight back?

5    A.    Yes.

6    Q.    That's your testimony that that's what happened?

7    A.    Yes.

8    Q.    So did you have any time to walk around the store,

9    count how many people were in the store?

10   A.    No.

11   Q.    Did you see me?  Did I have time to go count people

12   in the store?  Did I just go buy something, come back,

13   according to your memory?

14   A.    You were on the phone with Christofer, and you

15   was -- you were letting him know who was at the register

16   and how many people you seen in the store.  And when you

17   walked back, you told him y'all can go ahead.

18   Q.    So when I was at the register paying for the stuff,

19   that's when I was telling Chris how many people were in

20   there, that's what you are saying?

21   A.    When you were walking up to the register, yeah.

22   Q.    You know, the footage just showed that when we

23   walked to the register I wasn't on the phone and before I

24   left out of the store.  Do you need me to play it again

25   so you can refresh your memory?

UNREDACTED TRANSCRIPT

*CROSS - SARA COX*                                                          436

1    A.    No.

2    Q.    Why would you say I was on the phone speaking with

3    Chris if the video footage just showed that when we left

4    I wasn't on the phone anymore?

5          Don't answer that.  Let me ask you this:  You say a

6    prosecutor here came and spoke with you regarding the

7    testimony that you will give, your statement; is that

8    correct?

9    A.    Yes.

10   Q.    So did he pretty much lead you or basically let you

11   know what proper things to say and not to say in so many

12   words?

13   A.    No.

14   Q.    What did he go over, if you don't mind me asking,

15   regarding that testimony?

16   A.    Just tell the truth, I seen the clip of the video,

17   and that was it.

18   Q.    Did he show you any video footage of you or myself

19   going around the store casing out, counting people or

20   just walking around other than going straight to buy

21   something, coming straight out, did you see any footage

22   such as that?

23   A.    No, I haven't seen that footage.

24                 (The defendant and elbow counsel conferred)

25                 **THE DEFENDANT:**  Regarding the statement --

UNREDACTED TRANSCRIPT

CROSS - SARA COX                                                    437

1    Your Honor, I would like to proffer not this copy, have

2    her review a copy so she'll know exactly the statement

3    I'm referring to, the statement she gave.

4              **THE COURT:**  Do we have another copy of that we

5    can provide to the witness?

6              **MR. PRITCHARD:**  I do.

7              **THE COURT:**  Would you pass that up to the

8    witness?

9              All right, Mr. Jackson.

10             **THE DEFENDANT:**  I'm actually on --

11             **THE COURT:**  Well, I tell you, first ask her

12   what it is and let her identify it and then let's go from

13   there.

14   **BY THE DEFENDANT:**

15   Q.    The statement you have in your hands, do you

16   recognize it?

17   A.    I didn't hear the question.

18   Q.    Do you recognize the statement that you have in

19   your hand?

20   A.    Yes.

21   Q.    Could you describe what it is?

22   A.    It's my statement that I gave in Collierville.

23   Q.    Where at in Collierville, to who?

24   A.    At the police station.

25   Q.    Is that your signature on the statement?

UNREDACTED TRANSCRIPT

1    *A.*    Yes.

2    *Q.*    If you flip to page -- to the fourth page where the

3    last question asks, describe in detail the events prior

4    to, during and after this robbery, do you see that page?

5    *A.*    Yes.

6    *Q.*    Okay.  If you would stroll down to the statement

7    where it says, they said we were getting ready to go to

8    the Walgreens, and could you read the rest of that for

9    us?

10           **MR. PRITCHARD:**  Judge, that's not relevant.

11           **THE DEFENDANT:**  It's relevant to --

12           **THE COURT:**  Pardon?

13           **MR. PRITCHARD:**  That's not the proper way to

14   cross-examine her about a prior statement, so I object to

15   improper cross-examination.

16           **THE DEFENDANT:**  Would it be proper if I just

17   asked her if she said this then, Your Honor, to appease

18   the prosecutor?

19           **THE COURT:**  Let me give you a minute to speak

20   to Mr. Woods.  That's probably the best way to handle

21   this.

22           (The defendant and elbow counsel conferred.)

23   **BY THE DEFENDANT:**

24   *Q.*    For a quick second, I would like to remind you of

25   your testimony that you just gave where you stated to the

*CROSS - SARA COX*                                                        439

1   prosecutor that upon seeing someone running up to the

2   vehicle, I stated to them, run away, there is the police,

3   et cetera, et cetera; is that correct what you --

4   A.    Yes.

5   Q.    Okay.  But in your statement that you have in front

6   of you, you only stated that you seen a guy running

7   toward the van, but you guess he seen the police and kept

8   on running.  Do you find anywhere where you mentioned I

9   stated any type of statement you stated to the prosecutor

10  and to the Court?

11  A.    No.

12  Q.    Could you answer why you didn't mention that?

13  A.    I don't know.  I was still kind of shook up from

14  that night, and it was the prior morning.  And I was

15  scared.  I couldn't remember.

16         (The defendant and elbow counsel conferred.)

17  **BY THE DEFENDANT:**

18  Q.    Okay.  To be honest, you say it was fresh, crime

19  just occurred, you were kind of nervous and shook up;

20  then March of 2014 of this year and you pled guilty,

21  correct?

22  A.    I pled guilty when?

23  Q.    You pled guilty to these charges; is that correct?

24  A.    Yes, I pled guilty.

25  Q.    You don't think that it would seem that from a deal

UNREDACTED TRANSCRIPT

*CROSS - SARA COX*                                                    440

1    you were kind of influenced to change your statement from

2    what it originally was, and this was from 2012 all the

3    way to 2014?

4    *A.*    No.

5            (The defendant and elbow counsel conferred)

6    **BY THE DEFENDANT:**

7    *Q.*    If you refer back to, Ms. Cox, the third page of

8    your statement, this is pretty much the page where you

9    pretty much detail who you were with, if they had

10   weapons, et cetera, et cetera.  Do you find anywhere

11   within this statement, not just on this page, but the

12   entire statement you have in your hand where you

13   mentioned that I gave Javon Frazier a gun?

14   *A.*    No, I don't see it.

15   *Q.*    Let me ask you this then, because I kind of

16   understand the fact you say you were shook up, but if you

17   made this statement, informed the police a crime

18   occurred, who was with you, who participated, you don't

19   think it would be important to tell them that this guy,

20   that's where he got his gun from, he got it from this guy

21   here and he was involved, too?  You don't think that

22   would be important to inform the police about?

23   *A.*    Yes.

24   *Q.*    But you didn't?

25   *A.*    Not at the time, no.

UNREDACTED TRANSCRIPT

CROSS - SARA COX                                              441

1    Q.    Would it be fair to assume that you are receiving
2    the benefit of a plea bargain to change your statement;
3    would that be fair to assume in your opinion?
4    A.    No.
5    Q.    Why not?  If you were on the other end of the
6    spectrum, why not?
7    A.    I mean I'm not really understanding where you
8    are -- what you are saying.
9    Q.    This is basically an example:  If I were to give
10   you an offer for something you did wrong and I told you I
11   would give you ten years, but however, if you make this
12   statement against so and so or so and so to help my case,
13   I would give you six or five, wouldn't you be willing to
14   do that?  If you had -- you say you have a child, if I'm
15   not mistaken, you have a child?
16   A.    Yes, I do.
17   Q.    So would you be willing to try to get back to your
18   child just to help them get the benefit for yourself, get
19   that benefit?
20   A.    Are you trying to say that my statement was false?
21   I mean I'm not understanding.
22   Q.    I'm asking you, according to the statement you have
23   in front you in your paper --
24   A.    Yes.
25   Q.    -- you are saying things that you didn't mention in

*CROSS - SARA COX*                                                          442

1    this statement.

2    A.    Yes.

3    Q.    So I'm asking you, if you were on the other end of

4    the spectrum, would it be correct for you to assume that

5    if it was me and I took the deal changing my statement,

6    that it would be because I was receiving a benefit?

7    A.    No.

8          **MR. PRITCHARD:**  Apparently he's asking her to

9    assume what he's thinking.

10         **THE COURT:**  We've been over this two or three

11   times.  She's responded to your question, Mr. Jackson, so

12   let's move on.

13         (The defendant and elbow counsel conferred.)

14         **THE DEFENDANT:**  One last question, Your Honor.

15   **BY THE DEFENDANT:**

16   Q.    What would make your testimony more credible and

17   truthful than anybody else due to you being a participant

18   in a crime?

19         **MR. PRITCHARD:**  Judge, I object to that

20   question.

21         **THE COURT:**  I don't know how she can answer

22   that, Mr. Jackson.  That's not a proper question.

23         **THE DEFENDANT:**  It's not?

24         **THE COURT:**  No, sir.

25         (The defendant and elbow counsel conferred.)

UNREDACTED TRANSCRIPT

CROSS - SARA COX                                                    443

1                    **THE DEFENDANT:**  Your Honor, could I clarify

2     the purpose of my last question?

3                    **THE COURT:**  You can restate it if you would

4     like to.

5                    (The defendant and elbow counsel conferred.)

6     **BY THE DEFENDANT:**

7     Q.    Your Honor, the final question I have for Ms. Cox

8     is why after two years from 2012 did you wait all the way

9     until now to change your testimony from what it

10    originally was even after you had time within two years?

11    A.    I didn't wait.  After immediately the, I guess, the

12    federal agents, they came and they talked to me, I said

13    my statement in 2012.  This what I'm saying today, it

14    isn't from 2014, it's what I've been saying.

15    Q.    You are aware that this statement says 2012,

16    correct?

17    A.    Yes, I was at the Collierville Police Department.

18    Q.    What period of time did you change your statement

19    then, you said 2014?

20    A.    No, it was -- I talked to the federal agents in

21    2012.

22    Q.    Do you have any documents --

23                   **THE DEFENDANT:**  Would it be proper to ask if

24    she has any documentation verifying that, Your Honor?

25                   **THE COURT:**  Is there any other Jencks

UNREDACTED TRANSCRIPT

*CROSS - SARA COX*                                                    444

1    material?

2              **MR. PRITCHARD:**  No, Your Honor.  We provided

3    all Jencks material.

4              **THE COURT:**  There is no other documentation

5    according to what I'm being told.

6              (The defendant and elbow counsel conferred.)

7    **BY THE DEFENDANT:**

8    *Q.*    Okay.  According to you say the federal agent you

9    spoke with, did you sign any type of paperwork correcting

10   your statement or amending it?

11   *A.*    No, I'm not sure.

12   *Q.*    So you don't recall -- do you recall specifically

13   who you spoke with?  You just know they were a federal

14   agent?

15   *A.*    I can't think of his name.

16   *Q.*    But you don't remember signing any documentation or

17   new statements changing your statement from this

18   statement in 2012 until today, this testimony in court

19   right now in front of this jury in public?

20   *A.*    Repeat the question.

21   *Q.*    You don't recall signing any other statement in

22   front of a federal agent, according to what you

23   testified, what you are testifying here today in front of

24   the jury in this public -- in this court?

25   *A.*    No, I don't remember signing anything.

UNREDACTED TRANSCRIPT

REDIRECT - SARA COX                                            445

1          **THE DEFENDANT:**  I have no further questions,

2    Your Honor.

3          **THE COURT:**  All right.  Any redirect?

4          **MR. PRITCHARD:**  Yes, Your Honor.

5                    REDIRECT EXAMINATION

6    BY MR. PRITCHARD:

7    Q.    Ms. Cox, Mr. Jackson asked you a question about why

8    you would agree to get involved in a robbery with someone

9    you just met?

10   A.    Yes.

11   Q.    And you said that Chris Broden had told you some

12   things about Ronnie Jackson before that day?

13   A.    Yes.

14   Q.    What did he tell you about?

15   A.    He told me that him and Ronnie were robbing Family

16   Dollar Stores and Dollar General Stores.

17   Q.    Now Mr. Jackson was also asking you about a

18   statement that you gave that you have a copy right there

19   in front of you; is that correct?

20   A.    Yes.

21   Q.    This statement, the date on it is May 22nd of 2012;

22   is that correct?

23   A.    Yes.

24   Q.    So how long was this after you were arrested that

25   evening on May the 21st with Mr. Jackson in the van out

REDIRECT - SARA COX                                              446

1    there at the Walgreens?

2    A.    When I made the statement?

3    Q.    Yes, ma'am.

4    A.    It was the following day, the following morning.

5    Q.    And what was your mindset at that point in time,

6    what was going on in your head?

7    A.    Oh, my God, I was scared.  I was terrified.

8    Q.    Had you slept that night at all?

9    A.    No.

10   Q.    And you had a chance to look through the statement

11   based on some of the questions Mr. Jackson was asking

12   you; is that correct?

13   A.    Yes.

14   Q.    And you talked about -- well, let me ask you this;

15   were you introduced to Mr. Jackson by a nickname back in

16   May of 2012?

17   A.    Yes, he went by two nicknames.  One was Spook and

18   the other one was Bobby Fisher.

19   Q.    In your statement to the police on May 22nd of

20   2012, did you make reference to him by the nickname

21   Spook?

22   A.    Yes.

23   Q.    And did you talk to the police about him picking

24   you and Chris up at Chris's house?

25   A.    Did I talk to the police about that?

REDIRECT - SARA COX                                                    447

1    Q.    Is that in your statement there?

2    A.    Yes.

3    Q.    And that you then went over to the Z Market to pick

4    up the other guy?

5    A.    Yes.

6    Q.    That people talked about robbing the Walgreens that

7    night?

8    A.    Yes.

9    Q.    You gave a description of what the clothing was

10   that Chris and the other guy were wearing that night?

11   A.    Yes.

12   Q.    Being dark clothing?

13   A.    Yes, sir.

14   Q.    You talked about going into the Walgreens with

15   Mr. Jackson to purchase the items that we discussed here

16   today?

17   A.    Yes, sir.

18   Q.    I asked you before, but have you been sentenced yet

19   in this case?

20   A.    No, sir.

21   Q.    So you don't know what term of imprisonment you are

22   going to get?

23   A.    No, sir; no, sir.

24   Q.    All you've done is plead guilty; is that right?

25   A.    Yes.

*RECROSS - SARA COX*                                                    448

1    *Q.*    Have I or anyone else with the government asked you

2    to tailor your testimony or direct your testimony in any

3    way other than to tell the truth here today?

4    *A.*    No, sir.

5    *Q.*    Have we promised you anything in exchange for your

6    testimony?

7    *A.*    No, sir.

8    *Q.*    Is what you told the ladies and gentlemen of the

9    jury of gentlemen here today the truth about what

10   happened an May 21st, 2012?

11   *A.*    Yes, sir.

12              **MR. PRITCHARD:**  Thank you.  No further

13   questions.

14              **THE COURT:**  All right.  Any recross?

15              **THE DEFENDANT:**  Yes, sir, Your Honor.

16              **THE COURT:**  Very briefly.

17                      RECROSS-EXAMINATION

18   **BY THE DEFENDANT:**

19   *Q.*    You just answered Mr. Prosecutor here that you

20   weren't promised any favors for your testimony; is that

21   correct?

22   *A.*    Correct.

23              **THE DEFENDANT:**  Well, Your Honor, I would like

24   her to review this for the record so we can see this is,

25   this is a plea agreement of the United States versus Sara

*RECROSS - SARA COX*                                                      449

1    Cox, can I read it out?

2              **THE COURT:**  Not yet.  Is this something that

3    was provided or what?

4              **MR. PRITCHARD:**  We provided that.  There was a

5    Giglio request a while back, and we turned it over as a

6    result.

7              **THE COURT:**  You need to let Mr. Woods give it

8    to Ms. Cox, let her look at it and identify it, and then

9    you can ask her questions about it if she is familiar

10   with the document.

11   **BY THE DEFENDANT:**

12   *Q.*    Could you tell me what you have in your hand for

13   the Court and jury?

14   *A.*    It's my plea agreement.

15   *Q.*    Could you basically read what it says?

16             **THE WITNESS:**  You want me to --

17             **THE COURT:**  The entire agreement?

18             **THE DEFENDANT:**  Well, actually I just need

19   Number 2 read, Your Honor, regarding what was just stated

20   by the prosecutor, Your Honor.

21             **THE COURT:**  Paragraph Number 2?

22             **THE DEFENDANT:**  Yes, sir.

23             **THE COURT:**  All right.

24             **THE WITNESS:**  "The United States will dismiss

25   Count 2 of the superseding indictment against the

                        UNREDACTED TRANSCRIPT

1    defendant at the time of sentencing."

2    **BY THE DEFENDANT:**

3    *Q.*    Are you the defendant?

4    *A.*    Yes, I am.

5    *Q.*    So that's a benefit, correct?

6    *A.*    A benefit?

7    *Q.*    Yes, you just told the government you didn't

8    receive any benefit for your testimony, right?

9    *A.*    Yes.

10    *Q.*    So is that a benefit that they promised you for

11    your testimony?

12    *A.*    No.

13    *Q.*    It's not a benefit?  You know what a benefit is,

14    don't you?

15    *A.*    Yes.

16    *Q.*    Can you read it over?

17    *A.*    It wasn't -- this wasn't made to me as a -- I'm

18    trying to see the word I'm looking for.

19    *Q.*    Could you read the rest of the entire paragraph?

20         **MR. PRITCHARD:**  Judge, if she could finish

21    answering the question?

22         **THE COURT:**  Hold on let her answer the

23    question.

24         **THE WITNESS:**  This wasn't promised to me as

25    for an exchange of my testimony or anything like that.

UNREDACTED TRANSCRIPT

1    **BY THE DEFENDANT:**

2    *Q.*    Could you read the rest of the paragraph so the

3    Court will be aware of what's on that paper?

4    *A.*    "If the defendant provides complete and truthful

5    information to law enforcement authorities and testifies

6    completely truthful at any proceeding at which she may be

7    called as a witness, the United States will make a motion

8    to reduce the defendant's sentence pursuant to 5K1."

9    *Q.*    Could you tell the Court what is 5K1?

10   *A.*    A 5K1 is when you --

11   *Q.*    Basically give testimony --

12           **THE COURT:**  Wait.

13           **THE DEFENDANT:**  Sorry.

14           **THE WITNESS:**  Not testimony, basically telling

15   about the events that occurred that you know.

16   **BY THE DEFENDANT:**

17   *Q.*    Do you know the exact definition?

18   *A.*    The exact definition, what is the exact definition?

19   *Q.*    I'm asking instead of having you paraphrase it, I

20   would like to see if you know the exact definition of a

21   5K1?

22   *A.*    No.

23   *Q.*    But it does say on there that in exchange for your

24   truthful information to law enforcement they will reduce

25   your sentence, et cetera, et cetera, correct?

UNREDACTED TRANSCRIPT

*RECROSS - SARA COX*                                                          452

1    *A.*     Yes.

2    *Q.*     And you say you've already pled guilty to that,

3    correct?

4    *A.*     Yes.

5    *Q.*     So that means you are about to receive a benefit;

6    is that correct?

7    *A.*     Yes.

8    *Q.*     But is it correct you just told the prosecutor you

9    didn't receive any benefits for your testimony; is that

10   correct?

11   *A.*     Yes.

12   *Q.*     So is that in essence a false statement you just

13   made to the prosecutor or to the Court, to the jury?

14   *A.*     No.

15           **THE DEFENDANT:**  I think she's confused.  No

16   further questions, Your Honor.

17           **THE COURT:**  All right.  Thank you, Ms. Cox.

18   You can step down.

19           (Witness excused).

20           **THE COURT:**  Ladies and gentlemen, I think

21   we're going to adjourn for the day.  As I indicated to

22   you yesterday, 4 o'clock is as late as I could go today.

23   So I'm going to ask you to -- I'm going to ask you -- you

24   can take Ms. Cox and go ahead, if you would.

25           Now is it still convenient for everyone if we

UNREDACTED TRANSCRIPT

453

```
1    convene at 9:00 in the morning?  Does that make it
2    difficult on anyone?  Is that okay?  Well, if you will be
3    back in the jury room about 8:45.  Again, let me go over
4    the rules with you one more time.  Don't discuss the
5    case.  I'm sometimes tempted by raising of the hands to
6    say how many of you were confronted and someone tried to
7    pressure you into talking.  Well, now you've heard
8    testimony so they're really going to put pressure on,
9    okay.  Stand strong.  Just tell them you cannot discuss
10   the case, it would just not be appropriate.  Wait until
11   you hear all the evidence and you have reached your
12   verdict, then you can talk to anyone and everyone you
13   want to if you choose to.  But don't discuss the case
14   with anyone between yourselves, any family members or
15   anyone else until after you have reached a verdict in the
16   case.
17           Don't do any research or investigation, and we
18   will see you back in the morning.  We hopefully will be
19   ready to begin at 9 o'clock.  If you would be in the jury
20   room about 8:45.  All right.  Have a safe trip.
21           (The following occurred outside the presence
22           of the jury:)
23           **THE COURT:**  All right.  Be seated for just one
24   minute.  Mr. Summers, Mr. Pritchard, how are we coming as
25   far as witnesses, and when do you -- how many more
```

454

1    witnesses do you anticipate calling?

2            **MR. PRITCHARD:**  Judge, we have about 11 more

3    witnesses.  The next one after -- we have one more

4    cooperator, Mr. Broden, that would be pretty lengthy.  I

5    would say the most of the rest of them would be fairly

6    brief.  They are employees from different stores.  And we

7    have the nexus witnesses for each of the different

8    stores.

9            **THE COURT:**  I know you have no way of knowing

10   exactly, but would you anticipate that it's likely you

11   would complete your proof by tomorrow, by the end of

12   tomorrow?

13           **MR. PRITCHARD:**  We didn't make it as far as

14   today as I hoped.  I'm beginning to think it might be

15   Thursday morning, Your Honor, just to be realistic.

16           **THE COURT:**  All right.  What I'm going to do,

17   I guess I'll wait until probably we take our lunch break

18   tomorrow, and then I'll provide both sides with a copy of

19   the proposed jury instructions and verdict form for you

20   to start reviewing.  And we will have our charge

21   conference, depending on where we are tomorrow afternoon,

22   either late tomorrow afternoon or possibly first thing

23   Thursday morning.  Okay?

24           **MR. PRITCHARD:**  Yes, Your Honor.

25           **THE COURT:**  All right.  Anything else from the

UNREDACTED TRANSCRIPT

1    government before we adjourn for the day?

2              **MR. PRITCHARD:**  No, thank you.

3              **THE COURT:**  Mr. Jackson, anything from you?

4              **THE DEFENDANT:**  Yes, sir, quick question.

5    Will I be able to submit my instructions to you tomorrow

6    morning or would that be --

7              **THE COURT:**  Yes, sir, you can.  I think I told

8    you I would give you until noon tomorrow.  So if you have

9    some instructions you want the Court to consider, you can

10   submit those in the morning first thing, or like I say,

11   I'll give you until we break at noon tomorrow if you want

12   to submit something.

13             **THE DEFENDANT:**  Thank you, Your Honor.

14             **THE COURT:**  Anything else?

15             **THE DEFENDANT:**  No, sir.

16             **THE COURT:**  Let's adjourn, Mr. Haley.

17             **THE CLERK:**  All rise.  This Honorable United

18   States District Court now stands adjourned.

19             (Adjournment).

20

21

22

23

24

25

UNREDACTED TRANSCRIPT